UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAMPTON DELLINGER, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel,<br><br>Plaintiff,<br><br>-against-<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury, SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office, KAREN GORMAN, in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel, KARL KAMMANN, in his official capacity as the Chief Operating Officer of the Office of Special Counsel, DONALD J. TRUMP, in his official capacity as President of the United States of America, and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br><br>Defendants. | Civil Case No. _____<br><br><br><br>**EMERGENCY HEARING RESPECTFULLY REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Kate L. Doniger*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493
Benjamin Stern*
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Applications for pro hac vice pending*    *Attorneys for Plaintiff Hampton Dellinger*

# INTRODUCTION

This past Friday, after sunset, President Donald J. Trump purported to terminate Special Counsel Hampton Dellinger from his Senate-confirmed role at the United States Office of Special Counsel (OSC). Special Counsel Dellinger hereby seeks emergency, interim relief from that illegal termination, which violated a statute conferring for-cause removal protections designed to ensure the independence of the OSC—a unique office that exists to protect whistleblowers from reprisal.

As shown below, Special Counsel Dellinger is likely to succeed on the merits of his claims that President Trump violated the law in terminating him and that the other Defendants may not lawfully treat this purported termination as valid. Special Counsel Dellinger is also suffering clear irreparable injury, including the deprivation of his statutory right to function in office. Moreover, the equities and the public interest both favor interim relief to preserve the status quo while these issues are more fully adjudicated. Two major considerations underwrite that conclusion. *First*, in light of the historic upheaval currently occurring within federal employment, it is urgent that the OSC remain operational and free of legal doubt in carrying out its statutory mission. *Second*, without interim relief that clarifies Special Counsel Dellinger's lawful role, individuals lacking proper legal authorization may improperly be given access to sensitive, confidential information about whistleblower matters—thus jeopardizing the trust essential to the OSC's core function.

Accordingly, and as set forth below, Special Counsel Dellinger seeks a TRO (1) declaring on an interim basis that President Trump's removal of Special Counsel Dellinger from office, and any recognition of an Acting Special Counsel in his place, is unlawful, and that Mr. Dellinger is the Special Counsel; and (2) enjoining the remaining Defendants from removing Special Counsel Dellinger from his office or in any way treating him as having been removed, denying or obstructing him in accessing any of the benefits or resources of his office, placing an Acting

Special Counsel in his position, or otherwise recognizing any other person as Special Counsel or as the agency head of the Office of Special Counsel, pending proper further order of the Court.

## BACKGROUND

I.   **The United States Office of Special Counsel**

   A.   **The Founding and Mission of the OSC**

The Office of Special Counsel is an independent agency of the United States and was originally founded as part of the Civil Service Reform Act of 1978 (CSRA). *See* 5 U.S.C. § 1211(a). The CSRA was enacted to address widespread public concerns about the federal civil service—including evidence that it was vulnerable to political manipulation and failed to protect whistleblowers. *See The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1631-32 (1984). The CSRA began with a proposal to Congress by President Carter, who recommended creating the Merit Systems Protection Board (MSPB), a nonpartisan board of three members appointed to seven-year terms who would be removable only for cause and who would adjudicate alleged violations of federal civil service laws. *See* Federal Civil Service Reform Message to the Congress (Mar. 2, 1978).[1] President Carter further proposed the creation of a Special Counsel within the MSPB—an official who would be "appointed by the President and confirmed by the Senate" to investigate and prosecute abuses of the civil service laws. *Id.* This structure, President Carter explained, would "guarantee independent and impartial protection to employees" and thereby "safeguard the rights of Federal employees who 'blow the whistle' on violations of laws or regulations by other employees, including their supervisors." *Id.*

Congress introduced President Carter's CSRA proposal the next day, including the MSPB and the Special Counsel roles with statutory protections to secure their independence. *See* S. 2640,

---

[1] President Carter's letter is available at https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress.

2

95th Cong. (Mar. 3, 1978); H.R. Rep. 95-1403, at 388 (1978) (supp. views of Rep. Stephen Solarz). In its draft bill, Congress vested the Special Counsel with additional "quasi-judicial authority," concluding that this was "necessary to adequately protect employees." H.R. Rep. No. 95-1043 at 7. Throughout the ensuing legislative deliberations, Congress and President Carter repeatedly emphasized that the Special Counsel required a measure of independence and "clout" to adequately safeguard federal employees and whistleblowers. *E.g.*, 124 Cong. Rec. 25727 (Aug. 11, 1978) (statement of Rep. Patricia Schroeder). In the CSRA's express legislative findings, Congress further explained that the "authority and power of the Special Counsel" was required to "investigate allegations involving prohibited personnel practices and reprisals against Federal employees." Civil Service Reform Act of 1978, § 3(4), Pub. L. No. 95–454, 92 Stat. 1112.

