# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ ) | | |
| **HAMPTON DELLINGER** ) | | |
| *in his personal capacity and* ) | | |
| *in his official capacity as* ) | | |
| *Special Counsel of the* ) | | |
| *Office of Special Counsel*, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | Civil Action No. 25-0385 (ABJ) | |
| v. ) | | |
| ) | | |
| **SCOTT BESSENT** ) | | |
| *in his official capacity as* ) | | |
| *Secretary of the Treasury*, *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

## ORDER

Plaintiff Hampton Dellinger brought this action against defendants Scott Bessent, in his official capacity as Secretary of the Treasury; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Karen Gorman, in her official capacity as Principal Deputy Special Counsel; Karl Kammann, in his official capacity as the Chief Operating Officer of the Office of Special Counsel; Donald J. Trump, in his official capacity as President of the United States; and Russell Vought, in his official capacity as Director of the Office of Management and Budget. *See* Compl. [Dkt. # 1]. Pending before the Court is plaintiff's motion for a temporary restraining order preventing defendants from removing him from his position as Special Counsel, who heads the Office of the Special Counsel ("OSC"). Pl.'s Mot. for a Temporary Restraining Order [Dkt. # 2] ("Pl.'s TRO"); Compl. ¶ 1.

After receiving plaintiff's motion for a temporary restraining order on February 10, 2025, the Court set what it intended to be scheduling hearing for 4:30 p.m. the same day. *See* Notice of Hr'g (Feb. 10, 2025). At the hearing, counsel for defendants represented that they had not yet had an opportunity to file a response to the motion, and that defendants were "not prepared to" take a position as to whether they would be willing to freeze plaintiff's firing until the Court resolved the legal issues. Tr. of Proceedings [Dkt. # 9] ("Tr.") at 3.

After hearing some argument from both sides with respect to the applicable factors, the Court decided to issue a brief administrative stay so that it could consider the matter with the benefit of the defendants' position. *See* Minute Order (Feb. 10, 2025). The administrative stay ordered that plaintiff continue to serve as Special Counsel until midnight on February 13, 2025. *Id.*

In addition to filing an emergency appeal of the Court's administrative stay, Notice of Appeal [Dkt. # 7],[1] and a motion to stay the Court's administrative stay, Mot. to Stay Ct.'s Administrative Stay [Dkt. # 10], defendants have filed their opposition to the motion for temporary restraining order. Defs.' Opp. to Pl.'s TRO [Dkt. # 11] ("Defs.' Opp.).

---

1       Defendants' appeal of the administrative stay did not divest this Court of jurisdiction to consider the instant motion. Only "a non-frivolous appeal from the district court's order divests the district court of jurisdiction over those aspects of the case on appeal." *Bombadier Corp. v. Nat'l R.R. Passenger Corp.*, No. 02-7125, 2002 WL 31818924, at *1 (D.C. Cir. 2002), citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). A motion is "frivolous" when its disposition is obvious and the legal arguments are wholly without merit. *Reliance Ins. Co. v. Sweeney Corp.*, 792 F.2d 1137, 1138 (D.C. Cir. 1986). It is well-settled that even a temporary restraining order "is not generally appealable," *Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978), and that principle applies to the brief administrative stay entered to preserve the status quo. *See Griggs*, 459 U.S. at 58 ("[N]otice of appeal from unappealable order does not divest district court of jurisdiction."), citing *Ruby v. Sec'y of the U.S. Navy*, 365 F.2d 385, 389 (9th Cir. 1966).

For the reasons stated below, plaintiff's motion for a temporary restraining order will be **GRANTED.**

## BACKGROUND

### A. Statutory Background

The Office of Special Counsel is an independent agency originally created by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1206 *et seq.*, to "safeguard" federal civil service employees "who 'blow the whistle' on illegal or improper official conduct." *See Wren v. Merit Systems Protection Bd.*, 681 F.2d 867, 872–83 (D.C. Cir. 1982). The OSC was first established as a part of the Merit Systems Protection Board ("MSPB"), but in 1989, Congress separated the OSC as an independent agency in the Whistleblower Protection Act of 1989, Pub. L. No. 101–12, 103 Stat. 16 (Apr. 10, 1989).

The statute that spells out the powers and functions of the Office of the Special Counsel states that OSC "shall protect [federal] employees, former employees, and applicants for employment from prohibited personnel practices." 5 U.S.C. § 1212(a)(1). To fulfill this mandate, OSC is authorized to "receive and investigate allegations of prohibited personnel practices," and "where appropriate, bring petitions for stays and petitions for corrective action." *Id.* § 1212(a)(2).

The statute enables the agency to operate in three primary ways. First, under section 1213, the agency acts as a confidential channel for a federal employee to disclose "information" that the individual "reasonably believes evidences": (1) "a violation of any law, rule, or regulation"; (2) "gross mismanagement"; (3) "a gross waste of funds"; (4) "an abuse of authority"; or (5) a "substantial and specific danger to public health or safety." *Id.* § 1213(a)(1)(A), (B). The "identity of any individual who makes a disclosure . . . may not be disclosed by the Special Counsel, with certain narrow exceptions. *Id.* § 1213(h). If the Special Counsel determines that there is a

"substantial likelihood" that the information discloses a violation of law, or other enumerated wrongdoing, the Special Counsel asks the relevant agency to investigate and report on the matter. *Id.* § 1213(c).  The OSC then reviews the agency's report, gives the whistleblower an opportunity to comment, creates its own assessment of the report, and submits both the agency report and the OSC's findings to Congress and the President.  *Id.* § 1213(e).  In these types of disclosure cases, the OSC does not have independent authority to investigate.  *See generally id.* § 1213.

