# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HAMPTON DELLINGER, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel,<br><br>     Plaintiff,<br><br>    -against-<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury, SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office, KAREN GORMAN, in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel, KARL KAMMANN, in his official capacity as the Chief Operating Officer of the Office of Special Counsel, DONALD J. TRUMP, in his official capacity as President of the United States of America, and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br><br>     Defendants. | Civil Case No. 1:25-cv-00385-ABJ |

## <u>PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION AND IN OPPOSITION TO THE GOVERNMENTS MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Hampton Dellinger hereby requests, under Federal Rule of Civil Procedure 56, that this Court deny Defendants' motion for summary judgment, grant Plaintiff's cross-motion for summary judgment, and enter declaratory judgment and a permanent injunction in his favor. A proposed ordered is attached.

Respectfully submitted,

Kate L. Doniger*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

_____/s/ Joshua A. Matz_____
Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493
Benjamin Stern*
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Admitted pro hac vice

*Attorneys for Plaintiff Hampton Dellinger*

DATED: February 24, 2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAMPTON DELLINGER, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel,

        Plaintiff,

        -against-

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office, KAREN GORMAN, in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel, KARL KAMMANN, in his official capacity as the Chief Operating Officer of the Office of Special Counsel, DONALD J. TRUMP, in his official capacity as President of the United States of America, and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,

        Defendants.

Civil Case No. 1:25-cv-00385-ABJ

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION AND IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Kate L. Doniger*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493
Benjamin Stern*
HECKER FINK LLP
1050 K Street NW Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Admitted pro hac vice

*Attorneys for Plaintiff Hampton Dellinger*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND .................................................................................................................... 1

    A.   The United States Office of Special Counsel ................................................. 1

    B.   Procedural History .......................................................................................... 7

LEGAL STANDARD ............................................................................................................ 9

ARGUMENT ...................................................................................................................... 10

   I.   Special Counsel Dellinger's Removal Was Unlawful ..................................... 10

    A.   Special Counsel Dellinger Is an Inferior Officer ............................... 11

    B.   The Statutory Removal Protection Comports with Supreme Court Precedents ........... 15

   II.   This Court Should Enter a Permanent Injunction ............................................ 18

    A.   This Court Has Authority to Grant the Requested Relief ............................. 18

    B.   The Permanent Injunction Factors Strongly Favor Relief ........................... 27

CONCLUSION ................................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Emps., AFL-CIO v. O'Connor*,
　　747 F.2d 748 (D.C. Cir. 1984) .............................................................. 5, 6, 11, 15

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
　　64 F.4th 1354 (D.C. Cir. 2023) ...................................................................... 9

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
　　576 U.S. 787 (2015) ..................................................................................... 28

*Barnes v. Kline*,
　　759 F.2d 21 (D.C. Cir. 1984) ....................................................................... 27

*Berry v. Reagan*,
　　No. 83 Civ. 3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ............................ 21

*Borak v. Biddle*,
　　141 F.2d 278 (D.C. Cir. 1944) ..................................................................... 26

*Boyd v. Nebraska*,
　　143 U.S. 135 (1892) ..................................................................................... 22

*CIGNA Corp. v. Amara*,
　　563 U.S. 421 (2011) ..................................................................................... 25

*Clinton v. City of New York*,
　　524 U.S. 417 (1998) ..................................................................................... 26

*Collins v. Yellen*,
　　594 U.S. 220 (2021) ............................................................................. *passim*

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
　　968 F.3d 755 (D.C. Cir. 2020) ..................................................................... 28

*Delgado v. Chavez*,
　　140 U.S. 586 (1891) ..................................................................................... 22

*Dellinger v. Bessent*,
　　No. 25 Civ. 5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................... 18, 19

*Dellinger v. Bessent*,
　　No. 25 Civ. 385, 2025 WL 471022 (D.D.C. Feb. 12, 2025) ....................... *passim*

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................ 9

*Edmond v. United States*,
    520 U.S. 651 (1997) ............................................................................ 11

*Frazier v. Merit Sys. Prot. Bd.*,
    672 F.2d 150 (D.C. Cir. 1982) ........................................................... 4

*Harkrader v. Wadley*,
    172 U.S. 148 (1898) ............................................................................ 23

*Harris v. Bessent*,
    No. 25 Civ. 412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ............................. 19, 20, 27, 29

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ............................................................................ 25

*Honig v. Doe*,
    484 U.S. 305 (1988) ............................................................................ 23

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) .......................................................... 10, 14, 16, 24

*Illinois v. Lidster*,
    540 U.S. 419 (2004) ............................................................................ 14

*Knight First Amend. Inst. v. Trump*,
    302 F. Supp. 3d 541 (S.D.N.Y. 2018) ............................................. 19

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................... 29

*Mackie v. Bush*,
    809 F. Supp. 144 (D.D.C. 1993) ................................................. 20, 21

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................ 11, 13, 14

*Myers v. United States*,
    58 Ct. Cl. 199 (1923) .......................................................................... 24

*Myers v. United States*,
    272 U.S. 52 (1926) .................................................................. 11, 13, 14, 24

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ................................................................. 26

*Newman v. United States ex rel. Frizzell*,
    238 U.S. 537 (1915) ................................................................. 22, 23

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 9

*Paroczay v. Hodges*,
    219 F. Supp. 89 (D.D.C. 1963) ................................................................. 20, 21

*Pelicone v. Hodges*,
    320 F.2d 754 (D.C. Cir. 1963) ................................................................. 21

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ................................................................. 25

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................. 27

*Ross v. Bernhard*,
    396 U.S. 531 (1970) ................................................................. 23

*Salleh v. Christopher*,
    876 F. Supp. 297 (D.D.C. 1995) ................................................................. 21

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................. 23, 28

*In re Sawyer*,
    124 U.S. 200 (1888) ................................................................. 22

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ................................................................. *passim*

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ................................................................. 18, 19, 20

*Severino v. Biden*,
    581 F. Supp. 3d 110 (D.D.C. 2022) ................................................................. 23

*Shurtleff v. United States*,
    189 U.S. 311 (1903) ................................................................. 14

*Spicer v. Biden,*
    575 F. Supp. 3d 93 (D.D.C. 2021) ................................................................. 20

*Stern v. S. Chester Tube Co.,*
    390 U.S. 606 (1968) ....................................................................................... 23

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................... 18, 19, 20, 21, 23

*United States ex rel. Crawford v. Addison,*
    73 U.S. 291 (1867) ......................................................................................... 22

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) .................................................................................... 11, 12

*United States v. Perkins,*
    116 U.S. 483 (1886) ....................................................................................... 11

*United States v. Wilson,*
    290 F.3d 347 (D.C. Cir. 2002) ...................................................................... 26

*Vanda Pharms. Inc. v. Food & Drug Admin.,*
    No. 23 Civ. 2812, 2024 WL 4133623 (D.D.C. Sept. 10, 2024) ................... 13

*Villarreal-Dancy v. U.S. Dep't of the Air Force,*
    No. 19 Civ. 2985, 2021 WL 3144942 (D.D.C. July 26, 2021) ..................... 13

*Vitarelli v. Seaton,*
    359 U.S. 535 (1959) ....................................................................................... 23

*Walton v. House of Representatives of State of Okl.,*
    265 U.S. 487 (1924) ....................................................................................... 23

*Webster v. Doe,*
    486 U.S. 592 (1988) ....................................................................................... 23

*White v. Berry,*
    171 U.S. 366 (1898) ....................................................................................... 22

*Wiener v. United States,*
    357 U.S. 349 (1958) ....................................................................................... 24