Consistent with that vision, Congress took pains to provide that the Special Counsel could be removed "by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act of 1978, § 1204, Pub. L. No. 95-454, 92 Stat. 1122; *see* H.R. Rep. No. 95-1403, at 18. This drew an initial objection from the U.S. Department of Justice Office of Legal Counsel (OLC), which President Carter effectively overruled in an exercise of his Article II prerogatives when he subsequently signed the legislation into law and declared that it would create "a new system of excellence and accountability." *Compare Memorandum Opinion for the General Counsel, Civil Service Commission*, 2 Op. O.L.C. 120 (1978), *with President Jimmy Carter Remarks on Signing the Civil Service Reform Act of 1978 into Law* (Oct. 13, 1978).[2]

---

[2] President Carter's message is available at https://www.presidency.ucsb.edu/documents/civil-service-reform-act-1978-statement-signing-s-2640-into-law. The OLC opinion referenced here was requested not by President Carter but instead by the General Counsel of the Civil Service Commission, which would be replaced by the proposed CSRA.

3

In 1988, Congress again grew concerned that federal employees who blew the whistle on fraud and legal violations were not adequately protected from retaliation. It therefore crafted the Whistleblower Protection Act to "strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government." Whistleblower Protection Act of 1989, § 2(b), Pub. L. No. 101–12, 103 Stat. 16 (Apr. 10, 1989).

As originally drafted, the Whistleblower Protection Act of 1988 separated the OSC from the MSPB, establishing the OSC as an independent agency. The original draft also vested the OSC with significant new powers. President Reagan, however, pocket vetoed this legislation in 1988. In a statement explaining his decision, President Reagan objected to several new authorities that the legislation would vest in the OSC—most notably including the authority to seek judicial review of adverse MSPB decisions in federal court, which would "permit[] the Executive branch to litigate against itself." Memorandum of Disapproval on a Bill Concerning Whistleblower Protection (Oct. 26, 1988).[3] President Reagan also suggested—in a single sentence—hesitancy about the bill's for-cause removal protections, which were identical to those already in effect. *Id.* ("Section 1211 creates an Office of Special Counsel and purports to insulate the Office from presidential supervision and to limit the power of the President to remove his subordinates from office.").

After President Reagan's pocket veto in 1988, Congress worked closely with Presidents Reagan and Bush to revise the bill to address separation of powers concerns and secure presidential approval. As a result of these careful negotiations, the revised bill—enacted as the Whistleblower Protection Act of 1989—no longer authorized the OSC to pursue litigation against other agencies in federal court. *See* Whistleblower Protection Act of 1989, Pub. L. No. 101–12, 103 Stat. 16; 135 Cong. Rec. 5036-5038 (1989) (statement of Rep. Patricia Schroeder) ("[W]e agreed to make the

---

[3] President Reagan's memorandum is available at https://www.reaganlibrary.gov/archives/speech/memorandum-disapproval-bill-concerning-whistleblower-protection.

4

changes requested by the administration to clip the special counsel's wings."); 135 Cong. Rec. 5012, 5039 (Mar. 21, 1989) (statement of Rep. Stanford Parris) ("[A]n agreement has been reached with the administration. As amended, S. 20 would resolve the administration's constitutional concerns by eliminating the right of the special counsel to sue in Federal court.").