Second, the agency can "receive" and "investigate" allegations of prohibited personnel practices, including whistleblower and other types of discrimination or retaliation.  *Id.* § 1212(a)(2); *id.* § 2302(b)(1)–(14) (defining "prohibited personal practice").  In furtherance of this duty, the OSC may "issue subpoenas" and order "the taking of depositions" and "responses to written interrogatories."  *Id.* § 1212(b)(2)(A), (B).

If the OSC determines "that there are reasonable grounds to believe" that a prohibited practice has occurred, exists, or will occur, it can work with the relevant agency to ensure that is corrective action is taken.  *See id.* § 1214(b)(2).  But, "[i]f, after a reasonable period of time, the agency does not act to correct the prohibited personnel practice," OSC may petition the Merits System Review Board for corrective action.  *Id.* § 1214(b)(2)(C); *id.* § 1212(a)(2)(A).  The OSC has no authority over the MSPB, which is itself an independent adjudicatory agency.  *See id.* § 1202.

Similarly, the OSC has authority under the Hatch Act, 5 U.S.C. § 7321 *et seq.*, to investigate "any allegation" concerning prohibited "political activity" and "any activity relating to political intrusion in personnel decisionmaking."  *Id.* § 1216(a)(1), (4).  If the Special Counsel determines "that disciplinary action should be taken," the Special Counsel must "prepare a written complaint against the employee" to present to the MSPB, which ultimately adjudicates the matter

and determines whether disciplinary measures are appropriate.  *Id.* § 1215.  The OSC also has authority to investigate and enforce claims under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301–35, which prohibits employment discrimination against members of the uniformed services and veterans "because of their service in the uniformed services."  38 U.S.C. §§ 4301(a)(3), 4311.  The agency can further "review rules and regulations issued by the Director of the Office of Personnel Management" and can "file a written complaint" with the MSPB if it "finds that any such rule or regulation would, on its face or as implemented, require the commission of a prohibited personnel practice."  5 U.S.C. § 1212(a)(4).

Third, the OSC has reporting obligations to Congress.  The Special Counsel must submit a report to Congress "[o]n an annual basis" regarding the "activities" of the agency, which must include, among other things, "the number, types, and disposition of allegations of prohibited personnel practices filed with the Special Counsel and the costs of resolving such allegations."  *Id.* § 1218(1)–(13).  And each time the OSC resolves an allegation "by an agreement between any agency and an individual," it must submit a report to Congress "regarding the agreement."  *Id.* § 1217(b)(1).  Further, "on the request of any committee or subcommittee," the Special Counsel or his designee "shall transmit to the Congress . . . by report, testimony, or otherwise, information and the Special Counsel's views on functions, responsibilities, or other matters relating to the Office."  *Id.* § 1217(a).  That information is also "transmitted concurrently to the President and any other appropriate agency in the executive branch."  *Id.*

The Office of the Special Counsel is led by the Special Counsel, 5 U.S.C. § 1211(a), who is "appointed by the President, by and with the advice and consent of the Senate" to serve "for a term of five years."  *Id.* § 1211(b).  Congress requires that the Special Counsel must "be an attorney

who, by demonstrated ability, background, training, or experience, is especially qualified to carry out the functions of the position." *Id.* And, by statute, "[t]he Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.*

### B. Factual Background

On October 3, 2023, President Biden nominated Hampton Dellinger to be Special Counsel. Compl. ¶ 30. The Senate confirmed Dellinger on February 27, 2024, and he was sworn into office on March 6, 2024. Compl. ¶ 30. His five-year term will expire in 2029. Compl. ¶ 30.

At 7:22 p.m. on Friday, February 7, 2025, Sergio N. Gor, identified in his email signature as "Assistant to the President, Director of Presidential Personnel Office" sent Dellinger an email that stated simply:

> On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately."

Ex. A to Compl. [Dkt. # 1-1] ("Ex. A").

Plaintiff filed this action on Monday morning, February 10, 2025, and the complaint consists of five claims. *See* Compl. Count One alleges that the termination by President Trump was *ultra vires* and in "clear violation" of 5 U.S.C. § 1211(b). Compl. ¶¶ 37–41. Count Two alleges that to the extent defendants Bessent, Gor, Gorman, Kammann, and Vought exercise authority on behalf of the Office of Special Counsel without regard to plaintiff's position as Special Counsel, those actions are "not in accordance with law," "contrary to a constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction" under the Administrative Procedure Act, 5 U.S.C. § 706(2). Compl. ¶ 43. Count Three seeks a declaratory judgment that the President does not have authority to remove plaintiff absent inefficiency, neglect of duty, or malfeasance in office. Compl. ¶ 45. Count Four alleges a violation of the separation of powers

under Article I, section 8 and Article II, sections 2 and 3 of the Constitution. Compl. ¶ 47.  And

Count Five seeks a writ of mandamus prohibiting plaintiff's removal from office.  Compl. ¶ 50.