## STATUTES AND REGULATIONS

5 C.F.R. § 1201.126 ........................................................................................... 5

5 U.S.C. § 1211 ........................................................................... 1, 10, 14, 29

5 U.S.C. § 1212 ........................................................................................... 5, 6

5 U.S.C. § 1214 ............................................................................................... 6

5 U.S.C. § 1215 ............................................................................................... 6

5 U.S.C. § 1216 ............................................................................................... 5

5 U.S.C. § 1217 ........................................................................................... 6, 16

5 U.S.C. § 1218 ............................................................................................... 6

5 U.S.C. § 7703 ............................................................................................... 6

Civil Service Reform Act of 1978,
    Pub. L. No. 95-454, 92 Stat. 1111 ...................................................... 1, 2

D.C. Code § 16-3501 ....................................................................................... 23

Whistleblower Protection Act of 1989,
    Pub. L. No. 101-12, 103 Stat. 16 ...................................................... 2, 3, 4

## RULES

Fed. R. Civ. P. 56 ............................................................................................. 9

Fed. R. Civ. P. 65 ............................................................................................. 8

## OTHER AUTHORITIES

135 Cong. Rec. 5012 (Mar. 21, 1989) ............................................................. 3

*Authority for Issuing Hatch Act Regulations*,
    18 Op. O.L.C. 1 (1994) ........................................................................... 6

*Black's Law Dictionary* (12th ed. 2024) ....................................................... 13

*Constitutionality of the Commissioner of Social Security's Tenure Protection*,
    2021 WL 2981542 (O.L.C. July 8, 2021) .................................... 17, 25

*Developments in the Law—Public Employment*, 97 Harv. L. Rev. 1619 (1984) .......................... 1

Federal Civil Service Reform Message to the Congress (Mar. 2, 1978) ................................... 1, 2

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890)...................... 22

H.R. Rep. No. 95-1403 (1978)................................................................................................. 2

John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibition* (1888) .. 22

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ................................................ 21

*Memorandum Opinion for the General Counsel, Civil Service Commission*,
    2 Op. O.L.C. 120 (1978)................................................................................................... 2

*Oxford English Dictionary* (2d ed. 1989) .................................................................................. 13

Ronald Reagan, *Memorandum of Disapproval on a Bill Concerning Whistleblower Protection*
    (Oct. 26, 1988) ................................................................................................................ 3

Samuel Slaughter Merrill, *Law of Mandamus* (1892) ............................................................... 22

Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it
    Obtains Both in England and in Ireland* (1853) ............................................................... 21

## INTRODUCTION

Special Counsel Hampton Dellinger enjoys an express statutory protection against removal from office without cause. 5 U.S.C. § 1211(b). President Trump nevertheless purported to remove him without cause. In defense of that position, the government—on behalf of the President and the other named Defendants—claims that § 1211(b) is unconstitutional. The government also contends that the Court lacks any power to preserve Special Counsel Dellinger in office, even if the President's purported termination was unlawful. The government is mistaken on both points. Because those are purely legal questions and there are no disputes of material fact, the Court should grant summary judgment to Special Counsel Dellinger and enter an order providing proper declaratory and injunctive relief.

## BACKGROUND

### A.    The United States Office of Special Counsel

#### 1.  The Founding and Mission of the OSC

The Office of Special Counsel ("OSC") is an independent federal agency, originally established by the Civil Service Reform Act of 1978 ("CSRA"). *See* 5 U.S.C. § 1211(a). The CSRA was enacted to address widespread public concerns about the federal civil service—including evidence that it was vulnerable to political manipulation and failed to protect whistleblowers. *See Developments in the Law—Public Employment*, 97 Harv. L. Rev. 1619, 1631-32 (1984). The CSRA began with President Carter, who recommended creating a Special Counsel, "appointed by the President and confirmed by the Senate" to investigate abuses of civil service laws, and the Merit Systems Protection Board ("MSPB"), a nonpartisan board removable only for cause to adjudicate those disputes. *See* Federal Civil Service Reform Message to the Congress (Mar. 2, 1978). This structure, President Carter wrote, would "guarantee independent and impartial

protection to employees" and thereby "safeguard the rights of Federal employees who 'blow the whistle' on violations of laws or regulations by other employees, including their supervisors." *Id.*

Congress accepted President Carter's proposal, including the MSPB and the Special Counsel with for-cause removal protections. *See* S. 2640, 95th Cong. (Mar. 3, 1978); H.R. Rep. No. 95-1403, at 388 (1978) (supp. views of Rep. S. Solarz). Congress made an express finding that "the authority and power of the Special Counsel" was required to "investigate allegations involving prohibited personnel practices and reprisals against Federal employees." Civil Service Reform Act of 1978, § 3(4), Pub. L. No. 95-454, § 3(4), 92 Stat. 1111, 1112. Consistent with this vision, Congress provided that the Special Counsel could be removed "by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act of 1978, § 1204. This provision drew an initial objection from the U.S. Department of Justice Office of Legal Counsel ("OLC"), which President Carter effectively overruled when he subsequently signed the law and declared it would create "a new system of excellence and accountability." *Compare Memorandum Opinion for the General Counsel, Civil Service Commission*, 2 Op. O.L.C. 120 (1978), *with* Jimmy Carter, Civil Service Reform Act of 1978 Statement on Signing S. 2640 Into Law (Oct. 13, 1978).[1]

In 1988, Congress again grew concerned that federal whistleblowers were not adequately protected, and crafted the Whistleblower Protection Act to "strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government." Whistleblower Protection Act of 1989, Pub. L. No. 101-12, § 2(b), 103 Stat. 16, 16.

---

[1] The OLC opinion referenced here was requested not by President Carter but instead by the Civil Service Commission, which would be replaced in the proposed CSRA. 2 Op. O.L.C. at 120.

As originally drafted, the Whistleblower Protection Act of 1988 separated the OSC from the MSPB, establishing the OSC as an independent agency. The original draft also vested the OSC with new powers. President Reagan, however, pocket vetoed this legislation, objecting to several new authorities that the legislation would vest in the OSC—singling out the authority to seek judicial review of adverse MSPB decisions in federal court, which would "permit[] the Executive branch to litigate against itself." Ronald Reagan, Memorandum of Disapproval on a Bill Concerning Whistleblower Protection (Oct. 26, 1988). President Reagan also suggested hesitancy about the bill's for-cause removal protections, which were identical to those already in effect. *Id.*

After the pocket veto, Congress worked with Presidents Reagan and Bush to address their separation-of-powers concerns. After these negotiations, the revised bill—the enacted Whistleblower Protection Act of 1989—no longer authorized the OSC to pursue litigation against other agencies in federal court. *See* 135 Cong. Rec. 5012, 5037 (Mar. 21, 1989) (statement of Rep. P. Schroeder) ("[W]e agreed to make the changes requested by the administration to clip the special counsel's wings."); *id.* at 5039 (statement of Rep. S. Parris) ("As amended, S. 20 would resolve the administration's constitutional concerns by eliminating the right of the special counsel to sue in Federal court.").

But those negotiations did not displace the OSC's status as an independent agency or its existing for-cause removal provision. As the House Subcommittee on Civil Service stated, federal employees required "assurance that the Office of Special Counsel is a safe haven," because otherwise it "can never be effective in protecting victims of prohibited personnel practices." *Id.* at 5034 (Joint Explanatory Statement); *id.* at 5032 (statement of Rep. G. Sikorski) ("Until whistleblowers are confident that the Office of Special Counsel is on their side, that office will not be an effective advocate for their cause."). Following this inter-branch agreement on the

importance of maintaining a measure of independence for the OSC, President Bush's Attorney General thanked the bill's sponsor for "forg[ing] a mutually acceptable resolution of our serious constitutional concerns" and "pledge[d]" to lobby for the Act as drafted. *See Letter from Office of the Attorney General to Sen. Levin dated Mar. 3, 1989*, 135 Cong. Rec. 5012, 5033-34.