Even as Congress amended the draft legislation to ensure consistency with separation of powers concerns, it maintained the OSC's status as an independent agency, as well as the original for-cause removal provision. *See* 5 U.S.C. § 1211. As the Joint Explanatory Statement of the Subcommittee on Civil Service emphasized in connection with the OSC's independence, federal employees required "assurance that the Office of Special Counsel is a safe haven," because otherwise it "can never be effective in protecting victims of prohibited personnel practices." 135 Cong. Rec. 5012, 5034 (Mar. 21, 1989); *see also* 135 Cong. Rec. 5012, 5032 (Mar. 21, 1989) (statement of Rep. Gerald Sikorski) (explaining that the revised bill "establishes the Office of Special Counsel as a separate, distinct, and independent entity" and thereby provides "confiden[ce]" to whistleblowers that the OSC "is on their side"); *see also* Jimmy Balser, CRS, R48318, *The Whistleblower Protection Act (WPA): A Legal Overview* 15 (2024) (explaining "the WPA made OSC an independent agency apart from the MSPB" to accomplish the Act's purpose of "protect[ing] employees, especially whistleblowers, from prohibited personnel practices"). In a letter to the bill's sponsor, the Attorney General praised Congress's revisions and "pledged" the Administration's "cooperation" to pass the bill. *See* Letter from the Office of the Attorney General to Sen. Carl Levin dated Mar. 3, 1989, 135 Cong. Rec. 5012, 5033-34 (Mar. 21, 1989).

President Bush agreed with his Attorney General and Congress that this final round of revisions had "addressed" the "constitutional concerns" that he and President Reagan had raised about the Whistleblower Protection Act. *See* George H.W. Bush, Remarks on Signing the

5

Whistleblower Protection Act of 1989 (Apr. 10, 1989).[4] In signing the law, he celebrated that the Act would "enhance the authority of the Office of Special Counsel to protect whistle-blowers and other employees victimized by prohibited personnel practices." *Id.* As relevant here, President Bush also specifically approved the Act for retaining "current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance"—and raised this point about removal in the context of his observation that negotiations between the Executive Branch and Congress had resolved any outstanding constitutional disagreements. *Id.*

### B.   The OSC's Jurisdiction and Functions

As contemplated by Congress through the enactments described above—which reflected a deliberate inter-branch settlement of constitutional questions and shared policy goals resolved through landmark legislation signed by two Presidents—the OSC maintains independence so that it can protect federal employees and applicants from prohibited personnel practices, especially reprisal for whistleblowing. The OSC also affords a secure channel for federal employees to blow the whistle by disclosing wrongdoing. It civilly enforces the Hatch Act, which puts certain restrictions on partisan political activity by government employees. And it acts as an aide to Congress by providing reports meant to inform legislative and oversight agendas.

In performing these functions, the OSC does not regulate or penalize private activity. Instead, the OSC acts as an "ombudsman" and "watchdog" for federal employees, *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162-63 (D.C. Cir. 1982), and possesses "only limited jurisdiction to enforce certain rules governing Federal Government employers and employees," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 221 (2020). As the OLC has noted, Congress created the OSC with a "clear understanding . . . that it was legislating only in relation to employees of the

---

[4] President Bush's remarks are available at https://bush41library.tamu.edu/archives/public-papers/290.

government." *See Jurisdiction of the Office of Special Counsel, Merit Systems Protection Board*, 5 Op. O.L.C. 77, 79 (1981).

Even with respect to federal employees, the OSC does not impose any discipline or other adverse action directly—and it is not authorized to adjudicate proceedings. Rather, it serves a "primarily investigatory function," for which its independence of perspective and legal obligations of confidentiality and neutrality are vital. *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *9 (O.L.C. July 8, 2021).

Specifically, the OSC can receive allegations of prohibited personnel practices (PPP), assess and investigate such complaints, and decide on a proper course of action. *See* 5 U.S.C. § 1212(a). Where the OSC finds reasonable grounds to conclude that a federal employee engaged in misconduct by committing a PPP, its first option generally is to work with the relevant agency head on a voluntary basis to ensure that corrective action is taken and the PPP victim receives relief. If a voluntary settlement cannot be reached, the OSC has the statutory authority to petition MSPB on the injured employee's behalf, *id.* § 1214, which an employee is also free to do in their own right (subject to certain procedural requirements), *id.* § 1221. In addition, the OSC can file a complaint with the MSPB asking that a perpetrator of a PPP be disciplined. *See id.* § 1215. The Special Counsel also has authority to investigate and seek remedies for violations of the Hatch Act, and to issue nonbinding advisory opinions concerning the scope and proper interpretation of that Act. *See id.* §§ 1212(f), 1216. The OSC exercises no authority over the MSPB, which is itself an independent adjudicatory agency whose members enjoy for-cause removal protections, *id.* § 1202(d), and whose decisions are subject to judicial review by the U.S. Court of Appeals for the Federal Circuit, *id.* §§ 1214(c)(2), 1215(a)(4), 7703(b). The OSC cannot proceed directly in any Article III court except (in limited cases) as an amicus. *See id.* § 1212(h); 28 U.S.C. § 516.