## ANALYSIS

### I.    Legal Standard

"A temporary restraining order is an extraordinary remedy, one that should be granted only

when the moving party, by a clear showing, carries the burden of persuasion." *Sibley v.*

*Obama,* 810 F. Supp. 2d 309, 310 (D.D.C. 2011), citing *Mazurek v. Armstrong,* 520 U.S. 968, 972,

(1997); *Munaf v. Geren,* 553 U.S. 674, 690–91 (2008).

As the Supreme Court explained in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008), when considering a motion for a preliminary injunction, the Court must consider whether

the movant has met its burden of demonstrating that:  1) it "is likely to succeed on the merits";  2)

it is "likely to suffer irreparable harm in the absence of preliminary relief";  3) "the balance of

equities tips in [its] favor"; and 4) an injunction serves the public interest.  *Id.*  "The court considers

the same factors in ruling on a motion for a temporary restraining order."  *Morgan Stanley DW*

*Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).

The manner in which courts should weigh the four factors "remains an open question" in

this Circuit.  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  For some time, the Court

of Appeals adhered to the "sliding-scale" approach, where "a strong showing on one factor could

make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir.

2011) (citations omitted).   However, the *Sherley* opinion explains that because the Supreme

Court's decision in *Winter* "seemed to treat the four factors as independent requirements,"

the Court of Appeals has more recently "read *Winter* at least to suggest if not to hold 'that a

likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"

*Id.* at 393, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).  The Court will follow this approach.

Although the D.C. Circuit has not yet announced "whether the 'sliding scale' approach remains valid after *Winter*," *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016), it has ruled that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction.  *See Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). As another court in this district has observed, "absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Navistar, Inc. v. EPA*, Civil Action No. 11-cv-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (alteration omitted), quoting *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007).

Regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been a "basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959).  A failure to show irreparable harm is grounds for the Court to refuse to issue an injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## II.    The likelihood of success on the merits.

The Court finds that there is a substantial likelihood that plaintiff will succeed on the merits. The effort by the White House to terminate the Special Counsel without identifying any cause plainly contravenes the statute, which states, "[t]he Special Counsel may be removed by the

President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1211(b). This language expresses Congress's clear intent to ensure the independence of the Special Counsel and insulate his work from being buffeted by the winds of political change.

Defendants' only response to this inarguable reading of the text is that the statute is unconstitutional. Defs.' Opp. at 8–11. But no court has said so, and to date, the Supreme Court has taken pains to carve the OSC *out* of its pronouncements concerning the President's broad authority to remove officials who assist him in discharging his duties at will. Moreover, the reasoning underlying the decisions relied upon by defendants does not extend to the unique office and official involved in this case.

In *Seila Law LLC v. CFPB,* 591 U.S. 197 (2020), a party resisting a civil investigative demand ("CID") issued by the Consumer Finance Protection Bureau ("CFPB") challenged the legitimacy of the agency's structure. *Id.* at 208. The Ninth Circuit upheld the for-cause removal protection for the single head of the independent agency, agreeing with the *en banc* decision of the D.C. Circuit in *PHH Corp. v. CFPB,* 881 F.3d 75 (D.C. Cir. 2018). *See CFPB v. Seila Law LLC*, 923 F.3d 680, 682 (9th Cir. 2019). The Supreme Court granted certiorari. Because the government agreed with the petitioner on the constitutional issue, the Court appointed an amicus to defend the judgment of the Ninth Circuit. *Seila Law*, 591 U.S. at 209

The Court began by repeating its prior holding that "'as a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties." *Id.* at 204, quoting *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 513–14 (2010). It explained that "[t]he President's power to remove – and thus supervise – those who wield executive power on his behalf flows from the text of Article II," and that "[w]ithout such

power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Seila* Law, 591 U.S. at 204.

But the Court did not announce a blanket rule that the President has the power to remove the head of every independent agency led by a single director, as defendants would have this Court believe. The Court held that the CFPB's leadership by a single individual removable only for statutorily prescribed reasons violated the separation of powers, *id.* at 205, and it went into considerable detail as to why the Director of the CFPB in particular should not be shielded from Presidential control.

Before it turned its attention to the CFPB, the Court reviewed its prior decisions concerning the President's removal power in general, and it repeated its observation in *Humphrey's Executor v. United States*, 295 U.S. 602, 631–32 (1935) that Congress's ability to impose removal restrictions "will depend upon the character of the office." *Seila Law*, 591 U.S. at 215. *Humphrey's Executor* involved the President's authority to replace five members of the New Deal-era Federal Trade Commission ("FTC"), and looking at the agency as it was constituted in 1935, the Court held that the restrictions on replacing the panel members were lawful. *Humphrey's Executor*, 295 U.S. at 619, 623–25, 628–29. In the *Seila Law* opinion, the Supreme Court listed some of the circumstances that animated its opinion in *Humphrey's Executor*, and several of them pertain to the OSC today: the Court noted that the agency performed specified duties to aid the legislature, such as making investigations and reports to Congress, and like the OSC, the five member board of the FTC was "designed to be non-partisan and to act with entire impartiality." *Seila Law*, 591 U.S. at 215–16 (internal quotation marks omitted). The *Seila Law* Court also pointed out that *Humphrey's Executor* found that "[t]he FTC's duties were 'neither political nor executive,' but

instead called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* at 216, quoting 295 U.S. at 64.