Ultimately, President Bush agreed that the revisions had "addressed" the "constitutional concerns" he and President Reagan had raised about the Act. George H.W. Bush, Remarks on Signing the Whistleblower Protection Act of 1989 (Apr. 10, 1989). Indeed, he specifically praised that the Act would "enhance the authority of the Office of Special Counsel to protect whistle-blowers," and that it "retain[ed] current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance." *Id.* Rather than reserve the question or call this provision into doubt, President Bush thus made apparent his approval of the for-cause removal limitation, which reflected a deliberate interbranch settlement of constitutional issues.

### 2. The OSC's Limited Jurisdiction and Functions

As contemplated by Congress and two Presidents in the enactments described above, the OSC maintains a unique and partly independent position to protect federal employees from prohibited personnel practices ("PPPs")—especially reprisal for whistleblowing. The OSC also affords a secure channel for employees to blow the whistle on wrongdoing. And it assists Congress's legislative and oversight agendas.

None of the OSC's authorities empowers it to regulate or penalize private activity. Instead, as an "ombudsman" and "watchdog," *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162-63 (D.C. Cir. 1982), the OSC has "only limited jurisdiction to enforce certain rules governing Federal Government employers and employees," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 221 (2020). And even as to federal employees, the OSC does not impose any discipline or

other adverse action. Instead, the OSC receives allegations of PPPs and Hatch Act violations, assesses and investigates such complaints, and promotes a proper course of action. *See* 5 U.S.C. §§ 1212(a), 1216(c). Where the OSC finds that an allegation was warranted, it first works with the relevant agency head to encourage voluntary corrective action and relief for the PPP victim (or voluntary discipline from an agency head in the case of a Hatch Act violation). However, any recommended action by the OSC may be rejected: the Special Counsel has no power to bind any other agency. Absent voluntary settlement, the OSC may petition the MSPB on the injured employee's behalf. *Id.* § 1214. But an injured employee may also petition the MSPB directly (subject to certain procedural requirements). *Id.* § 1221.

In addition, the OSC can refer a complaint to the MSPB, asking that a perpetrator of a PPP or Hatch Act violation be disciplined. *See id.* §§ 1215, 1216. In such circumstances, the OSC exercises no authority over the MSPB, which is an independent adjudicatory agency whose members separately enjoy for-cause removal protections. *Id.* § 1202(d). "[T]he MSPB is free to disagree with the Special Counsel and often does." *Am. Fed'n of Gov't Emps., AFL-CIO v. O'Connor ("AFGE")*, 747 F.2d 748, 753 (D.C. Cir. 1984). In that respect, the MSPB supervises the OSC's exercise of authority to refer complaints and makes its own decisions. Similarly, while the OSC has limited authority to issue subpoenas, only the MSPB can seek to enforce such subpoenas. 5 U.S.C. § 1212(b)(3)(A). Thus, as the D.C. Circuit has explained, "the Special Counsel's 'seemingly broad powers are greatly circumscribed in practice, [in part] by the Special Counsel's lack of authority to require either the Board or other agencies to do its bidding.'" *AFGE*, 747 F.2d at 753 (quoting 97 Harv. L. Rev. at 1643). Even when the MSPB—not the OSC—chooses to impose discipline, the maximum "civil penalty" it can issue is $1,330. 5 U.S.C. § 1216(a)(3); 5 CFR § 1201.126(a). And any decision by the MSPB is subject to judicial review in federal court.

5 U.S.C. §§ 1214(c)(2), 1215(a)(4), 7703(b). The OSC cannot participate in any litigation in any Article III court, except in a limited role as *amicus curiae*. *See id*. § 1212(h).

Beyond its human-resources investigative role, the Whistleblower Protection Act authorizes the OSC to receive reports from employee-whistleblowers within agencies. *See id.* § 1213(a). However, if a report appears credible, the OSC cannot conduct its own investigation or otherwise take direct action on the report. Instead, it may only review the investigation conducted by the whistleblower's agency, and then report the investigation and the OSC's own assessment of it to Congress and the President. *See id.* §§ 1212(a)(3), 1213(c)-(e). The Special Counsel must keep the identity of any whistleblower strictly confidential. *Id.* § 1213(h).[2]

The OSC is also vested with limited authority to "prescribe . . . regulations," although this authority is strictly and statutorily limited only to internal matters "necessary to perform the functions of the Special Counsel." *Id.* § 1212(e). The Special Counsel may separately issue nonbinding advisory opinions concerning the Hatch Act, but he has no rulemaking authority that compels compliance. *Id.* § 1212(f); *see also, e.g.*, *AFGE*, 747 F.2d at 752 ("[T]he advice the Special Counsel is permitted to give creates no law and binds neither the public nor any agency or officer of government."); *Authority for Issuing Hatch Act Regulations*, 18 Op. O.L.C. 1, 1 (1994).

Finally, virtually every action undertaken by the OSC—from receipt of allegations, to investigations, to agreed corrective actions, to complaints in the MSPB—must be directly reported to Congress to inform oversight and legislative functions in this space. 5 U.S.C. §§ 1217, 1218.

---

[2] In a similarly advisory capacity, the OSC reviews regulations issued by the Office of Personnel Management for any rule that would require committing a PPP. *See* 5 U.S.C. § 1212(a)(4).

B.     **Procedural History**

Plaintiff Hampton Dellinger has served as Special Counsel since March 6, 2024, following his nomination by the President and confirmation by the Senate to a five-year term. On Friday, February 7, 2025, at 7:22 PM, Special Counsel Dellinger received an email from Sergio Gor, Assistant to the President and Director of the White House Presidential Personnel Office, that stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately. Thank you for your service[.]" Ex. A to Compl., No. 25 Civ. 385 (D.D.C. Feb. 10, 2025), ECF 1-1.

The following Monday, February 10, 2025, Special Counsel Dellinger filed a complaint and simultaneously sought a temporary restraining order to preserve the *status quo ante* pending further proceedings. That afternoon, this Court held an in-person hearing. The Court proposed that the government "extend the effective date of the President's proposed action while [the parties] brief [the motion]," but the government refused that proposal. Tr. Of Mot. for TRO ("Tr.") 3:1-18, No. 25 Civ. 385 (D.D.C. Feb. 10, 2025), ECF 9. The government then requested leave to file an opposition the next day to Special Counsel Dellinger's TRO application. *Id.* 27:23-24. The Court agreed, noting that it may issue an administrative stay to preserve the *status quo ante* while it decided the TRO application. *Id.* 25:8-11. That evening, the Court issued a three-day administrative stay, ordering that Special Counsel Dellinger be allowed to continue to serve in his position through midnight on February 13, 2025. *See* Order, No. 25 Civ. 385 (D.D.C. Feb. 10, 2025, 8:20 PM).

The next morning, the government filed in the U.S. Court of Appeals for the D.C. Circuit a motion for an emergency stay pending appeal. Emergency Mot. for a Stay Pending Appeal, No. 25-5025 (D.C. Cir. Feb. 11, 2025), ECF 4. One day later, Special Counsel Dellinger filed a

response. Opp. to Emergency Mot. for a Stay, No. 25-5025 (D.C. Cir. Feb. 12, 2025), ECF 7. That

evening, the D.C. Circuit denied the government's motion and *sua sponte* dismissed the

government's appeal, holding that the court lacked appellate jurisdiction and that the government

was not entitled to mandamus relief. Order at 1-2, No. 25-5025 (D.C. Cir. Feb. 12, 2015), ECF 9

(Katsas, Childs, Pan, JJ.). Judge Katsas issued a concurring opinion. *See id*. at 3.