Beyond its human resources-related investigative role, the Whistleblower Protection Act authorizes the OSC to receive reports from employee whistleblowers within agencies. *See* 5 U.S.C. § 1213(a). However, if a report appears credible, the OSC cannot conduct its own investigation. Instead, it may only review the investigation conducted by the whistleblower's agency, and then report the investigation and the OSC's own assessment to Congress and the President. *See id.* §§ 1212(a)(3), 1213(c)-(e). As the governing statutory framework makes clear, the Special Counsel must keep the identity of any whistleblower strictly confidential. *Id.* § 1213(h).[5]

Finally, the OSC has been delegated through legislation signed by the President functions that are best described as quasi-legislative. Virtually every action taken by the OSC—from receipt of allegations, to investigations, to agreed corrective actions, to complaints in the MSPB—must be meticulously reported to committees in Congress to inform legislative functions, including oversight and legislation. *See id.* § 1217; *see also id.* § 1218 (reporting to the President).

## II.  Procedural History

Plaintiff Hampton Dellinger has served as Special Counsel of the Office of Special Counsel since March 6, 2024, following his nomination by the President and confirmation by the Senate to a five-year term. On February 7, 2025, Special Counsel Dellinger received an email from Sergio Gor, Assistant to the President and Director of the White House Presidential Personnel Office, that purported to remove him from office. In full, that email stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately. Thank you for your service[.]" Ex. A.

---

[5] In a similarly advisory capacity, the OSC reviews regulations issued by the Office of Personnel Management for any rule that would require committing misconduct. *See* 5 U.S.C. § 1212(a)(4).

8

**LEGAL STANDARD**

To obtain a TRO, a movant must show that "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in [its] favor; and (4) the issuance of a preliminary injunction is in the public interest." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quotation marks and citation omitted); *accord Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 74 (D.D.C. 2009).

**ARGUMENT**

**I.    Special Counsel Dellinger Has a Substantial Likelihood of Success on the Merits.**

Special Counsel Dellinger is substantially likely to prevail on his claims, all of which rest on the premise that he has been unlawfully removed from office in violation of his statutory for-cause removal protection. *See* 5 U.S.C. § 1211(b). In purporting to terminate Special Counsel Dellinger on behalf of President Trump, Mr. Gor stated only that Mr. Dellinger was "terminated, effective immediately" and did not reference any finding of "inefficiency, neglect of duty, or malfeasance in office." *Id.* Accordingly, this termination notice facially violated 5 U.S.C. § 1211(b). Special Counsel Dellinger will therefore prevail unless his statutory for-cause removal protection is unconstitutional—and he is substantially likely to show that this protection is fully consistent with the constitutional separation of powers and applicable Supreme Court precedents. Indeed, the application of a for-cause removal provision to the OSC advances important statutory purposes, reflects a considered inter-branch agreement, and poses no harm to Article II authorities.

The Supreme Court's original pronouncement on this issue is *Humphrey's Executor v. United States*, which upheld the constitutionality of a materially identical restriction on the President's authority to remove members of the Federal Trade Commission (FTC). 295 U.S. 602, 625-26, 629 (1935). There, the Supreme Court explained that Congress had created the FTC as an independent agency—and that the FTC held not only executive authorities, but also "specified

9

duties as a legislative or as a judicial aid" that distinguished it from being "an arm or an eye of the executive." *Id.* at 628. For example, the FTC was required to "mak[e] investigations and reports thereon for the information of Congress . . . in aid of the legislative power," in which function it "acts as a legislative agency." *Id.* Because of the FTC's quasi-legislative and quasi-judicial roles, the Supreme Court concluded that Congress could appropriately impose for-cause limits against presidential removal. More broadly, the Supreme Court recognized in *Humphrey's Executor* that Congress could shield agency heads from removal without cause where Congress deemed such protections necessary to secure a measure of impartiality, expertise, and independence. That ruling was no small matter: it forms the basis for a substantial part of the modern federal government and has been repeatedly reaffirmed. *E.g.*, *Wiener v. United States*, 357 U.S. 349, 355-56 (1958); *Mistretta v. United States*, 488 U.S. 361, 410-11 & n.32 (1989); *Am. Fed'n of Gov't Emps., AFL-CIO v. Gates*, 486 F.3d 1316, 1328-29 (D.C. Cir. 2007) (Kavanaugh, J.).