Here we have a statute that incorporates Congress's judgment with respect to the qualifications to be the Special Counsel, *see* 5 U.S.C. § 1211(b) ("The Special Counsel shall be an attorney who, by demonstrated ability, background, training, or experience, is especially qualified to carry out the functions of the position."), as well as the restrictions on removal. *Id.  Seila Law* summed up *Humphrey's Executive* as recognizing the President's "unrestrictable power . . . to remove *purely executive* officers," but it did not extend the principle to less obvious situations. *Seila Law*, 591 U.S. at 217 (emphasis added).

The *Seila Law* court also chose not to walk away from the Court's decision in *Morrison v. Olson*, 487 U.S. 654 (1988) that upheld the statutory protection from removal afforded to an independent counsel under the now-defunct Independent Counsel Act.  *See Seila Law*, 591 U.S. at 217–18.  Even though the independent counsel was a single person exercising law enforcement functions typically performed by the executive branch, the Court held that the requirement of for-cause removal did not unduly interfere with the President's powers because the petitioner was "an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691.  While plaintiff does not argue here, and the Court would not presume to rule at this time that the Special Counsel is an "inferior officer" akin to a naval cadet engineer, *see United States v. Perkins*, 116 U.S. 483, 485 (1886)*,* it is relevant that like the independent counsel, plaintiff does not appear to have policymaking or significant administrative authority.

*Seila Law* then differentiated the agency officials it found were entitled to protection from removal in *Humphrey's Executor* from the Director of the CFPB:

> [T]he CFPB Director is hardly a mere legislative or judicial aid. Instead of making reports and recommendations to Congress, as the 1935 FTC did, the Director possesses the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy. And instead of submitting recommended dispositions to an Article III court, the Director may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications. Finally, the Director's enforcement authority includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*.

*Seila Law*, 591 U.S. at 218–19. And then it distinguished the Director of the CFPB from the independent counsel in *Morrison*:

> Unlike the independent counsel, who lacked policymaking or administrative authority, the Director has the sole responsibility to administer 19 separate consumer-protection statutes that cover everything from credit cards and car payments to mortgages and student loans. It is true that the independent counsel in *Morrison* was empowered to initiate criminal investigations and prosecutions, and in that respect wielded core executive power. But that power, while significant, was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had a potential conflict of interest. By contrast, the CFPB Director has the authority to bring the coercive power of the state to bear on millions of private citizens and businesses, imposing even billion-dollar penalties through administrative adjudications and civil actions.

*Id.* at 219.[2]

All of this points to a conclusion that *Seila Law* does not answer the question presented in this case. While the Special Counsel's role is not entirely analogous to that of the FTC panel

---

2    The Court also observed that the CFPB does not rely on the annual Congressional appropriations process, but it receives its funding directly from the Federal Reserve, which is also funded outside the appropriations process. *Seila Law*, 591 U.S. at 207; *see also id.* at 225 ("The Director does not even depend on Congress for annual appropriations.") and 226 ("The CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential Control."). The OSC does not present these concerns.

members from 1935 or an individual appointed under the old Independent Counsel Act, who was

confined to a single criminal prosecution, the circumstances do not present the sort of concerns

that troubled the Supreme Court when it looked at the functions assigned to the Director of the

CFPB.

Indeed, the Chief Justice took the trouble to say just that.

The CFPB's defenders tried to compare the agency to the OSC, but the Court resisted the

analogy:

> The OSC exercises only limited jurisdiction to enforce certain rules
> governing Federal Government employers and employees.  *See* 5 U.S.C. §
> 1212.  It does not bind private parties at all or wield regulatory authority
> comparable to the CFPB.

*Id.* at 221.[3]

This Court's review of the statutory provisions establishing the Special Counsel's purview

confirms that the agency is not "comparable to the CFPB," *id.*, and that *Seila Law* does not compel

the conclusion advanced by the defendants.  One can hardly describe the OSC as "an independent

agency led by a single director *and vested with significant executive power*" as *Seila Law* described

the CFPB.  *Id.* at 220 (emphasis added).  Therefore, the showing that the statute establishing the

---

3       Before making this comparison, the Court did point out that while the OSC had been
headed by a single officer since 1978, its structure "drew a contemporaneous constitutional
objection from the Office of Legal Counsel under President Carter and a subsequent veto on
constitutional grounds by President Reagan." *Seila Law*, 591 U.S. at 221, citing *Memorandum
Opinion for the General Counsel, Civil Service Commission*, 2 Op. O.L.C. 120, 122 (1978); Public
Papers of the Presidents, Ronald Reagan, Vol. II, Oct. 26, 1988, 1391–92 (1991).  It is equally
worth observing that notwithstanding that opinion, President Carter signed the legislation in 1978,
and that after President Reagan's action in 1988, negotiations concerning the legislation continued,
and President George H.W. Bush signed the Whistleblower Protection Act into law in 1989.  The
Court has not been provided with materials showing that any administration since then has sought
to have the statute amended.

Office of Special Counsel has been unquestionably violated supports a finding that plaintiff has made the necessary showing of a likelihood of success on the merits.

The holding in *Collins v. Yellin,* 594 U.S. 220 (2021), does not compel a different conclusion. The opinion reiterated the importance of guarding against new intrusions on the President's Article II powers, and it explained that the "nature and breadth of an agency's authority" should not be "dispositive in determining whether Congress may limit the President's power to remove its head." *Id*. at 251–52. The Court rejected the notion that it should apply different rules depending on an agency's size, power, or perceived "importance." *Id.* at 252–53. But when the court-appointed *amicus curiae* in that case warned that a decision invalidating the removal restrictions in the Housing and Economic Recovery Act would call into question the constitutionality of other agencies, including the OSC, the Court chose to reply, "[n]one of these agencies is before us, and we do not comment on the constitutionality of any removal restriction that applies to their officers." *Id.* at 256 n.21.