Later that night, the Court granted Special Counsel Dellinger's TRO application. *Dellinger
v. Bessent*, No. 25 Civ. 385, 2025 WL 471022, at *2 (D.D.C. Feb 12, 2025). Consistent with

Federal Rule of Civil Procedure 65, the Court limited its TRO to a fourteen-day period and

scheduled a hearing on February 26 to decide whether to issue "an appealable preliminary

injunction." *Id.* at *14. The government responded to that order by filing a notice of appeal and a

second emergency stay application in the D.C. Circuit. The government also filed a second stay

application before Your Honor, Mot. to Stay TRO Pending Appeal, No. 25 Civ. 385 (D.D.C. Feb.

12, 2025), ECF 16, which the Court denied the next day, Order, No. 25 Civ. 385 (D.D.C. Feb. 13,

2025), ECF 19. On Saturday, February 15, the Court issued a scheduling order consolidating

consideration of a preliminary injunction with consideration of the merits. Order, No. 25 Civ. 385

(D.D.C. Feb. 15, 2025, 4:27 PM).

That evening, the D.C. Circuit denied the government's second motion for an emergency

stay and dismissed its appeal, again finding that the government had failed to demonstrate appellate

jurisdiction or the propriety of mandamus relief. Order, No. 25-5028 (D.C. Cir. Feb 15, 2025),

ECF 9. Judge Katsas dissented. *See id.* at 16-27. The following morning, the government filed an

emergency application asking the Supreme Court to vacate the TRO and enter an administrative

stay. Application to Vacate, *Dellinger v. Bessent*, No. 24A790 (U.S. Feb. 16, 2025). Two days

later, Special Counsel Dellinger opposed that request. Opposition Brief, *Dellinger v. Bessent*, No.

24A790 (U.S. Feb. 18, 2025). On February 21, 2025, the Supreme Court issued an order holding the stay application in abeyance until February 26, 2025, the day the TRO is currently scheduled to expire. Order, *Dellinger v. Bessent*, No. 24A790 (U.S. Feb. 21, 2025). Justices Sotomayor and Jackson voted to deny the government's emergency application. *Id.* at 2. Justice Gorsuch, joined by Justice Alito, filed a dissenting opinion. *Id*. at 2 (Gorsuch, J., dissenting).

Meanwhile, the parties proceeded with briefing in this Court. On February 20, Special Counsel Dellinger filed a reply in support of his motion for a preliminary injunction. *See* No. 25 Civ. 385 (D.D.C. Feb. 20, 2025), ECF 21. That motion remains pending. On February 21, the government moved for summary judgment. *See* No. 25 Civ. 385 (D.D.C. Feb. 20, 2025), ECF 22. This brief constitutes a response to that filing and a cross-motion for summary judgment.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant entitled to summary judgment may also obtain a permanent injunction by demonstrating: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Factors (3) and (4) merge when the defendant is the government. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I. Special Counsel Dellinger's Removal Was Unlawful

There is a single reason why Special Counsel Dellinger's motion for summary judgment should be granted and the government's motion should be denied: the government did not comply with an applicable and constitutional for-cause removal protection statute when it purported to terminate the Special Counsel. *See* 5 U.S.C. § 1211(b). There are no disputes of material fact that would preclude the Court from deciding whether Special Counsel Dellinger's purported removal was unlawful. Indeed, the government has conceded that Special Counsel Dellinger's termination—which did not reference any finding of "inefficiency, neglect of duty, or malfeasance in office"—violated § 1211(b). The government's position depends entirely on the premise that § 1211(b) violates the separation of powers under *Seila Law*, 591 U.S. 197, and *Collins v. Yellen*, 594 U.S. 220 (2021). The Court can address that claim as a matter of law. In so doing, it should reject the government's position—as it already did at the TRO stage. *See Dellinger*, 2025 WL 471022, at *5 ("The Supreme Court has taken pains to carve the OSC *out* of its pronouncements concerning the President's broad authority to remove officials who assist him in discharging his duties at will."); *see also* Order at 14, No. 25-5028 (D.C. Cir. Feb. 15, 2025), ECF 9 ("[T]he cited cases do not hold that the President has unrestricted power to remove the Special Counsel.").

As we will show, taken together, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), *Seila Law*, and *Collins* all support the constitutionality of the OSC's for-cause removal limitation. That is true for two independent reasons: (a) the Special Counsel is an inferior rather than principal officer (and those cases all concerned principal officers); and (b) the central grounds given for invalidating for-cause removal restrictions in *Seila Law* and *Collins* do not apply here.

### A.    Special Counsel Dellinger Is an Inferior Officer

For inferior officers, Congress can "limit and restrict the power of removal as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886); *see also Myers v. United States*, 272 U.S. 52, 161-64 (1926); *Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988). The Supreme Court recognized that important distinction concerning inferior officers in *Seila Law*. *See* 591 U.S. at 218-20. In assessing whether a given official is an inferior or principal officer, the key question is "whether he has a superior other than the President." *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (cleaned up). Courts also consider the "nature, scope, and duration of an officer's duties." *Seila Law*, 591 U.S. at 217 n.3 (citing *Edmond v. United States*, 520 U.S. 651, 661 (1997)).

Under that standard, the Special Counsel of the OSC is an inferior officer—and Congress is thus freer to set terms for his removal from office. As explained above, the Special Counsel's role is important but circumscribed. The OSC exercises what this Court has aptly described as "limited jurisdiction." *Dellinger*, 2025 WL 471022, at *8. In essence, he is an ombudsman. He cannot regulate or penalize (directly or indirectly) any private conduct. Within the world of federal employment, moreover, he cannot impose any discipline or adverse action on his own authority. Instead, he receives complaints and encourages agencies to seek consensual resolutions; in some cases, he may also petition the MSPB on an injured employee's behalf or petition it to address a possible Hatch Act violation, but it is then up to the MSPB how it wishes to act on the petition. The MSPB is "free to disagree with the Special Counsel and often does." *AFGE*, 747 F.2d at 753. The Special Counsel can issue subpoenas while investigating, but he cannot actually enforce them—only the MSPB can do so. Similarly, although the Special Counsel can issue internal regulations and Hatch Act advisory opinions, they "bind[] neither the public nor any agency or officer of government." *Id.* at 752. The Special Counsel cannot bring an action in federal court.

Nor can he conduct his own investigation of reports from employee-whistleblowers within agencies; for such cases, he only reviews and assesses investigations by the relevant agency.

In these concrete respects, the Special Counsel's powers do not resemble the authority of the principal officers who lead the CFPB and FHFA. The CFPB Director, for instance, wields the power to "unilaterally . . . issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Seila Law*, 591 U.S. at 225. The FHFA Director, in turn, can "hold hearings," "suspend corporate officers," "bring civil actions in federal court," and "impose penalties ranging from $2,000 to $2 million per day." *Collins*, 594 U.S. at 230. The Special Counsel lacks these kinds of executive authorities. Nor does the Special Counsel's HR-oriented administrative functions compare to the criminal enforcement power wielded by U.S. Attorneys. As the Court knows well, U.S. Attorneys possess direct civil and criminal enforcement authority and wield immense power to directly and indirectly affect the rights, property, and liberty of private parties; they can bind and make representations on behalf of the federal Executive Branch; and they seek enforcement of their investigative subpoenas not from another independent agency of the Executive Branch, but rather from the Judiciary. The Special Counsel (and the OSC more generally) lacks any of those core executive prerogatives— and most certainly lacks the authority to act coercively against third parties on its own prerogative.