In recent years, the Supreme Court has identified several contexts in which for-cause removal limits unduly infringe on Article II—either because an independent agency's leadership is too insulated from presidential control or because a single-director agency's power and functions require more robust presidential supervision. The reasoning of those authorities only confirms that the limited for-cause removal protection afforded to the Special Counsel is constitutional.

The Supreme Court began this line of cases by addressing a scheme that created too many layers of insulation between agency officials and the President. Specifically, in *Free Enterprise Fund v. PCAOB*, the Supreme Court considered removal protections for members of the Public Company Accounting Oversight Board (PCAOB), an independent multi-member agency within the Securities and Exchange Commission (SEC). 561 U.S. 477, 485 (2010). The PCAOB was vested with broad power to regulate the accounting industry and impose severe financial penalties to enforce its rules. *See id.* Members of the PCAOB could be removed by the SEC only for willful

violations of the law or abuses of authority. *See id.* at 486-87. Commissioners of the SEC, in turn, could be removed by the President only for cause. *See id.* at 503. Confronted with this novel scheme—in which the layering of "dual for-cause limitations" precluded the President from directly removing PCAOB members—the Supreme Court struck it down. *Id.* at 492, 495-96. In so holding, however, the Court maintained precedents affirming the constitutionality of single-layer removal provisions directly beneath the President, as is true of the OSC. *See id.* at 495, 508.

Since *PCAOB*, the Supreme Court has published two opinions invalidating removal limits for single-headed agencies that wield substantial regulatory and enforcement authority over private actors. First came *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020). There, the Supreme Court noted that for-cause removal limits for single-person agency leadership structures are a relatively recent phenomenon. *See id.* at 220-22. It then concluded that applying such statutory protections to the Director of the CFPB raised exceptionally grave concerns in light of the Director's broad power to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Id.* at 225. As the Supreme Court noted, the Director's authority to "dictate and enforce policy for a vital segment of the economy affecting millions of Americans" infringed on Article II. *Id.* And this violation was magnified by the CFPB's unique funding structure, which ensured automatic funding through the Federal Reserve and defeated a crucial source of potential accountability to the President. *See id.* at 226. Accordingly, the Supreme Court held that the President must be able to remove the CFPB Director at will. *See id.* at 227-238. In reaching this conclusion, though, the Supreme Court expressly distinguished the OSC, which "exercises only limited jurisdiction to enforce certain rules governing Federal Government employers and employees" and "does not bind private parties at all or wield regulatory authority comparable to the CFPB." *Id.* at 221.

11

Whereas *Seila Law* distinguished removal protections at the OSC, it expressly cast into doubt such protections at the Federal Housing Finance Agency (FHFA)—which were stricken down one year later in *Collins v. Yellen*, 594 U.S. 220 (2021). *See Seila Law*, 591 U.S. at 222. In reaching this conclusion, *Collins* reasoned that asserted differences between the CFPB and FHFA regarding the "nature and breadth" of their authority were not dispositive of the constitutional analysis—adding that the FHFA was in some respects *more* powerful than the CFPB and that it had direct "regulatory and enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector." 594 U.S. at 251, 253.

Together, *Humphrey's Executor*, *Seila Law*, and *Collins* all support the constitutionality of the OSC's for-cause removal provision. Four considerations anchor that conclusion.

*First*, *Seila Law* and *Collins* were fundamentally animated by a profound concern about the President's inability to remove officials exercising executive power in ways that could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 225; *accord Collins*, 594 U.S. at 255 (highlighting that "FHFA's control over Fannie Mae and Freddie Mac can deeply impact the lives of millions of Americans by affecting their ability to buy and keep their homes"). As the Supreme Court recognized when it distinguished the OSC in *Seila Law*, that concern is not present here. The OSC is a primarily investigative agency with limited advisory and reporting functions—all focused exclusively on federal personnel issues. In performing these functions, the OSC does not regulate or penalize private activity. *See Seila Law*, 591 U.S. at 221 (noting that the OSC "does not bind private parties at all"). The OSC lacks the power to issue final regulations, oversee adjudications, commence prosecutions, determine what penalties to impose, appear in an Article III tribunal (except as an amicus), or control (whether directly or indirectly) the substantive regulatory framework for any public or private entities. While the OSC's work is truly essential, it occurs within a "limited jurisdiction" related