Also, while the opinion made clear that the number of individuals or businesses regulated by any particular agency should not be the touchstone, it noted that the agency in question, the Federal Housing Finance Agency, did in fact "regulate[] a small number of Government-sponsored enterprises," receiving roughly half of its budget from those regulated entities. *Id.* at 251. It also pointed out:

> [W]hile the CFPB has direct regulatory and enforcement authority over purely private individuals and businesses, the FHFA has regulatory and enforcement authority over two companies that dominate the secondary mortgage market an have the power to reshape the housing sector . . . . FHFA actions with respect to those companies could have an immediate impact on millions of private individuals and the economy at large.

*Id.* at 253; *see also id.* at 224 ("[T]he President's removal powers serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives.")  These things cannot be said about the OSC, even if, like the FHFA, it is authorized to issue subpoenas.  *See id.* at 254.[4]

The OSC is not an agency endowed with the power to articulate, implement, or enforce policy that affects a broad swath of the American public or its economy.  It does not have broad rulemaking authority or wield substantial enforcement authority over private actors; it has no authority over private actors.  It is an agency with limited jurisdiction: its job is to investigate government employees' allegations of specifically identified prohibited personnel practices, and where appropriate, to seek corrective or disciplinary action.  The agency's statutory functions require it to report directly to Congress about what it has found and whether any executive agency has stood in its way.  While the federal workforce includes a large number of

---

4    It is notable that after *Collins*, the Office of Legal Counsel issued an opinion firmly concluding that the combination of the rulings in *Seila Law* and *Collins* compelled the conclusion that the protections against removing the Commissioner of the Social Security Administration ("SSA") were constitutionally infirm.  *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 45 Op. O.L.C. __, 1 (O.L.C. July 8, 2021).  But the OLC included an explicit caveat that this vindication of the President's prerogative did not necessarily extend to the Office of Special Counsel.  *See id.* at 10 n.3 ("This opinion does not address the validity of tenure protections conferred on the Special Counsel, whose removal restrictions implicate different considerations," contrasting the massive impact, enormous budget, and exceptionally broad rulemaking authority of the SSA with the OSC's right to recommend regulatory changes); *see also id.* at 15, citing *Seila Law*, 591 U.S. at 217–18 ("We emphasize the limited scope of our conclusion regarding the [SSA] Commissioner.  It does not imply any similar determination with respect to the validity of tenure protections conferred on other executive officials – for example, the Special Counsel, another single member agency had whose removal restrictions implicate different considerations, such as the Special Counsel's primary investigative function and 'limited jurisdiction.'").

people, the Special Counsel is only called upon to interact with a small subset of them on an individual basis, and only in connection with one aspect of their personal employment situations; he does not guide or direct them in any way in connection with the policies they will promulgate or implement in the course of that employment.

In sum, the OSC is an independent agency headed by a single individual, but otherwise, it cannot be compared to those involved when the Supreme Court found the removal for cause requirement to be an unconstitutional intrusion on Presidential power.

### III.    Irreparable harm

Next, the plaintiff must show that he is likely to suffer irreparable harm in the absence of preliminary relief.  *Winter*, 555 U.S. at 20.

The D.C. Circuit "has set a high standard for irreparable injury" – it "'must be both certain and great; [and] it must be actual and not theoretical.'"  *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297, quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). The same opinion instructs that "the injury must be beyond remediation."  *Id.*  It explains:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* (emphasis in original), quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiff asserts that being deprived of his "statutory entitlement to serve as the lawful agency head of OSC" – his right to fulfill the five-year position created and defined by Congress to which he was nominated and confirmed by the Senate – has caused and will continue to cause him to suffer irreparable harm.  Pl.'s TRO at 14–15.  He submits that this is not something that can

be remediated with economic damages, and it is compounded by the loss of the opportunity to fulfill the duty he owes to all federal employees, and whistleblowers in particular, regardless of their political affiliation, to be free from prohibited practices on the part of federal agencies. *See* Pl.'s TRO at 15.

Defense counsel announced at the hearing that injunctive relief was completely foreclosed by *Sampson v. Murray*, 415 U.S. 61 (1974), which counsel represented to be "binding precedent that job loss does not constitute irreparable harm." Tr. at 4, 6. Defendants backed away from that overstatement in their written submission and argued that under *Sampson,* "[t]he loss of government employment constitutes irreparable harm only in a genuinely extraordinary situation," Defs.' Opp. at 2 (internal quotations omitted), and they maintain that the circumstances in this case do not meet that test.

But that authority is entirely distinguishable. In *Sampson*, the district court temporarily enjoined the discharge of a "probationary employee" from the General Services Administration pending an administrative appeal to the Civil Service Commission. *Sampson*, 415 U.S. at 62–63. The plaintiff claimed that the discharge, which came just four months after she started, would cause irreparable harm by depriving her of income and causing "her to suffer the embarrassment of being wrongfully discharged." *Id.* at 62–63, 66.

It is well established now, of course, that allegations of economic losses that can be cured with money damages do not constitute irreparable harm. But there is no claim for lost earnings or compensation in the complaint.