Accordingly, the Special Counsel is properly considered an inferior officer under Supreme Court precedent—and the for-cause removal provision is thus lawful. The government disagrees, stating that inferior officers must have superiors "other than the President." Gov't Br. 14 (quoting *Arthrex*, 594 U.S. at 13).[3] But in practice, the Special Counsel does have such superiors and

---

[3] "Gov't Br. __" refers to the government's memorandum of law in support of its motion for summary judgment, ECF 22.

supervisors: he is effectively supervised by and accountable to the MSPB and the other federal agencies where whistleblowers raise concerns, since it is ultimately their decision whether and how to accept his positions. Those agencies must exercise their independent discretion in assessing whether to pursue the Special Counsel's recommendations and, in that sense, act as "manager[s] or overseer[s]" of the OSC by deciding which actions by the OSC may proceed further. *Supervisor*, *Black's Law Dictionary* (12th ed. 2024); *Supervisor*, *Oxford English Dictionary* (2d ed. 1989) ("an overseer; a person who directs or oversees a task"). As a commonsense matter, government officials with limited authority and whose decisions are reviewable or modifiable by someone else inside the Executive Branch are not constitutional principal officers. *See Vanda Pharms. Inc. v. Food & Drug Admin.*, No. 23 Civ. 2812, 2024 WL 4133623, at \*19 (D.D.C. Sept. 10, 2024) ("[I]nferior officers may issue binding resolutions so long as they are properly supervised by a superior with the power to direct and overrule their decisions."); *Villarreal-Dancy v. U.S. Dep't of the Air Force*, No. 19 Civ. 2985, 2021 WL 3144942, at \*9 n.5 (D.D.C. July 26, 2021). The Special Counsel entirely lacks authority to issue binding decisions, and any recommendation he makes, whether that be to the MSPB or another agency head, is subject to the discretion of principal officers. This intra-branch supervision means that the Special Counsel is not a principal officer.

The government next claims that even if the Special Counsel is an inferior officer, Congress still may not restrict his removal. Gov't Br. 14. Citing *Myers v. United States*, 272 U.S. 52 (1926), the government states that if an inferior officer is sufficiently important to require the Senate's participation in his appointment, then the President must be able to fire him at will.

But *Myers* concerned Congress's attempt to vest the removal power in Congress itself— not the imposition of modest limits on the President's ability to remove an official. 272 U.S. at 107-08; *see Morrison*, 487 U.S. at 687 n.24 ("[T]he only issue actually decided in *Myers* was that

13

'the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress.'" (quoting *Humphrey's Executor*, 295 U.S. at 626)). Thus, any "general language" in *Myers* about Congress's ability to impose removal limitations should be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). Moreover, *Myers* itself also includes dicta inconsistent with the government's position. Specifically, *Myers* noted that, "[t]o take away this power of removal in relation to an inferior office created by statute, although that statute provided for an appointment thereto by the President and confirmation by the Senate, *would require very clear and explicit language.* It should not be held to be taken away by mere inference or implication." *Myers*, 272 U.S. at 163 (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903)) (emphasis added). That is precisely the situation here: Congress used "very clear and explicit language" to create a for-cause removal protection. *See* 5 U.S.C. § 1211(b). And the Supreme Court has clarified that what matters in assessing the lawfulness of removal protections for inferior officers is not the method of appointment, but whether the inferior officer "lack[s] policymaking or significant administrative authority." *Seila*, 591 at 218 (quoting *Morrison*, 487 U.S. at 691)); *Dellinger*, 2025 WL 471022, at *6 (observing that "like the independent counsel, plaintiff does not appear to have policymaking or significant administrative authority"). The Special Counsel lacks *any* authority to make binding decisions. Therefore, under the law as set forth by the Supreme Court, the OSC's for-cause removal provision is valid.[4]

---

[4] The government's view of these issues is not a model of consistency. Just days ago, the government argued before Judge Chutkan that Elon Musk, the single-headed Administrator of the Department of Government Efficiency, is not a principal or inferior officer because he lacks "formal authority to exercise the sovereign power of the United States" and because his work "is a purely internal act of government" in "a preparatory step to *inform* some later action." Defs.'

**B.      The Statutory Removal Protection Comports with Supreme Court Precedents**

Alternatively, even if Special Counsel Dellinger is a principal officer, the government's argument that § 1211 is unconstitutional under *Seila Law* and *Collins* fails because the OSC is distinguishable from the agencies at issue in those cases—the CFPB and FHFA—in ways that powerfully support the continued constitutionality of its removal limitation.

*First*, *Seila Law* and *Collins* were animated by a profound concern about the President's inability to remove officials sitting atop single-headed agencies that exercise core executive power in ways that could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 225; *accord Collins*, 594 U.S. at 255. In that scenario, even "modest restrictions" on the President's removal authority may impede his ability to carry out his Article II duties. *Collins*, 594 U.S. at 256 (quoting *Seila Law*, 591 U.S. at 228 (internal quotation marks omitted)); *see* Gov't Br. 15. But here, that concern is not implicated: the OSC is an ombudsman with limited advisory and reporting functions focused mainly on HR issues. In performing these functions, the OSC does not regulate or penalize private activity. *See Seila Law*, 591 U.S. at 221 (noting that the OSC "does not bind private parties at all"). The OSC also lacks the power to issue binding regulations, oversee adjudications, commence prosecutions, determine what penalties to impose, proceed in an Article III tribunal, or control in any way the substantive regulatory framework for any public or private entities. Further, the OSC's authority to promulgate regulations is confined to nonbinding advisory opinions and internal OSC affairs. *See AFGE*, 747 F.2d at 752 (observing that such regulations "bind[] neither the public nor any agency or officer

---

Resp. to Pls.' Revised Proposed TRO at 3-4, *New Mexico v. Musk*, No. 25 Civ. 429 (D.D.C. Feb. 13, 2025), ECF 20. As set forth above, the Special Counsel, too, is limited to purely internal acts of government that may subsequently inform some later action by other agencies.

of government"). And only the MSPB, not the OSC, can issue decisions in administrative adjudications arising from the OSC's performance of its statutory duties.

That is plainly not the type of "regulatory and enforcement authority" contemplated by the Supreme Court in *Collins*. 594 U.S. at 253; *See* Gov't Br. 15. Looking to the governing statutory framework—rather than cherry-picked language from the OSC website—the OSC's work occurs within a "limited jurisdiction" related to federal employers and employees. *Seila Law*, 591 U.S. at 221. As a matter of constitutional first principles, it poses no "special threat to individual liberty" for the Special Counsel to receive limited independence from political control in reviewing and preliminarily investigating confidential whistleblower reports from federal employees. *Id.* at 223.