12

to federal employers and employees. *Id.* at 221. It poses no "special threat to individual liberty" for the Special Counsel to receive limited independence from direct political control in reviewing and investigating confidential whistleblower reports from federal employees. *See id.* at 223.[6]

*Second*, consistent with the reasoning of *Humphrey's Executor*, the OSC exists to vindicate quasi-legislative functions and interests held in common by Congress, the Executive Branch, and the public. Congress carefully designed the OSC to play an important reporting role with respect to legislative oversight and deliberations. *See* 5 U.S.C. § 1217. The OSC's work also furthers the distinct, quasi-legislative interest in promoting Executive Branch compliance with congressionally imposed ethical and personnel requirements. In that respect, the OSC is more than just an aspect of the executive power. *See Humphrey's Executor*, 295 U.S. at 628. On this point, it is especially notable that the OSC's structure—specifically including its for-cause removal provision—reflects a heavily negotiated inter-branch resolution that was embraced by President Bush when he signed the Whistleblower Protection Act (and by his Attorney General in cooperating to pass the bill). *See supra* at 5-6. In fact, not one, but two presidents—Carter and Bush—signed legislation with for-cause removal protections at the OSC, making clear that any interstitial concerns raised by their subordinates at OLC had either been addressed or overruled by the Office of the President.

*Third*, the need for independence at the OSC is unique in its character and purposes. With respect to the CFPB and FHFA, the case for agency independence rested heavily on a substantive belief that economic regulation should be free of specific forms of presidential political control. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 229-30. Put differently, agency independence in those settings was specifically designed to restrain the President's ability to direct the agencies'

---

[6] *Accord Am. Fed'n of Gov't Emps. (AFL-CIO) v. United States*, 195 F. Supp. 2d 4, 25 (D.D.C. 2002), *aff'd*, 330 F.3d 513 (D.C. Cir. 2003) ("[T]here is, indeed, no case law that recognizes a fundamental right to federal employment, only a procedural due process guarantee.").

regulatory powers consistent with his agenda. Here, in contrast, the OSC lacks any regulatory powers—and the independence afforded by its statutory for-cause removal provisions serves an entirely different function. Rather than hamper the President's substantive regulatory agenda, the OSC's independence functions to protect and assure whistleblowers. If the official charged with protecting whistleblowers from retaliation was *himself* utterly vulnerable to retaliation and removal for taking on politically charged or inconvenient cases, then the OSC's whistleblower protection purpose might fail when it is most needed. Simply put, Congress reasonably concluded—and two Presidents agreed—that the Special Counsel cannot serve as an independent watchdog, or properly protect whistleblowers, if he is subject at all times to removal without cause by the President.

*Finally*, the presence of the for-cause removal limitation does not completely exempt the OSC from accountability. The OSC remains accountable through its substantial reporting obligations—and through the traditional appropriations process, which requires that Congress and the President approve the agency's funding, unlike the CFPB's and the FHFA's deliberately insulated funding schemes. *See Seila Law*, 591 U.S. at 225-26; *Collins*, 594 U.S. at 231.

Considering all this and applying the presumption of constitutionality afforded to Acts of Congress, *see Califano v. Aznavorian*, 439 U.S. 170, 175 (1978), the OSC's removal protection is plainly constitutional. Because President Trump purported to terminate Special Counsel Dellinger in flagrant disregard of that protection—and thus offended a squarely applicable statutory limit—Special Counsel Dellinger is likely to succeed on the merits of his claims in this action.

## II.     Special Counsel Dellinger Will Suffer Irreparable Harm Absent Relief.

Interim relief is further justified because Special Counsel Dellinger is suffering irreparable injury from Defendants' conduct, which is depriving him in real time of his statutory entitlement

14

to serve as the lawful agency head of the OSC.[7] This Court has recognized that even if the deprivation of a senior government official's "statutory right to function" is temporary, the injury to them and their agency is both significant and irreparable. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (granting preliminary injunction against removal of plaintiffs as members of the U.S. Commission on Civil Rights), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam). Certainly, a damages remedy after a final judgment and all appeals have been exhausted is ordinarily inadequate. *See Mackie v. Bush*, 809 F. Supp. 144, 147 (D.D.C. 1993) (granting TRO against removal of plaintiff members of Postal Service Board of Governors), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993) (per curiam).