*Sampson* held that while a district court "is not totally without authority to grant interim injunctive relief to a discharged [g]overnment employee," *Sampson*, 415 U.S. at 63, the claimed irreparable injury was insufficient to support a temporary injunction. *Id.* at 92–93. The Court

explained that the irreparable harm must be "in kind and degree to override" three factors that the court should "give serious weight": (1) the "disruptive effect which the grant of the temporary relief" has on the administrative process; (2) "the well-established rule that the [g]overnment has traditionally been granted the widest latitude in the dispatch of its own internal affairs"; and (3) "the traditional unwillingness of courts . . . to enforce contracts for personal service." *Id.* at 83 (internal quotation marks omitted). But *Sampson* recognized that:

> [C]ases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence . . . . [W]e do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case.

*Id.* at 92 n.68.

This is not a routine case. There is no contract for personal services involved, and plaintiff is not a "probationary employee"; he was appointed to serve the statutory term of five years. Compl. ¶ 30. The *Sampson* court observed that it was "dealing . . . not with a permanent Government employee, a class for which Congress has specified certain substantive and procedural protections, but with a probationary employee, a class which Congress has specifically recognized as entitled to less comprehensive procedures." *Sampson*, 415 U.S. at 80–81. So, its analysis is of little utility here.

There are no facts to suggest that an order maintaining Dellinger in the role he occupied for the past year would have a "disruptive" effect on any administrative process; if anything, it

would be his removal that is disruptive, as he suggests.[5]  And while it may be that the government traditionally has wide "latitude" in dispatching its internal affairs, whether it does or should have that latitude in the face of a statutory provision to the contrary is the question at the heart of the merits.

Furthermore, plaintiff's irreparable injury cannot be compared to the loss of income or embarrassment involved in the typical employment action, for which there are remedies that do not involve equitable relief.  This case falls outside of the typical paradigm since the OSC is an independent agency and the White House is not plaintiff's employer.  In short, plaintiff's injury stems directly from "extraordinary" circumstances as *Sampson* requires; namely, that for the first time, a President has removed the Special Counsel from his statutorily prescribed term without any cause or explanation.

Plaintiff relies on *Berry v. Reagan*, Civil Action No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), and the Court finds it to be instructive although not on all fours with the instant situation.  In *Berry*, the plaintiffs moved for a temporary restraining order and preliminary injunction "to enjoin the President . . . from removing them as Commissioners of the U.S. Commission on Civil Rights."  *Id.* at *1.  The Commission was a "temporary, bipartisan agency established by Congress," that was "composed of six members, appointed by the

---

[5]    By hanging their hat on *Sampson,* defendants imply that it would be too disruptive to the business of the agency to have Special Counsel Dellinger resume his work.  But any disruption to the work of the agency was occasioned by the White House.  It's as if the bull in the china shop looked back over his shoulder and said, "What a mess!"  Moreover, any disruption caused by the proposed temporary restraining order would be minimal;  plaintiff served as Special Counsel from March 6, 2024 through the end of the workday on Friday, February 7, 2025.  Compl. ¶¶ 2, 30,  He received the email announcing that his position was terminated later that evening, and according to defendants, the Acting Special Counsel took over on Monday morning.  By Monday night, this Court had already entered an administrative stay restoring the Special Counsel to the position he'd occupied for the prior year.  *See* Minute Order (Feb. 10, 2025).  Defendants have not proffered any facts to show that maintaining this rapid return of the torch will affect agency operations.

President, . . . with the advice and consent of the Senate," who investigated and collected information "regarding deprivations of both civil rights and equal administration of justice." *Id.* To perform its function, the Commission was permitted to "hold hearings and issue subpoenas for the attendance and testimony of witnesses and the production of evidence." *Id.* One month before the Commission was set to expire, President Regan terminated the plaintiffs from the Commission. *Id.* at 1, n.1.

*Berry* undertook to apply the *Sampson* test that "a federal employee seeking injunctive relief must make a strong showing of irreparable injury 'sufficient in kind and degree to override the factors cutting against the general availability of preliminary injunctions [such as disruption of the administrative process] in Government personnel cases.'" *Berry*, 1983 WL 538 at *5, quoting *Sampson*, 415 U.S. at 84. It then explained that the "deprivation of [plaintiffs'] statutory right to function as Commissioners until the Commission expires," and "their unlawful removal from office by the President" did constitute irreparable injury. *Id.* The Court noted the "obviously disruptive effect" that denial of preliminary relief would have on the Commission's final activities, including that it would leave the Commission "without a quorum" to conduct its mandated "wind–up" duties. *Id.* The Court further stated it was "not clear that the President has the power to remove Commissioners at his discretion," and that the plaintiffs did not have "administrative, statutory, or other relief that is readily available to many federal employees." *Id.*

While the Special Counsel is not a "temporary" employee with a set term in which his duties must be completed, plaintiff was appointed for a fixed term, and he has a statutory mission that his removal has rendered him unable to fulfill: to "protect employees, former employees, and applicants for employment from prohibited personnel practices." 5 U.S.C. § 1212. And the loss

of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief.[6]

Defendants insist, though, that there is authority that has already foreclosed the argument that the deprivation of a "statutory right to function" is irreparable harm. Defs.' Opp. at 2. They note that in *English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018), "another district court in this Circuit rejected the identical argument in analogous circumstances." Defs.' Opp. at 2. But putting aside the point that district court opinions are not binding on this Court, the circumstances in *English* are in no way "analogous."