*Second*, consistent with the reasoning of *Humphrey's Executor*, the OSC exists to vindicate functions and interests held in common by Congress, the Executive Branch, and the public. Congress carefully designed the OSC to play an important reporting role with respect to legislative oversight and deliberations. *See* 5 U.S.C. § 1217. The OSC's work also furthers the distinct and shared inter-branch interest in promoting Executive Branch compliance with congressionally imposed ethical and personnel requirements (although, again, not through issuing binding regulations, overseeing adjudications, or commencing prosecutions, *see* Gov't Br. 15). *See Dellinger*, 2025 WL 471022, at *8 ("The agency's statutory functions require it to report directly to Congress about what it has found and whether any executive agency has stood in its way."). In that respect, the OSC is more than just an aspect of the executive power or extension of presidential will. *See Humphrey's Executor*, 295 U.S. at 628. Moreover, the OSC's structure reflects a heavily negotiated inter-branch resolution that was embraced by President Bush when he signed the Whistleblower Protection Act (and by his Attorney General in cooperating to pass the bill). In fact, not one, but two Presidents—Carter and Bush—signed legislation with for-cause removal

16

protections at the OSC, making clear that any interstitial concerns raised by their subordinates at the OLC had either been addressed or overruled in practice by the Office of the President.[5]

*Finally*, the need for independence at the OSC is unique in its character and purposes. With respect to the CFPB and FHFA, the case for agency independence rested heavily on a substantive belief that economic regulation should be free of specific forms of presidential political control. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 229-30. Agency independence in those settings was designed to restrain the President's ability to direct the agencies' regulatory powers consistent with his agenda. Unfettered removal discretion in those circumstances served "vital purposes." *Collins*, 594 U.S. at 252; *see* Gov't Br. 15. Here, in contrast, the OSC lacks any regulatory powers—and the independence afforded by its statutory for-cause removal provisions serves an entirely different function. Rather than hamper the President's substantive regulatory agenda, the OSC's independence protects and assures whistleblowers, including those who may be reluctant to disclose potential wrongdoing to those in their own agencies. If the official charged with protecting whistleblowers from retaliation was himself utterly vulnerable to retaliation and removal for taking on politically charged or inconvenient cases, then the OSC's whistleblower protection purpose might fail when it is most needed. Simply put, Congress reasonably found— and two Presidents agreed—that the Special Counsel cannot serve as an independent watchdog, or protect whistleblowers, if he is subject at all times to removal without cause. *See, e.g.*, *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542,

---

[5] The government suggests that OLC opinions are a more accurate reflection of the Executive Branch's views than the positions taken by two Presidents. Whatever the virtue of that claim in general, it is exceptionally weak here given President Bush's decision to single out the for-cause removal provision while declaring that negotiators had resolved outstanding constitutional disagreements between the Executive and Congress in the Whistleblower Protection Act.

at *6 n.3, *9 (O.L.C. July 8, 2021) (concluding that *Collins* rendered the Social Security Commissioner removable at-will but did not apply to the OSC by virtue of its "limited jurisdiction"). It is presumably for this very reason that "*Seila Law* specifically distinguishes the Office of Special Counsel in its analysis." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025); *see* Gov't Br. 15.

Accordingly, the OSC's for-cause removal protection is constitutional.

## II.    This Court Should Enter a Permanent Injunction

No genuine disputes of material fact prevent the Court from concluding that Special Counsel Dellinger satisfies the requirements for a permanent injunction. The government errs by claiming that the Court has no authority to order the relief Special Counsel Dellinger seeks. Moreover, he has suffered irreparable harm from being denied his right to perform in office with the removal protections given by Congress; monetary damages cannot compensate for that injury; and the balance of the equities and the public's interest also weigh firmly against the government.

### A.    This Court Has Authority to Grant the Requested Relief

Before even addressing the permanent-injunction factors, the government argues that this Court lacks authority to grant the relief that Special Counsel Dellinger seeks. But a district court has authority to grant declaratory and injunctive relief in this context—including continuance and reinstatement remedies. *See Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 979-80 (D.C. Cir. 1996). The government's contrary arguments fail.

*First*, the government claims that Special Counsel Dellinger's requested relief would impermissibly enjoin the President. Gov't Br. 19, 23. But Special Counsel Dellinger has sought a declaratory judgment, not injunctive relief, against the President. *See* Compl. at 13-14, No. 25 Civ. 385 (D.D.C. Feb. 10, 2025), ECF 1. The D.C. Circuit has already recognized as much and noted

that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025); *see also id.* (concluding that "the TRO is properly read as not applying directly to the President but rather to the other defendants acting on his behalf"). Under binding D.C. Circuit precedent, this Court may provide effective relief to Special Counsel Dellinger by enjoining the same "subordinate executive officials" who are responsible for implementing the President's attempted termination. *Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 980; *Dellinger*, 2025 WL 559669, at *6 n.1. And this Court can also grant declaratory relief. *See, e.g.*, *Knight First Amend. Inst. v. Trump*, 302 F. Supp. 3d 541, 579-80 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021) (granting declaratory relief and noting that "all government officials are presumed to follow the law once the judiciary has said what the law is")

*Second*, the government claims that courts generally lack the power in equity (or otherwise) to reinstate unlawfully removed officials. Gov't Br. 17-18. To the extent this argument is focused on principal officers, it falls short because the Special Counsel is an inferior officer. *See supra* I.A. The government's argument is also flawed in several additional respects.[6]

To start, Special Counsel Dellinger does not seek (and this Court has not provided for) "reinstatement" to the office of Special Counsel. Rather, his position is that his purported termination without cause on February 7, 2025, was void *ab initio*. *See Harris v. Bessent*, No. 25

---

[6] In suggesting otherwise—in a dissent that was itself fairly tentative—Justice Gorsuch had not received briefing on many of the authorities set forth here (since the government meaningfully developed its arguments on this point for the first time only at the Supreme Court, which meant that neither this Court nor the D.C. Circuit nor Special Counsel Dellinger had much opportunity before emergency filings at the Supreme Court to properly research and address the issue).

Civ. 412, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025) ("Defendants thus conflate wrongful termination with the lack of power to effectuate termination—at least without cause."). Special Counsel Dellinger therefore seeks a declaration that his February 7 termination was unlawful and an order against subordinate executive officials to provide him the privileges and authorities of the Special Counsel, which would extend the relief this Court already provided in its TRO. *See Dellinger*, 2025 WL 471022, at *14 (ordering that Mr. Dellinger "*shall continue to serve* as the Special Counsel" (emphasis added)); *accord Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C 1963) (ordering that plaintiff's involuntary resignation was "void and of no effect; hence he was never legally separated from his position"); *Mackie v. Bush*, 809 F. Supp. 144, 147 (D.D.C. 1993) (granting a preliminary injunction against removal of members of Board of Governors of the Postal Service Board), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir.).[7] This is a continuance remedy, not a reinstatement.

And it is settled that such limited injunctive relief would properly and "*de facto*" grant Special Counsel Dellinger continued service in office. *Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 979-80; *id.* at 989 (Silberman, J., concurring) ("[W]e could grant appellant all the relief he would ever need in this case . . . without ever attempting to impose judicial power directly on the President of the United States."); *Spicer v. Biden*, 575 F. Supp. 3d 93, 97 (D.D.C. 2021) ("Following *Swan*, the Court could grant effective relief in this case by ordering [defendants], in their capacities as the Board's Chairman and Designated Federal Officer, to treat the plaintiffs as full members of the Board."). An injunction would thus preserve rather than reinstate the Special

---

[7] While the fact pattern in *Mackie* presents a different theory of irreparable injury, *Dellinger*, 2025 WL 471022, at *11 n.6, the relief ordered by the court (specifically, that officers of an independent agency must be allowed to continue to serve in office) is directly relevant here.

Counsel's ongoing tenure—as confirmed by D.C. Circuit authorities inconsistent with the government's position.[8]

More broadly, the government errs in contending that courts are generally powerless to restore unlawfully removed officers to their positions. Gov't Br. 17-19. Nothing precludes a court from ordering such relief. *See* Laurence H. Tribe, *American Constitutional Law* 706 n.20 (3d ed. 2000) (explaining that "an injunction could issue to bar unlawful removal and . . . an appropriate subordinate could be required by mandamus to reinstate an unlawfully removed officer"). Courts in this Circuit have accordingly ordered reinstatement of officers (or prevented their unlawful removal) across the Executive Branch. *See Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (granting preliminary injunction against removal of plaintiffs as members of the U.S. Commission on Civil Rights), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Mackie*, 809 F. Supp. at 147-48; *Salleh v. Christopher*, 876 F. Supp. 297, 304, 307-08 (D.D.C. 1995), *aff'd*, 85 F.3d 689 (D.C. Cir. 1996) (ordering reinstatement of foreign service officer removed in violation of for-cause protection); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff is "entitled to reinstatement"); *Paroczay*, 219 F. Supp. at 94.