For three additional reasons, Special Counsel Dellinger's showing of irreparable injury is especially acute. *First*, if another person is nominated and confirmed to the role of Special Counsel, then his claim to that role will be mooted, and his judicial remedy extinguished entirely despite the illegality of his termination throughout this period. *See, e.g.*, *Berry v. Reagan*, 732 F.2d 949 (D.C. Cir. 1983); *Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993). *Second*, the denial of immediate emergency relief—and ensuing confusion or uncertainty about the status of the OSC—may deprive Special Counsel Dellinger and the OSC of the "ability to fulfill [their] mandate" to federal employees, *Berry*, 1983 WL 538, at *5, including those who have filed reports with the OSC regarding personnel actions, those whose challenges to personnel actions are pending now before the MPSB, and whistleblowers who have reported misconduct or alleged forms of retaliation. *Finally*, the unlawful removal of Special Counsel Dellinger may result in individuals who lack lawful authorization coming into possession of highly sensitive and confidential information at the

---

[7] In assessing whether the plaintiff has suffered an irreparable harm, this Court must assume that Special Counsel Dellinger has demonstrated a likelihood that Defendants' conduct violates the law. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

15

OSC—including the names of whistleblowers that the Special Counsel is statutorily obligated to keep confidential. *See* 5 U.S.C. § 1213(h). Any such compromise of confidential information would risk substantial and irreparable injury, including to the Special Counsel, whose ability to reassure whistleblowers that their identities will be protected is essential to carrying out his duties on behalf of Congress, the President, and the American people. *See Hum. Touch DC, Inc. v. Merriweather*, No. 15 Civ. 741, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (risk of disclosure of third parties' confidential information in violation of statute was irreparable injury).

Accordingly, this case is nothing like a garden-variety employment dispute in which an employee seeks backpay or similar remedies for wrongful termination. Special Counsel Dellinger is not suing for monetary harm but instead the fundamental loss of his unique public office. And even if the purely private employment context were a relevant comparator, then Special Counsel Dellinger's request would present exactly the kind of "extraordinary case[]" in which removal from office warrants extraordinary relief. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

**III.    The Balance of the Equities and Public Interest Favor Special Counsel Dellinger.**

Over the past several weeks, the Administration has announced the reassignment or termination of many thousands of employees and officials throughout the federal government. These personnel actions have generated widespread uncertainty among career civil servants and agency officials. *See* Erica Green et al., *Trump's Moves to Upend Federal Bureaucracy Touch Off Fear and Confusion*, N.Y. Times (Jan 25, 2025). In this context, the proper functioning of the OSC is more vital than ever—and the unlawful termination of the Senate-confirmed agency head creates a gap in protections provided by the OSC, risking severe confusion over the leadership, mission, and role of the agency (as well as doubt over the lawfulness of any actions that it takes and fear that confidential information may fall into unauthorized hands). Congress created the OSC to ensure that whistleblowers knew where to go and could trust that they would be safe from

16

retaliation. Ensuring that the OSC can carry out its statutory mission is plainly in the public interest. *See Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 123-24 (D.D.C. 2020) (recognizing the OSC's duty to "safeguard the civil-service merit system").

Here, Special Counsel Dellinger asks only that the Court preserve the status quo while the weighty issues he raises are more fully adjudicated. Such relief would vindicate important equities and public purposes, while inflicting marginal burdens on Defendants, who will soon enough have an opportunity to fully present their case and seek to defend their unprecedented conduct.

## CONCLUSION

For the foregoing reasons, Special Counsel Dellinger's motion for a TRO should be granted and the Court should so-order the proposed TRO submitted by Special Counsel Dellinger.

Respectfully submitted,

| | |
|---|---|
| Kate L. Doniger* <br> HECKER FINK LLP <br> 350 Fifth Avenue, 63rd Floor <br> New York, New York 10118 <br> (212) 763-0883 <br> kdoniger@heckerfink.com | /s/ Joshua A. Matz <br> Joshua A. Matz, Bar No. 1045064 <br> Jackson Erpenbach, Bar No. 1735493 <br> Benjamin Stern* <br> HECKER FINK LLP <br> 1050 K Street NW <br> Suite 1040 <br> Washington, DC 20001 <br> (212) 763-0883 <br> jmatz@heckerfink.com <br> jerpenbach@heckerfink.com <br> bstern@heckerfink.com <br><br> *Attorneys for Plaintiff Hampton Dellinger* <br><br> **Applications for pro hac vice pending* |

DATED: February 10, 2025