The statute establishing the Consumer Finance Protection Bureau prescribes that the Deputy Director "shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5). In *English*, the Director of the CFPB resigned and named the plaintiff as his Deputy Director in what the court characterized as "an apparent attempt to select his successor." *English*, 279 F. Supp. 3d at 311. Meanwhile, the President appointed a different acting Director pursuant to his power under the Federal Vacancies Reform Act of 1998. *Id.* The plaintiff filed suit to temporarily enjoin the President's pick from serving as the head of the CFPB

---

6    Plaintiff directs the court to another district court opinion, *Mackie v. Bush*, 809 F. Supp. 144 (D.D.C. 1993), but it is not comparable. *See* Pl.'s TRO at 15. In *Mackie*, the plaintiffs were members of the Board of Governors of the Postal Service Board, which was "a party to litigation pending" in the D.C. Circuit. 809 F. Supp. at 144–145. The President threatened to remove the plaintiffs if they did not withdraw from that lawsuit, and the district court temporarily enjoined "removal of the plaintiffs" because the removal "could jeopardize" the jurisdiction of the D.C. Circuit over the Postal Service Board's pending suit, which could have determined that the Board was "independent." *Id.* at 146. The Court also noted that "in the circumstances here, neither a damages remedy nor a declaratory judgment would provide an adequate remedy" because "neither a damage award in the Claims Court nor a declaratory judgment in [the district court] would afford our Court of Appeals, and thus the Judicial Branch, an opportunity to protect its jurisdiction over a matter pending before it and the several issues lurking there." *Id.* at 147 (footnote omitted). So, the procedural and jurisdictional concerns dictating temporary relief do not pertain here.

and restrain the President from appointing any acting Director other than herself. *Id.* at 315. The court summarized the issue presented as "whether the President is authorized to name an acting Director of the [CFPB] or whether his choice must yield to the ascension of the Deputy Director, who was installed in that office by the outgoing Director in the hours before he resigned." *Id.* at 311. The court denied the temporary relief on the grounds that the plaintiff had not demonstrated a likelihood of success on the merits, not had she made a showing of the necessary irreparable harm. *Id.* at 333, 336.

In making that finding, the court looked to *Sampson* and it differentiated the case before it from the way *Sampson* was applied in *Berry*. It noted that in *Berry,* the court considered the Commission's inability to complete its work and the individual plaintiffs' injury to be one and the same: the frustrated statutory objective also applied to each of them personally, as they could not do what they had been appointed and confirmed to do. *Id.* at 335. But English, according to the court, did not identify any harm that she would suffer personally if the injunction did not issue, as the work of the agency would go forward. *Id.* And while she may have been appointed as Deputy Director in a manner that was arguably consistent with the governing statute, she did not occupy a position established by Congress, for which she was subject to Senate confirmation, like the plaintiff in our case does.

But the more significant distinction drawn by the court in *English* was that "in *Berry,* the plaintiffs were attempting to preserve a status quo in which they had a 'statutory right to function as Commissioners,' after they were appointed by President Carter, with the advice and consent of the Senate, pursuant to the authorizing statute of the Commission. In contrast, there was never a time here in which English functioned as the CFPB's acting Director." *Id*. (citation omitted). In other words, the requested order requiring the President to withdraw his choice for acting Director

and name the plaintiff to that position would not restore the "status quo," which is defined as the "last uncontested status which preceded the pending controversy," *Id*. at 335–36, citing *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). Plaintiff had never been the acting Director, but she was simply picked by the outgoing Director to serve as his Deputy, who would be entitled to then ascend to the Director's position.[7]

Finally, defendants argue that the harm is not irreparable because the OSC "continues to operate" with another individual "functioning as acting Special Counsel." Defs.' Opp. at 13 (internal quotations omitted); Tr. at 4 ("There is currently an acting special counsel who is another official from the Office of Special Counsel who is serving in that rule currently."). Plaintiff submits that whether the agency is still up and running in some format, with some person at the helm, is not the point. He is concerned that in the absence of a leader lawfully appointed to fulfill the statutory duties of the Special Counsel, there would be no way to ensure the confidentiality and continuity of ongoing matters under his purview, no clarity as to what employees who have been subjected to prohibited actions or retaliation should do or where they should turn, and no

---

7    Defendants also argue that the harm is not irreparable because if plaintiff prevails in this lawsuit, he can be restored to his position then. *English* did observe that while the harm suffered by the plaintiff Commissioners in *Berry* was irreparable because once the term of the Commission expired, they could no longer be reappointed to it by a court, English could be reinstated to the "Acting" Deputy slot if her suit succeeded. *See English*, 279 F. Supp. 3d at 335. Here, plaintiff worries that unless he is restored to his position, the President could choose to fill the vacancy he unlawfully created, extinguishing any possible judicial remedy. That appears to be less speculative than the scenario rejected by the court in *English*, where the President had not just deposed the Senate-confirmed agency head. But even if the Court were to find *English* to be instructive, it would not advance the defendants' position given the fundamental difference between the equitable relief the plaintiff is seeking here and what was at issue in *English*. Dellinger wants to maintain the Presidential appointment he held until his removal; English was seeking an appointment to a position for which she was eligible, but she never received. Moreover, English is not a fair comparator as she was not ejected from a Presidential appointment with a fixed term.

assurance that only people with appropriate authorization will access the confidential and sensitive information maintained by the OSC, including information it is required by statute to keep secret. *See* 5 U.S.C. § 1213(h); Tr. at 18–19.