History confirms the Court's authority to order restoration of invalidly removed officers. For centuries, courts acting under the writ of mandamus have ordered plaintiffs be restored to public offices from which they were wrongfully removed. *See, e.g.*, Thomas Tapping, *The Law*

---

[8] The government tries to distinguish *Swan* because it addresses the question of Article III standing, but this attempted distinction misunderstands *Swan*'s relevance. Gov't Br. 19 n.4. *Swan* held, after surveying caselaw on the authority of courts to enjoin the President, that the court had authority to issue adequate relief even absent an injunction requiring "official reinstatement by the President." 100 F.3d at 980. That is exactly the kind of relief that Special Counsel Dellinger seeks. Separately, the court concluded that the officer at issue was not protected by any express for-cause removal provision. *Id.* at 981. But § 1211(b) provides such express protection for the Special Counsel.

*and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has been by a great number of cases held to be grantable, as well to admit him who has a right as to restore him who has been wrongfully displaced, to any office . . . ."); John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibitions* 302 (1888) (identifying "mandamus to restore" as a remedy available to plaintiffs "wrongfully dispossessed of any office"); Samuel Slaughter Merrill, *Law of Mandamus* § 148 (1892) ("When an officer has been wrongfully removed from his office, he will be restored thereto by the writ of *mandamus*."). And courts of law have similarly recognized proceedings in *quo warranto* as "a plain, speedy, and adequate" remedy in law "for trying the title to office." *Delgado v. Chavez*, 140 U.S. 586, 590 (1891); *see also, e.g.*, *Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 544 (1915) ("The writ thus came to be used as a means of determining which of two claimants was entitled to an office . . . ."). This longstanding procedure vests courts with the traditional remedial authority "not only to oust the respondent [officer] but also to install the relator [officer]." Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 496 (1890); *e.g.*, *Boyd v. Nebraska*, 143 U.S. 135, 151 (1892); *United States ex rel. Crawford v. Addison*, 73 U.S. 291, 297 (1867) (observing that upon judgment of ouster, "relator thereupon became entitled to the office").

The cases cited by the government confirm rather than undermine this point. *See In re Sawyer*, 124 U.S. 200 (1888); *White v. Berry*, 171 U.S. 366 (1898). As the Supreme Court wrote in *Sawyer*, "The jurisdiction to determine the title to a public office . . . is exercised either by . . . *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to . . . the mode of procedure, established by the common law or by statute." *Sawyer*, 124 U.S. at 212; *see also id.* at 213, 216, 220 (same); *White*, 171 U.S. at 377 (identifying

"mandamus, prohibition, quo warranto, or information in the nature of a writ of quo warranto"). The government's other authorities say the same, or rested on the conceptually distinct point that federal courts should abstain from adjudicating *state* offices. *See, e.g.*, *Walton v. House of Representatives of State of Okl.*, 265 U.S. 487, 490 (1924) (eligibility of state representative); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) (declining to enjoin state criminal proceeding).

To be sure, the government tries to disclaim *quo warranto* as a relevant analogue on the basis that it has been historically viewed as a "legal rather than an equitable remedy." Gov't Br. 18. But the Supreme Court in *Sawyer* and *White* divided legal and equitable remedies because those cases were "decided before the simplification of the rules of pleading and, more importantly, before the merger of law and equity." *Stern v. S. Chester Tube Co.*, 390 U.S. 606, 608-10 (1968). Now, "there is only one action . . . in which all claims may be joined and all remedies are available." *Ross v. Bernhard*, 396 U.S. 531, 539 (1970). Further, in the 100-plus years since *Sawyer* and *White* were decided, the Supreme Court has approved court-ordered reinstatements to positions in the Executive Branch. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988) (rejecting government's position that, on remand, courts lacked authority to "order respondent's reinstatement," approvingly citing "traditional equitable principles"); *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (holding Department of the Interior employee "is entitled to the reinstatement which he seeks"). And the government's categorical "no-reinstatement" rule cannot be reconciled with the Supreme Court's later recognition that, where warranted, courts have "injunctive power" to reinstate executive employees. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). There is thus no present-day basis for the government's antiquated view of pleadings and remedies.[9]

---

[9] In the same vein, the government does not contest the courts' authority to adjudicate the title to public office under *quo warranto* but objects that Special Counsel Dellinger did not plead *quo warranto* in his complaint. Gov't Br. 18. However, in cases involving removal from office, "the

Nor does the government succeed in deriving a "backpay-only" rule from a handful of prior cases involving removed officers. A litigant's choices about what remedy to seek in prior litigation tactics have nothing to do with the court's authority to issue a remedy. In any event, one analogous litigant (Myron Wiener) originally *did* sue for reinstatement, and filed suit for backpay only after Congress's abolition of the War Claims Commission mooted his request to be reinstated to it. *Wiener v. United States*, 357 U.S. 349, 350 (1958); Br. for United States, 1957 WL 87809, at *13-14 (Oct. 15, 1957). As to Mr. Humphrey, the government does not dispute that he was dead when a legal challenge to his removal was first filed. *See Humphrey's Executor*, 295 U.S. at 612; *see* Gov't Br. 16 n.3. Were there doubt, the parties' briefs confirm this timing. Br. for Executor, 1935 WL 32964, at *2-3 (Mar. 19, 1935) (explaining that Humphrey's estate first challenged his removal on April 28, 1934, two months after his death). And Mr. Myers—who was deceased at the time of a final judgment—saw his term of office expire in July 1921, only months after he first sued and years before the trial court heard his case. *See Myers v. United States*, 58 Ct. Cl. 199, 202-03 (1923), *aff'd*, 272 U.S. 52 (1926). Reinstatement would have been moot at that point. Accordingly, the government's effort to craft a back-pay-only rule from these cases ignores the facts and context of these proceedings.

Next, the government disputes the Court's remedial authority on the ground that there is no "previous case in which a court ordered the reinstatement of single agency head after removal

---

Court is to broadly construe" the request for relief, *Severino v. Biden*, 581 F. Supp. 3d 110, 116 (D.D.C. 2022), *aff'd*, 71 F.4th 1038 (D.C. Cir. 2023), and may grant any remedy necessary to accord the plaintiff relief (or may instead grant leave to amend), *Swan*, 100 F.3d at 980. Moreover, D.C. Code § 16-3501 expressly authorizes Special Counsel Dellinger as an "interested person" to seek a writ from this court. *See Newman*, 238 U.S. at 546 (distinguishing between a "third person" and "interested person"). A prior request to the U.S. Attorney General would have been both futile and inadequate. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 326-27 (1988); *see* Gov't Br. 18.

by the President." Gov't Br. 18. But there have not been any such cases involving an official removed without cause, principally because Presidents have not historically violated for-cause removal restrictions. Of course, President Biden removed the Commissioner of the Social Security Administration, but the removed commissioner did not choose to contest that determination in court (perhaps because the OLC's position after *Collins*—a position that distinguished the OLC—seemed likely to prevail if tested in the Judiciary). *See Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *6 n.3, *9 (O.L.C. July 8, 2021). Any absence of on-point authority thus cuts both ways and certainly does not support the government.