Plaintiff's assertion that it is irreparable harm to be deprived of the ability to perform his statutory functions and fulfill his statutory obligations to current and future whistleblowers overlaps considerably with his argument on the merits:  that it is Congress that established his position, his duties, and the sole grounds for his removal, and that the structure of the OSC reflects a Congressional determination that his independence is fundamental to the position it created.  One problem in *English* was that the Court found that the complaint failed on the merits, while this Court has already found that plaintiff has made a strong showing of success on the merits.  Since it also it finds that he has made a sufficient showing, for now, that these harms are indeed significant, impending, and irreparable, it will, consistent with *Winter* and *Sherley*, go on to the third and fourth factors.

## IV.    The balance of the equities and the public interest

Plaintiff advances the arguments concerning the third and fourth factors together, Pl.'s TRO at 16–17, and defendants' response addresses them together as well.  Defs.'s Opp. at 14–15. The Court agrees that in this case, they are necessarily intertwined:  plaintiff is a public official suing public officials, and both the scope of legitimate Presidential authority and the existence and extent of any remedies available to displaced civil servants and officials are very much matters of public interest.

Plaintiff maintains that recent "personnel actions have generated widespread uncertainty," and that "[i]n this context, the proper functioning of the OSC is more vital than ever."  Pl.'s TRO at 16.  According to plaintiff, his termination "creates a gap in protections provided by the OSC,

risking severe confusion over the leadership, mission, and role of the agency (as well as doubt over the lawfulness of any actions that it takes and fear that confidential information may fall into unauthorized hands)." *Id.*

For purposes of the temporary restraining order, the Court can and will consider these factors without characterizing or purporting to address the lawfulness of Presidential actions that have not been presented to it for review and may well be the subject of proceedings before other courts.

Defendants tie their argument to the merits:  that the relief requested would cause harm to the Executive and to the separation of powers by intruding on his Article II authority.  Defs.' Opp. at 2, 14–15.  But they proffer no circumstances that required the President's hasty, unexplained action, or that would justify the immediate ejection of the Senate-confirmed Special Counsel while the legal issue is subject to calm and thorough deliberation.

The Office of Special Counsel is a unique federal agency with a unique, but narrow focus. Congress created the position of Special Counsel to play a singular and important role that has strong bipartisan support:  to protect whistleblowers within the executive branch from reprisals and prohibited personnel practices, even as administrations change hands.  *See* Whistleblower Protection Act of 1989, Pub. L. No. 101–12, 103 Stat. 16 (Apr. 10, 1989) ("[T]he primary role of the Office of Special Counsel is to protect employees, especially whistleblowers, from prohibited personnel practices[.]").  Notwithstanding defendants' assertion, unsupported by any authority, that "the public interest is better served by a Special Counsel who holds the President's confidence," Defs.' Opp. at 15, Congress contemplated and established a structure that reflects a different priority.  Independence is essential to any Special Counsel's ability to perform the unique set of duties and reporting requirements set forth in the statute.  Defendants have identified no

impending injury or alleged constitutional error that cannot be fixed in the future that would outweigh the harm that will flow from the precise circumstance Congress deliberately chose to prohibit.  Therefore, the Court finds that the last two factors weigh heavily in favor of the temporary restraining order.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for a temporary restraining order [Dkt. # 2] is **GRANTED**.

It is hereby **ORDERED** that from the date of entry of this order until the Court rules on the entry of a preliminary injunction, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel of the Office of Special Counsel, the position he occupied at 7:22 p.m. on Friday, February 7, 2025 when he received the email from the Assistant to the President.  Defendants may not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel.

In light of this Order, the administrative stay entered on February 10, 2025, *see* Minute Order (Feb. 10, 2025) is hereby **VACATED,** and defendants' motion to stay the Court's administrative stay [Dkt. # 10], which was never granted, is **DENIED AS MOOT**.[8]

---

8    Putting aside the question of whether 5 U.S.C. § 3345 gives the President authority to appoint an Acting Special Counsel under the circumstances here, the appointment described in defendants' Notice [Dkt. # 13] as having taken place on February 11, 2025 may have been contrary to the order the Court issued on February 10th.  *See* Minute Order (Feb. 10, 2025) ("[I]t is HEREBY ORDERED that from the time of this order through midnight on February 13, 2025, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel of the Office of Special Counsel, the position he occupied at 7:22 p.m. on Friday, February 7, 2025 . . . .").  As of that date, there was no vacancy to fill.

The Court will hold a hearing on plaintiff's request for an injunction pending resolution of the case on the merits, i.e., an appealable preliminary injunction, on **February 26, at 10:00 a.m**. The parties are directed to confer and inform the court by **February 14** of their position (or positions if they do not agree) on whether, given the legal nature of the dispute, the Court should consolidate consideration of the request for a preliminary injunction with consideration of the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), and they must submit a proposed schedule for any additional submissions they believe are warranted.  The parties may propose that the Court deem the motion in support of the temporary restraining order to be a memorandum in support of a motion for preliminary injunction, with the opposition and reply similarly designated, and/or existing pleadings can be deemed to be motions and oppositions or cross motions under Federal Rule of Civil Procedure 56.  The Court notes that an order of consolidation does not require the consent of the parties.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  February 12, 2025