Regardless, the more sensible lesson to derive from past practice is that reinstatement remedies have long been perceived as inherent and integral to the statutory framework for independent agencies. As explained above, Special Counsel Dellinger challenges his removal by reference to a statutory provision that seeks to secure a measure of agency independence from direct political control. See *Dellinger*, 2025 WL 471022, at *6. It is appropriate for this Court to craft equitable remedies by reference to that statutory scheme. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 444-45 (2011) (defining the district court's remedy by reference to "equitable principles[] as modified by the obligations and injuries identified by ERISA itself"); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("[S]ince the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake."); *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944) ("[D]iscretion under [the statutory provision authorizing relief] must be exercised in light of the large objectives of the" statute, "[f]or the standards of the public interest[,] not the requirements of private litigation[,] measure the propriety and need for injunctive relief in these cases."). Attention to the statutory scheme, in turn, clarifies the proper remedial framework. In

designing the OSC, Congress undertook to safeguard covered officials against removal without cause. It follows from this statutory plan that officials removed without cause can seek a judicial order (just like the one issued here) providing for their continuance in the relevant office.

To hold otherwise would reduce for-cause removal statutes to rubble. On the government's view, a President could fire independent agency officials at will and, at most, months or years later, after final judgment and appeal, those fired officials might be able to recover some backpay from the Treasury . . . but nothing more. On this logic, a century of ink and energy devoted to agency independence has been a colossal misadventure: all it would cost is a few thousand dollars from the U.S. Treasury for a President to buy his way out of for-cause removal restrictions. Rather than infer that so many Presidents, legislators, courts, scholars, and agency officials misunderstood how for-cause removal restrictions work—namely, to keep covered officials in office unless they are properly terminated—the more natural inference is that equity permits courts to afford continuance or reinstatement remedies as necessary to effectuate these longstanding statutory safeguards.

Finally, and alternatively, even if the government is correct that this Court cannot issue an order against subordinate executive officials to provide Special Counsel Dellinger with the privileges and authorities of the Special Counsel, partial summary judgment would still be appropriate. *First*, the Court could still issue a declaratory judgment that Hampton Dellinger is the proper head of the OSC. *See, e.g.*, *United States v. Wilson*, 290 F.3d 347, 362 (D.C. Cir. 2002) (declaring that appellee "is a member of the United States Commission on Civil Rights 'with all the powers, privileges, and emoluments thereunto of right appertaining'"); *Borak v. Biddle*, 141 F.2d 278, 281 (D.C. Cir. 1944); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (issuing a declaratory judgment against the President); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (an action "traceable to the President's" decisions "would be

26

redressed by a declaratory judgment that the [actions] are invalid"). *Second*, and once again separate of the requested injunctive and declaratory relief, this Court may award Special Counsel Dellinger backpay, which would require it to hold that his termination was unlawful. Compl. 14.

### B.    The Permanent Injunction Factors Strongly Favor Relief

Special Counsel Dellinger has previously explained the irreparable harms he would suffer in both his personal and official capacities if he is removed from office: most notably, he would be deprived of the statutory right to function in his office, and deprivation of that statutory right would cause immeasurable and irreparable damage to the OSC at this especially fraught time for the federal civil service. *E.g.*, ECF 12 at 4-7; ECF 21 at 9. In its opinion granting the TRO, this Court thoroughly addressed each of those harms and explained in detail why the government's authority did not carry the day. *Dellinger*, 2025 WL 471022, at *9-13. Since that decision, Judge Contreras has followed this Court's careful analysis to reach a similar finding of irreparable harm to a member of the MSPB removed in violation of an express for-cause removal protection. *See Harris v. Bessent*, No. 25 Civ. 412, 2025 WL 521027, at *6-9 (D.D.C. Feb. 18, 2025).

The government does not refute the Court's analysis; instead, it mostly repeats the same points that this Court has already rejected. *Compare* Gov't Br. 20-21, *with Dellinger*, 2025 WL 471022, at *9-13 (addressing *Sampson*, *Berry*, and *English*). The government's sole new argument is to analogize Special Counsel Dellinger's deprivation of the statutory right to function in his office to suits filed by small numbers of congressional representatives in which courts rejected a theory of Article III "legislative standing." *See* Gov't Br. 20 (citing *Raines v. Byrd*, 521 U.S. 811, 820 (1997); *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1984) (Bork, J., dissenting)). But those cases do not stand for the broad principle that a public official can never sue to vindicate an irreparable institutional injury on behalf of a government office. Rather, they stand for the much

narrower proposition that individual representatives in a legislative body generally lack standing to vindicate the institutional interests of the whole body. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802-04 (2015); *see Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 763-66 (D.C. Cir. 2020) (en banc). Here, in contrast, Special Counsel Dellinger was appointed by the President and confirmed by the Senate to lead the OSC, and so is uniquely situated to vindicate his office's statutory right to function with a modest degree of independence. The government's further argument that Special Counsel Dellinger has no right to exercise authority absent presidential approval, Gov't Br. 20, rests on the predicate assumption that it will prevail on the merits. As discussed above, the government is wrong.

Further, as this Court has concluded, a post-judgment award of monetary damages would be an inadequate remedy for Special Counsel Dellinger's irreparable loss of his statutory right to function in office: "[P]laintiff's irreparable injury cannot be compared to the loss of income or embarrassment involved in the typical employment action, for which there are remedies that do not involve equitable relief. This case falls outside of the typical paradigm since the OSC is an independent agency and the White House is not plaintiff's employer." *Dellinger*, 2025 471022, at *10; *see also Sampson*, 415 U.S. at 86 n.58, 92 n.68 (explaining that monetary damages alone would be inadequate in "extraordinary" cases outside "routine" loss of employment).

Finally, the balance of the equities and the public interest strongly favor the relief sought by Special Counsel Dellinger. The government asserts a "great and irreparable harm to the Executive," Gov't Br. 21, but that same reasoning has not yet carried the day in any court to hear the case—and is unconvincing on its terms, since it amounts to a restatement of the government's view of the merits of the case, rather than a distinct explanation for why its position is correct. On the flip side of the equation, "[t]here is generally no public interest in the perpetuation of unlawful

agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Instead, there is a "substantial public interest" in the Executive Branch abiding by federal law. *Id.* at 12; *Harris*, 2025 WL 521027, at *9 (same).

The government separately argues that reinstating Special Counsel Dellinger—who was lawfully appointed and confirmed to his office—would cause confusion that could later invalidate actions by the OSC. Gov't Br. 22-23 (citing *Collins*, 594 U.S. at 259). But in light of the OSC's narrow jurisdiction and inability to regulate private parties, it is unclear who the government thinks could file suit to invalidate the OSC's actions (as a private party did in *Collins*). Regardless, any fault for confusion over the OSC's authority rests with the government, which refuses to comply with the plain terms of a 50-year-old statute. *See Dellinger*, 2025 WL 471022, at *10 & n.5; Order at 1, No. 25 Civ. 385 (D.D.C. Feb. 13, 2025), ECF 19.

The public interest in enforcing 5 U.S.C. § 1211(b) is particularly strong today. Congress established the Special Counsel to protect whistleblowers and federal employees victimized by prohibited personnel practices. As Congress and two Presidents recognized, "[i]ndependence is essential to any Special Counsel's ability to perform the unique set of duties and reporting requirements set forth in the statute." *Dellinger*, 2025 WL 471022, at *13. That independence has never been more important given the historic upheaval currently occurring within federal employment and the continued need to ensure that whistleblowers are guarded from reprisal.

## CONCLUSION

For the reasons above, Special Counsel Dellinger's cross-motion for summary judgment should be granted, the government's motion for summary judgment should be denied, and the Court should issue declaratory and permanent injunctive relief to Special Counsel Dellinger.

Respectfully submitted,

Kate L. Doniger*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

      /s/ Joshua A. Matz
Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493
Benjamin Stern*
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Admitted pro hac vice

Attorneys for Plaintiff Hampton Dellinger

DATED: February 24, 2025