# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA
333 Constitution Avenue NW
Washington D.C. 20001

| | |
|---|---|
| **HAMPTON DELLINGER,**<br>Special Counsel of the<br>Office of Special Counsel<br>*Plaintiff,* | Leave to File GRANTED<br><br>*Amy B Jack*<br><br>U.S. District Judge<br>March 3, 2025 |
| **SCOTT BESSENT,**<br>Secretary of the Treasury | |
| **SERGIO GOR**,<br>Director of the White House<br>Presidential Personnel Office | CIVIL ACTION No.<br>1:25-cv-00385-ABJ<br><br>Date: February 25, 2025 |
| **KAREN GORMAN**,<br>Principal Deputy Special Counsel<br>of the Office of Special Counsel, | |
| **KARL KAMMANN**,<br>Chief Operating Officer<br>of the Office of Special Counsel | |
| **DONALD J. TRUMP**,<br>President of the<br>United States of America, | |
| **RUSSELL VOUGHT**,<br>Director of the Office of<br>Management and Budget, | |
| *Defendants,* | |

## COMPLAINT

## MOTION TO INTERVE, or,
## in the alternative, AMICUS BRIEF

**COMES NOW**, Damian R. Nastri, *Pro Se*, (Intervenor) to Intervene in the immediate case (or in absence of acceptance or approval of such, to serve as Amicus in the matter), in which Intervenor contends he qualifies for both, Intervention of Right, Fed. R. Civ. P. 24(a); and, Permissive Intervention, 24(b); as well as Amicus, but for which should first be regarded as a matter of right. <u>This intervention or information is **critically urgent.**</u>

    1.    Intervenor has knowledge, experience, evidence, and interests relating to the matter before the Court, President and nation, in the immediate case – a case which is already impairing or impeding, and may further impair or impede movant's ability to protect his interests, for which no existing parties adequately represent, and where his claims share common questions of law and fact, for which he Intervenes for Defendants, or serves as Amicus Curiae.[1]

    2.    Intervenor can also demonstrate not only how the Office of Special Counsel (OSC) has been and continues to be engaged in misconduct dispositive to the immediate case, warranting the actions of Defendants, and demonstrate the need for decisive actions of the President (and this Court therefore) to prevent immediate and irreparable harm – but also, how <u>Plaintiff and those under the Special Counsel's control have engaged in inefficiency, neglect of duty and malfeasance</u>; and how <u>the Plaintiff has aided, abetted or served as accessory after the fact therefor</u>; and, how <u>**Plaintiff has deceived this Court**</u> (and as a result, the Circuit, and the Supreme Court

---

[1] Intervener takes exception to acting in defense of the OSC defendants, as he has reason to believe one or both have been engaged in misconduct, and should not be similarly grouped and seen as privy like the other Defendants.

of the United States), which Plaintiff did in service of Plaintiff's deceptions, apparently for personal interests, including specifically, to avoid being fired.[2]

3.      Plaintiff's filing before this Court used deception to cover up for inefficiency, neglect of duty, or malfeasance in office, ironically, while not only concurrently <u>admitting his own inefficiency, neglect of duty, or malfeasance</u>, but also <u>while asserting his intent (and therefore OSC's) to continue to do so</u>.

4.      Plaintiff's filing before this Court itself demonstrates that Plaintiff has either committed the violations sufficient to be removed,[3] or, if he claims it his incompetent error vice malfeasance, then he does not have the qualifications <u>which Federal statute **requires** as a condition to be the Special Counsel</u> (and which arguably simply makes *ultra vires* any such person in that position).[4]

5.      The Intervenor has experience, *inter alia,* in the Plaintiff's duties, as an investigator of violations by Federal agencies and employees; as an official who conducted oversight and advised upon the lawful sufficiency of the same types of investigations conducted by the Federal government; <u>as a person who (Congress confirmed, to OSC's knowledge) validly diagnosed the inefficiency, neglect of duty, or malfeasance of multiple persons and multiple agencies in the same type of work as performed by the Plaintiff;</u> as a person who assisted and protected Federal persons in whistleblowing and other protected activity; as a person who engaged in whistleblowing and other protected activity; and as an employee (including current,

---

[2] The U.S. Court of Appeals, and the Supreme Court, appear to have unwittingly assimilated Plaintiff's falsities.
[3] "The Special Counsel may be removed by the President only for <u>inefficiency, neglect of duty, or malfeasance</u> in office." 5 U.S.C. 1211(b)
[4] "The Special Counsel **shall be** an attorney who, by demonstrated ability, background, training, or experience, is **especially qualified** to carry out the functions of the position." 5 U.S.C. 1211(b)

former or applicant for employment) who OSC was/is **required** to protect, perform

for, and act in the interests of – but who OSC has illegally failed to, and which the

Plaintiff pleadings before the Courts demonstrates will continue.

6.      OSC and its leaders, including Plaintiff, have not only failed to, <u>but,</u>

<u>without the action of the President, and the Courts in this case, Plaintiff and OSC will</u>

<u>continue to, as proven by Plaintiff's own statements to this Court.</u>[5]

   a.  Plaintiff presented to this Court as if the Whistleblower Protection Act

       (WPA) only vested OSC with aspirational/discretionary "authorities" to

       receive complaints from whistleblowers and protect them from retaliation,

       while willfully omitting he/they actually have the duty to.[6]

   b.  And, in trying to falsely portray his office and his role as a disinterested

       "ombudsman" or watchdog, Plaintiff misleadingly cited to outdated

       caselaw from 1982, which not only preceded the 1989 WPA (let alone

       Congress's follow-on actions), but he cited from a period before which

       Congress rewrote the statutes to try to prevent further neglect of duty and

       malfeasance by OSC and further errors in caselaw, the exact which the

       Plaintiff commits or uses to mislead this Court.[7]

   c.  Despite that Plaintiff willfully deceitfully just misreported it to this Court as

       an aspirational "mission", Congress not only ensured OSC the authorities to

       aspirationally perform, but – though Plaintiff deceitfully omitted it,

---

[5] See, Plaintiff's <u>Complaint for Declarative and Injunctive Relief</u>, filed Feb. 10, 2025, Dellinger v. Bessent, *et al*.
[6] *Id.* at 19
[7] *Id.* at 21

Congress explicitly premised the WPA and Public Law with OSC's **duties** therefore, proclaiming in law that, "[T]he primary **role** of the Office of Special Counsel is **to protect** employees, especially whistleblowers, from prohibited personnel practices (PPP)", and while Plaintiff also willfully deceitfully omitted the companion provision in that law, by which Congress mandated also, "[T]he Office of Special Counsel **shall** act in the interests of employees who seek assistance from the Office of Special Counsel."[8]   Pub. L. 101–12, §2, Apr. 10, 1989, 103 Stat. 16 (2)(A) and (2)(B)

  i. Plainly, OSC is not an ombudsman, and the core of OSC's work is not optional.  OSC is supposed to be an advocate and protector who must perform on its protectorate's behalf to prevent or stop misconduct in and by government.  If the Special Counsel is not doing his duty, if he is allowing his office to fail to, or if he is failing to report or correct misfeasance, malfeasance or nonfeasance, that he has any reason to believe has happened, is happening, or will happen, then, at best, he has been and is neglecting his duties.

d. In describing (admitting) OSC's (enduring lack of) performance, the Plaintiff (the Special Counsel of OSC), proclaimed to this Court that,

  "When the OSC receives a complaint alleging a PPP… it reviews the allegations, assesses the evidence, and determines **whether** to begin an investigation … [and] When investigation is warranted, the OSC *resolves*

---

[8] *Id.* at 22

**most** matters by *assisting* settlement or alternative dispute resolution with the complainant-employee and the agency-employer, but the OSC **<u>occasionally</u>** seeks corrective action on behalf of the employee in the MSPB … [but,] If the OSC *declines* to seek corrective action, the employee alleging a PPP retains an **<u>independent</u>** <u>right of action</u> to file with the MSPB **without** OSC involvement, subject to certain procedural requirements."[9]

    i. This was an admission of past violations, and notice of Plaintiff's and OSC's intent to continue such, in violation of the laws <u>that Congress created to stop and prevent these same neglects of duty by OSC and its Special Counsel</u>, let alone that the Plaintiff did so while attempting to mislead the Courts.

        1. To prevent OSC from lackadaisically acting and failing to perform (as the Plaintiff's filing stipulated that he and OSC still does), Congress codified via statute that,

           "The Special Counsel **shall** receive **any** allegation of a prohibited personnel practice <u>and **shall** investigate the allegation</u> to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken."  5 U.S.C. § 1214(a)(1)(A)

---

[9] *Id.* at 22

    a. While the Special Counsel has discretion to determine if it has any reasonable grounds to believe a PPP occurred, exists or is to be taken, it is only supposed to do so after investigation, which not only do they fail to do, but Plaintiff admits such failures to this Court.

        i. The Intervenor himself had to previously work with Congress to prevent OSC's attempts to weaken such laws and avoid the work that Congress required it to do.

ii. Even then, as Plaintiff admitted before this Court, when OSC does determine reasons to believe that any PPP has occurred, exists, or is to be taken, OSC "resolves" most matters by ADR and settlement between the violators and the employee.

    1. Not only was this a continuance of OSC's deceitful practices of misleadingly reporting any closed cases as "resolved", but Plaintiff **admits** that OSC gets most employees with any reasonable claim to just relent to a settlement (whereby not only are the violators let off the hook, but OSC staff uses such to prematurely get out of work).  Not only is this illegal, but it creates a culture by which bad actors in government learn that if they are caught retaliating against whistleblowers or engaging in other misconduct, in **"most"** cases, the worst that

will happen is that the person who caught them must cut a deal to shut up and go back to business as usual.   And, OSC employees learn that – **most** of the time – they can avoid work if they get employees to relent to any deal, let alone if they simply fail to investigate.  And, despite merit, and while it is illegally in violation of OSC's Congressionally mandated role (which Plaintiff obscures), OSC will **only** **"occasionally"** seek corrective action for ***any*** wrongs.

      a.  This too is, at best, a neglect of duty.  As, after Congress realized that they may have to compel OSC to perform its job, and to ensure that the President's staff (in both "independent agencies" and departments) could help clean bad actors out of government, and ensure corrective actions for those who had been retaliated against or otherwise wronged, Congress codified in statute that,

        "If, in connection with **any** investigation, the Special Counsel determines that there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken which requires corrective action, the Special Counsel **shall** report the determination together with

any findings or recommendations to the [U.S. Merit

Systems Protection] Board, the agency involved, and

to the Office of Personnel Management (OPM)…" 5

U.S.C. § 1214(b)(2)(B); *and*, **shall** also report

violations of any other law, rule or regulation to the

responsible agency head. 5 U.S.C. § 1214(e)

iii.   And though employees have an 'Individual Right of Action' (IRA),

5 U.S.C. § 1221 – Plaintiff willfully falsely misled this Court, *et al,*

by renaming such in his complaint instead as an "**independent** right

of action".  He obfuscated his duties, and prevented the President

from learning of his neglect of duty.[10]

1. When Congress created OSC's related duties in law,

Congress documented its intent that, "[I]t is hoped that the

OSC will demonstrate an increased commitment to

whistleblowers so that **few** employees will feel it necessary to

pursue their cases independently," and then, for years

thereafter, as OSC still neglected their duties, Congress

further **mandated** and reaffirmed that, even if employees may

exercise **their** right, OSC had additional **ministerial duties to**

**help them** decide if they should, and to perform such, let

alone that even during any IRA, OSC can still support them,

---

[10] Plainly, the Special Counsel of the United States knew the correct wording, let alone the literal caption name of the relevant provision of statue that is specifically under or directly related to his role, agency and jurisdiction.

as opposed to the way the Plaintiff mischaracterizes it while obfuscating laws, and suppressing his and OSC's actual neglect of duty.[11]

    a. Plainly, as one of the many ways Plaintiff and OSC engage in deprivations of rights or other misconduct, Plaintiff tried to obfuscate the duties related to an **individual's** right, which he neglects, by falsely renaming it an "independent" right.

iv. While Plaintiff would have this Court, let alone those who the Plaintiff is **required** to protect and act in the interests of, and investigate and prosecute on behalf of, believe that we/those persons mostly need to relent to a settlement to get corrective actions, Congress made clear that for any action demonstrated to be a PPP, or otherwise illegal, the government is to order corrective actions. But because of the Plaintiff's and OSC's inefficiency, neglect of duty, or malfeasance, most cases and employees never get such; and worse, OSC illegally fails to inform the MSPB of violations thereby obstructing such.

    1. In fact, Congress ensured such at the administrative level to prevent the costs and trouble of having to take such matters to an actual court, where, if the Executive Branch failed in their

---

[11] *See, inter alia*, 5 U.S.C. § 1214(a)(1)(D), § 1214(a)(2)(A), § 1214(a)(4), and, § 1214(a)(5).

duty to correct all such, the Courts ministerially must so

perform as well. 5 U.S.C. § 706

e.  But, as Plaintiff confirms still endures and he intends to continue, OSC is

likely the only law enforcement agency in our government that mostly fails

to even investigate, and the only prosecutor who mostly only cuts deals that

make the *victims* relent to a settlement which lets the violators off without

any allocution, plea or penalty.

    i.  Ridiculously, Plaintiff does this not only while he advertises and

proclaims on his own website that OSC is a, "Federal **investigative**

*and* **prosecutorial** agency",[12] let alone that Congress itself has made

clear that, "The (law) established the Office of Special Counsel <u>to</u>

<u>**investigate** *and* **prosecute** allegations</u> of prohibited personnel

practices or other violations of the merit system."[13]

        1.  In fact, as per OSC's most recent Annual Report, OSC

processed *and closed* 2,879 PPP cases, of which OSC only

even informally negotiated **anything** favorable with the

agency in only 289 cases (**only 10%** of closed cases

(let alone only 7% of total cases) for that time period).[14]

        2.  In fact, <u>OSC Prosecuted PPPs at MSPB to achieve corrective</u>

<u>actions in **0 cases (0%)** or Prosecuted before MSPB to</u>

---

[12] <u>About OSC</u>, U.S. Office of Special Counsel.  Publicly available on the Internet at: <u>https://osc.gov/Agency</u>
[13] *See, for example,* <u>To Authorize Appropriations for the Merit Systems Protection Board and the Office of Special</u>
<u>Counsel, and For Other Purpose,</u> Comm. on Governmental Affairs, U.S. Senate, (S. Rpt. 107-349), Nov. 19, 2002
[14] OSC Annual Report at 17

<u>Discipline **any** agency violators, in **0 cases (0%)** in</u>

<u>**FY 2019, FY 2020, FY 2021, FY 2022, and FY 2023.**</u>[15]

    a.  The agency created to "investigate **and prosecute**"

these exact types of violations virtually never does.

3.  All of OSC's "investigation and prosecution" attorneys are

paid at least six-figures per year, and numerous attorneys and

other staff at OSC, including Plaintiff, are paid upwards of

$200,000/year, from tax-payer's dollars, though they often

fail to sufficiently perform, do not sufficiently investigate,

and most have **never** prosecuted, as enabled or caused by the

Plaintiff and predecessors, which Plaintiff will not change.

  a.  Plaintiff (or his predecessors, including those who literally lied to

Congress that they were going to change this exact thing) continue to

fail to encourage and motivate their prosecutors to prosecute PPP

cases – the core task area of OSC, and at best only privately cut a

few insufficient deals by negotiating in the blind with the violators,

where the victims get shortchanged, and there is not even any public

record about the violators, so they all only fester like Cancer to

decimate our government – the opposite of OSC's mission and role.

---

[15] OSC Annual Report at 17.
https://osc.gov/Documents/Resources/Congressional%20Matters/Annual%20Reports%20to%20Congress/FY%202020 23%20Annual%20Report%20to%20Congress.pdf

7.    In the Special Counsel's most recent Annual Report to Congress, he wrote, a "**If a meritorious case** cannot be resolved through negotiation with the agency involved, (OSC's Investigation and Prosecution Division) *may* bring an enforcement action before the MSPB." [16]

    a.  This is a perfect illustration of OSC's neglect of duty which the Plaintiff has done, and has told this Court and the President that he will continue to.

    b.  OSC is not supposed to have to negotiate.  They are required to inform the President's agency representatives (who have a duty to act) of PPPs.

        i.  OSC can, however, negotiate to get **more** than just corrective actions, *i.e.,* compensatory damages or other such enhancements.

    c.  U.S. Citizens do not need to negotiate to utilize and enjoy their rights.

    d.  Federal employees have **rights** to correction of any and all PPPs.

    e.  Despite how Plaintiff portrayed it, OSC actually, and often secretly or privately, negotiates settlements on employees' behalf – and often not even with an agency head, but with implicated subunit employees, simply to get anything OSC can report as a subjectively "favorable" action in their annual report – even if it does not ensure protection or full corrective actions.

        i.  Not only does OSC not "assist" employees as the Plaintiff would have this Court, *et al,* believe, but instead, they illegally do so often against the victim employee's own will or even knowledge.

---

[16] OSC Annual Report at 11.

    f.  By contrast, since OSC had, for years, been insufficiently and lazily performing as such, if at all, Congress mandated that in **any** meritorious case, the Special Counsel ministerially **shall** inform the MSPB, OPM, and the agency head – who themselves have duties and authorities regarding corrective actions.  5 U.S.C. § 1214(b)(2)(B)

8.  As Plaintiff's complaint hedged, he and his office also (fail to) serve as the United States' putative wrongdoing hotline, essentially for the entire government.

    a.  Under Federal statute, in *any* instance where the Special Counsel finds it substantially likely that anything which any employee, former employee, or applicant for employment discloses to OSC indicates **any** violation of **any** law, rule, or regulation, or gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health and safety, § 1213(c), then the Special Counsel **must** refer such to the head of the involved agency, and **require** that the agency head **must** conduct an investigation and submit a written report of their findings. § 1213(c)

    b.  While OSC is supposed to make a 'substantially likely' determination, it is superficial, and should err on referral, because it is pre-investigative.

    c.  But, as per the most recent Annual Report, of the 1,285 disclosures the Special Counsel both processed and closed in the most recent reporting year, the Special Counsel determined that it was substantially likely that

any violation was *possibly* disclosed, in only 19 cases – or **1% of cases**,

and thereby hid disclosures from the President, *et al*, in 99% of cases.[17]

9.    As a result of the Plaintiff's pretense, the Court may not have realized the

significance that Plaintiff mostly premised OSC's performance on the Hatch Act

– and his complaint mentioned it more than PPPs (7 v 6) – while obfuscating that

the Hatch Act is **not** OSC's primary role, and instead is only a supplemental ancillary

"other matter" in OSC's jurisdiction, like FOIA-related investigations, and other such.

5 U.S.C. § 1216.  Yet, Plaintiff, and predecessors – while being the protectors from

political influence, use the Hatch Act for self-promotion or political agenda purposes.

    a.    In fact, in 2011, the Plaintiff's partisan predecessor Special Counsel,

        abused her authority to use a newspaper to influence Congress to eliminate

        work from OSC, and to undercut the Hatch Act (while eroding the unit)

        during the period her preferred political party occupied the White House.[18]

        i.    And then, during the term of Plaintiff's partisan predecessor, and

            while the White House was occupied by her preferred political party,

            the Special Counsel gutted OSC's Hatch Act office, eliminating all

            line staff from the office, and leaving only supervisor who reported

            to OSC's political leadership, and it remained as such through 2016,

            until it became apparent that the Special Counsel's less-preferred

            political party, and in fact, President Trump, would take over the

            administration, the Hatch Act unit was suddenly bolstered to

---

[17] OSC Annual Report at 26
[18] A Law Misused for Political Ends, Carolyn N. Lerner, New York Times, Oct. 30, 2011.

perform against him and his appointees, by multiple Special

Counsels, including those who made believe they were of the

same beliefs as President Trump.

10.    An OSC who performs as Congress intended and enshrined in law is

especially necessary because the other side, the government's advocates, are

behemoth.  In addition to free use of the largest law firm on earth (*i.e.,* the U.S.

Department of Justice), every Federal Agency has an Office of General Counsel

(OGC), or other ability to retain lawyers – and they do so with grossly wasteful

abandon because, unlike private businesses or regular citizens who have to be

efficient and prudent, Federal agencies have essentially unlimited funds from tax-

dollars to pay teams of attorneys to defend them or destroy anyone who they see as a

threat – be it a wage-grade whistleblower, or a candidate for President of the United

States.  <u>OSC was codified to be a counterbalance</u>.


**Special Counsel Avoids Prosecution / Protectors Prosecute Political Opponent**

11.    In or by 2012, (and as they would later also repeatedly do to the

Intervenor), OSC leadership reportedly illegally violated the confidentiality of, and

otherwise endangered a federal whistleblower, to the subjects of that whistleblower's

disclosures; and, OSC's leadership had taken actions to thwart investigation of

whistleblower complaints.  The allegations were so credible that not only did a

Federal IG look into these matters, but that IG and the Federal Bureau of Investigation

(FBI) jointly conducted investigations into OSC's misconduct.  These activities

developed charges against OSC that were so significant that the Office of Personnel

Management (OPM) even suspended its own investigations.  And, the IG's and the

FBI's findings were so substantial that they were briefed to the Department of Justice

(DOJ), for prosecution by DOJ Criminal Division's Public Integrity Section (PIN).

    a.  PIN, under then Chief Jack Smith (who was later assigned as the Special

Counsel against President Trump), and Principal Deputy Chief Ray Hulser

(who was later chosen to help the Special Counsel's attempts to prosecute

President Trump), **refused** to prosecute OSC and its Special Counsel.[19]


**Qualification and Actions Intervenor / Decade of OSC Violations to Continue**

***OSC, Congress and Watchdogs Regard Intervenor's Case as 'Biggest in History'***

*Special Counsel's Failures or Misconduct **Crippled or Killed** Witnesses, Ongoing*

12.    Also beginning in 2012, and in addition to years of other related experience

in State and Federal government (including military services and the Inspector

General (IG) and Intelligence (IC) communities, the Intervenor was hired into the

Department of Defense (DoD), Office of the Secretary of Defense (OSD), as a

team chief and senior investigator, assigned to the DoD's IG.[20]

---

[19] See, *for example*, <u>Lack of cooperation by the U.S. Chemical Safety Board with the EPA's Office of Inspector General</u>, Statement of Arthur A. Elkins Jr., Inspector General, before the Committee on Oversight and Government Reform, U.S. House of Representatives, June 19, 2014, at Page 3.  Publicly available on the Internet at: <u>https://www.epa.gov/sites/production/files/2015-07/documents/written_statement_for_epa_ig_arthur_elkins_6-19-14.pdf</u>

[20]  *Inter alia,*
      1)  Intervenor investigated senior-most government officials, including the civilian heads of Intelligence Agency and uniformed military leaders who led international military commands.
      2)  Intervenor also conducted oversight of the investigations conducted by other investigators, attorneys, and subordinate IGs.

13.     However, beginning in 2012, Intervenor also began to personally identify fraud, waste, and abuse not only in DoD and the IC, but even shockingly in its IG.

    a.    In dutifully disclosing this up his chain of command, Intervenor began suffering retaliation for his whistleblowing and protected activity.

14.     Beginning in 2013, Intervenor uncovered and disclosed that his IG had not only been failing to perform and engaging in misconduct, including that the IG, *et al*, had been suppressing or otherwise mishandling the whistleblowing of DoD's employees, including the men and women of the armed forces; and worse, that the IG, *et al*, had been failing to protect whistleblowers, failing to follow or enforce law regarding fraud, waste, abuse or even security and intelligence violations in DoD, in its military services, and even in the IG itself.

15.     By 2013, after the Intervenor's such whistleblowing and other protected activity directly extended to Congress, Committee and/or the Member thereof, began raising concerns regarding the exact performance failures and misconduct that the Intervenor had been raising in and to DoD IG, such that he was known or otherwise perceived to be the cause therefor, and for which he began to suffer even more insidious retaliation in and by DoD's IG.

16.     In 2014, as a result of the Intervenors whistleblowing and protective activity, Congress bipartisanly requested that the Comptroller General of the United States, review the DoD not only in some of the exact same matters which DoD IG

---

3)    Intervenor also wrote, amended, coordinated or enforced the policies (e.g., rules) of DoD's Presidentially-appointed, Senate-confirmed IG; directly worked with and advised him; and, assisted in liaison with the Council of Inspectors General on Integrity and Efficiency (CIGIE).

knew that the Intervenor had been disclosing, but with a scope ranging from DoD (including military-service wide), but uniquely all the way down to the Intervenor's small team within DoD IG.

    a.   The Intervenor's whistleblowing and other protected activity was plainly causal.  Retaliation against him by DoD only escalated worse.

17.    Beginning in 2014, Intervenor filed claims of years of PPPs  (5 U.S.C. § 2302) with the Special Counsel, § 1214; ***and* also** disclosed information which he – a career permanent professional senior IG investigator – reasonably believed evidenced violations of laws, rules, regulations, gross mismanagement, gross waste of funds, abuses of authority, or substantial and specific dangers to public health or safety § 1213 (and later supplemented these with, *inter alia*, violations § 1216).[21]

18.    Ensuring she performed as ethically as possible, Intervenor's spouse (who for years had been and still was one of OSC's most experienced and acclaimed attorneys), promptly notified OSC and ethically offered her recusal.

19.    Thereafter in 2014, and based upon his experience validly uncovering and disclosing such about the IG community, the Intervenor also began to experience or otherwise uncover, and lawfully contest and disclose, performance failures and other illegal misconduct by the OSC as well.

---

[21] Via, for example, (and in addition to years of supplementary follow-ons to and with OSC) email entitled, "URGENT - Formal Complaint **and** Disclosures Against DoD IG" to Special Counsel Carolyn Lerner, Principle Deputy Special Counsel Marc Cohen, OSC Congressional Liaison Adam Miles, and OSC Complaints Examining Unit (CEU, now Case Review Division) Chief Barbara Wheeler, March 23, 2024 – in which the intervenor related that he was therethrough filing that which not only included, "violations of the Merit Systems Principles and Prohibited Personnel Practices (PPPs)" *e.g.,* 5 U.S.C. § 1214 , but **also** "disclosures of violations of laws, rules, regulations, gross mismanagement, gross wastes of funds, abuses of authority, and threats to health or safety" *e.g.,* § 1213 .

    a. Inconsistent with law, OSC suppressed it all, failed to refer **any** allegations against the Special Counsel or her staff for **any** impartial investigation, and instead retaliatorily mistreated the Intervenor (for years, *et seq.*)

20. The Special Counsel mishandled everything from the beginning.

    a. Throughout the pendency of Intervenor's matters at OSC, and of all OSC's staff, the Special Counsel repeatedly assigned biased and otherwise improperly conflicted staff to the Intervenors case.

        i. First, the Special Counsel assigned an attorney who was not only actively a military reserve attorney in the conflicted in Intervenor's case against DoD; but was a person who had relationships or other conflicts with subjects, whistleblowers, or other persons or interests in the case; and, who not only demonstrated bias and impropriety, but who had publicly professed bias against whistleblowers or other complainants.

        ii. Next, after Congress raised their concerns about such, the Special Counsel assigned an attorney who was actively intimately involved in a sexual and financially encumbering relationship with the Special Counsel's politically appointed congressional liaison – *i.e.,* the Special Counsel's designee who defended OSC against the Intervenor's (or his spouse's) complaints to Congress, including those which thereby implicated OSC and the mishandling attorney, and thereby, OSC's liaison's personal and financial interests.

1. As was later publicly announced to the agency, the assigned attorney became impregnated from (unethically) sleeping with OSC's political liaison (who was defending her performance failures or misconduct from Congress).

   a. She fled OSC and was positioned to shockingly serve as an attorney on Congress's Ethics committee (and from there, into the IG community she covered up for, and where she now serves as a Senior Counsel defensive agent for), because OSC failed to ever process any complaints or ever hold staff accountable.

iii. Next the Special Counsel assigned an attorney who not only willfully failed to perform any work on the case for more than year, and who illegally acted against the Intervenor's interest, but who even admitted such, and admitted his bias against the Intervenor, defended violators, and leaked pre-decisional and otherwise privileged information with the Special Counsel's knowledge and sustained allowance, to get the Intervenor harmed – including wherefor the Intervenor was crippled for life.

iv. Later, the Special Counsel even assigned an attorney who not only had other conflicts, but was – at the same time she was mishandling matters for the Intervenor – she was actively pursuing employment as a defensive agent for those the Special Counsel knew were

implicated in retaliating against the Intervenor, and for whom third-parties had even given OSC reason to believe was still occurring.

    v.  And, for years, the Special Counsel assigned staff under managers who were under investigation for charges of misconduct against OSC's staff, including Intervenor's wife, in OSC, at the same time.

    vi.  Repeatedly, the Special Counsel(s) would allow persons of known bias or documented conflicts to harm the Intervener.

b.  Worse, ongoing to date, the Special Counsel has failed, <u>and under the Plaintiff has continued to fail</u>, to perform its duties under *inter alia*, 5 U.S.C. § 1213, § 1214, and § 1216, and other laws, or to otherwise protect the Intervenor or his spouse, despite the rights that Congress assured them – ministerial duties and rights that the Plaintiff and OSC has not only failed to perform or ensure, and noticed this Court and the President that the Plaintiff and OSC intend to continue to fail to perform, but which the Plaintiff willfully engaged in, *inter alia,* malfeasance to deceive this Court, *et al*; and, proceedings, about.

c.  Worst, the Special Counsel (including the Plaintiff) has allowed and continues to allow fraud, waste, abuse and otherwise improper Federal agencies, programs and persons to operate at tax-payer expense.

21.    Beginning in 2014, Congress, OSC and the DoD's new Presidentially-appointed, Senate-confirmed IG, began to take some (albeit insufficient) steps to protect the Intervenor from those he blew the whistle on, let alone those Intervenor

served as witness for criminal investigation or prosecution to, and the Intervenor was assigned to a different immediate chain of command, but unfavorably so, and he was unfairly held in DoD IG, while DoD continued to retaliate, and OSC neglected duty.

22.    In May 2014, the Intervenor uncovered, *inter alia*, that DoD IG's OGC (who were created by Congress separate from DoD's OGC, solely so the the IG could have independent legal guidance in IG work reviewing the DoD, and not to deprive the authority of the Secretary of Defense and his General Counsel) were instead acting unlawfully; and even aiding and abetting, or directly engaging in, *inter alia*, retaliation against whistleblowers, and conspiracy thereof – including very specifically against the Intervenor.

23.    Promptly, the Intervenor related allegations and evidence of this to OSC, both in so far as it was dispositive to his PPP claims, *e.g.,* § 1214; and, in disclosure of the misconduct of DoD officials that the Secretary of Defense, the Attorney General, and the President needed to be alerted to by OSC, e.g., § 1213.

   a.    But, instead of processing this, let alone any other disclosure the Intervenor prior (or later) made to the Special Counsel, as ministerially required by Federal Statute, e.g., 5 U.S.C. § 1213, OSC's mishandling staff suppressed and leaked the Intervenor's disclosure to OSC's General Counsel.

   b.    Then, in continuance of violations, not only did OSC not process such as required by law, but even disregarding confidentiality provisions, the Special Counsel, via her General Counsel, **informally leaked this** back to

DoD – and not even to the agency head (i.e., Secretary of Defense) or even his OGC, but to the IG's implicated OGC.

  i. As a result, multiple DoD IG employees were placed under investigation and interrogated regarding relating matters.

    1. DoD's implicated IG even attempted to get whistleblowers to OSC prosecuted; and after prosecutors declined, DoD IG even administratively pursued them.

  ii. Worse, the Intervenor was directly questioned, by DoD IG's Office of Professional Responsibility (OPR) who demanded that the Intervenor reveal – by name – who in OSC or Congress that he made disclosures to, and the Intervenor was even intimidated by OPR that he could not disclose **anything** from DoD to OSC or Congress.

  iii. OSC refused to protect the Intervenor, and afterwards, ignored his §§1214 and 1216 complaints and §1213 disclosures.

  iv. OSC suppressed, and therefore served as accessory after the fact that, DoD IG committed crimes (e.g., 18 U.S.C. § 505), and other misconduct (5 U.S.C. § 7211) doing so.

  v. And, in failing to inform the Secretary of Defense, OSC enabled DoD IG OGC and OPR staff, *et al*, to continue to keep their jobs and be paid in direct violation of the law therefore.[22]

---

[22] '**No** part of **any** appropriation contained in this or any other Act shall be available for the payment of the salary of **any** officer or employee of the Federal Government, who prohibits or prevents, or attempts or threatens to prohibit or prevent, any other officer or employee of the Federal Government from having any direct oral or written communication or contact with any Member, committee, or subcommittee of the Congress in connection with any matter pertaining to the employment of such other officer or employee or pertaining to the department or

1. In fact, involved DoD IG OGC and OPR officials, *et al*, instead received promotions, in DoD, throughout the IG community, or even to lead "Civil Rights" activities in another agency, (as OSC's highly unlawful General Counsel, later was as well).

24.    On October 4, 2014, the Special Counsel came to the OSC office of Intervenor's spouse, and conceded recognition of <u>this employee's complaints that OSC's policy which required OSC employees to let OSC screen their allegations against OSC to decide **if** they could go to any IG, was improper.</u>

   a. And, while the Special Counsel was there, the Intervenor's wife disclosed more allegations of misconduct in OSC to her as well.

25.    On October 5, 2014, Intervenor's spouse received an urgent email from another OSC employee asking her to call her.  On the call, that employee related that their manager, whose unit was implicated in the Intervener's spouse's disclosures, alleged to his subordinate that the Intervenor's spouse had also implicated this other employee in disclosures to the Special Counsel.

   a. Ironically, it was later confirmed that Intervenor's spouse did not even allege such as part of her disclosures, and OSC officials made such up in an attempt to harm and ostracize OSC's employee whistleblower.

---

agency of such other officer or employee in any way, irrespective of whether such communication or contact is at the initiative of such other officer or employee or in response to the request or inquiry of such Member, committee, or subcommittee.' The Consolidated Appropriations Act of 2012, P.L. 112-74 at Sec. 713(1).

b. Regardless, it showed that, endemically, OSC staff, up to and including *the*
Special Counsel, illegally fail to protect the identity of those who engage in
whistleblowing and other protected activity.

26. On November 26, 2014, the Intervenor filed complaints against DoD's
actual Inspector General and other senior officials thereof with DoD IG and the
Council of Inspectors General on Integrity and Efficiency (CIGIE).

a. Intervenor's complaints were made to DoD's Presidentially-appointed,
Senate-confirmed IG, CIGIE, the FBI, PIN Chief Jack Smith, PIN Principal
Deputy Chief Ray Hulser, and the Special Counsel – who screened such for
CIGIE's Integrity Committee.

b. But, without ever interviewing the Intervener or clarifying his complaint,
they refused to investigate or refer anything, and, they even made false
statements about the allegations to avoid jurisdiction.

27. Thereafter, the Immediate Office of the Special Counsel (IOSC) queried the
Intervener's spouse (an OSC employee) if she had reason to believe that OSC was
illegally mishandling the Intervenor's OSC case, and if OSC's OGC had illegally
mishandled the Intervenor's disclosures about the DoD IG's OGC. Under direct
questioning from the IOSC, the Intervenor's spouse answered in the affirmative, and
confirmed misconduct by OSC staff, including misconduct by political appointees in
IOSC, and their OGC.

a. In chilling retaliatory response, and attempt to tamper with a witness,
OSC's General Counsel threatened Intervenor's spouse about such.

b. On or about February 10, 2015, Intervenor's spouse made complaints about OSC's General Counsel's misconduct to the Special Counsel.

c. Since the Special Counsel unlawfully mishandled this too, OSC's General Counsel again attempted to intimidate Intervenor's spouse.

28. On or about February 12, 2015, the Intervenor's spouse filed further complaints, directly with the Special Counsel, about misconduct of OSC staff not only against the Intervenor, but even retaliation by OSC against the Intervenor's spouse (one of OSC's most expert attorneys in the evaluation of complaints of prohibited personnel practices, including retaliation). Intervenor's spouse even complained directly to **the** Special Counsel that she was subjected to retaliation for disclosing, "violations of laws, rules, and regulations and gross mismanagement by OSC".

a. The Special Counsel failed to process such allegations or refer any such for independent investigation, and instead suppressed them.

29. Thereafter, on February 12, 2015, the Special Counsel abused her authority to order the Intervenor's spouse to come to **the** Special Counsel's own office, along with the employee's conflicted manager, to engage about her whistleblowing and other protected activity against OSC and its Special Counsel.

a. Therein, while engaging in witness tampering and placing the Intervenor's spouse under duress – with even implications for the Special Counsel's further/future handling of the Intervenor's PPP case and whistleblower disclosures, the Special Counsel chilled her own employee's whistleblowing and other protected activity, compelled her own employee

to sign a waiver of her claims, and then implemented and enforced a
nondisclosure policy to hide it.

b.  In pertinent parts, the written agreement drafted by **the** Special Counsel:

   i.  Denoted that the employee was a whistleblower who engaged in
       protected activity in and against OSC.

   ii.  Denoted that the employee's spouse (the Intervenor) was both a
        complainant before, and whistleblower about, OSC.

   iii.  <u>Compelled the employee, under duress, to immediately recant
         any charges of whistleblower retaliation against OSC</u>.

   iv.  Claimed that neither the Special Counsel of the United States,
        nor OSC's Chief Complaints Examiner, nor the employee, had any
        clarity on how to handle the employee's disclosures regarding the
        Special Counsel and OSC's illegal mishandling of her spouse's
        (the Intervenor's case), but **the** Special Counsel pledged to seek out
        an opinion to move forward with such via "outside counsel" which
        would then be discussed with the employee *and* her manager.

       1.  But still, the Special Counsel illegally failed to perform,
           and suppressed such internal allegations against itself.

   v.  Certified that, starting that day forward, <u>the Special Counsel and **any**
       staff of the IOSC would be recused from the employee's spouse's
       (**the Intervenor's**) case</u>, or any OSC handling thereof.

c. And then, even though the agreement explicitly involved OSC handling of his PPP case, and his whistleblowing – let alone that it would be an illegal action by the Special Counsel which she had reason to fear that the employee's spouse (the Intervenor) would reveal to Congress and the President, **the** Special Counsel instructed her employee (Intervenor's spouse) **not** to reveal the agreement to her spouse (the Intervenor).

30.    Thereafter, that same evening (February 12, 2015), the Intervenor acted upon just the information that his spouse was able to tell him of, and engaged in whistleblowing and other protected activity, via email directly to the then-Presidentially-appointed, and Senate-confirmed, Special Counsel herself, with copy to his spouse's conflicted manager, OSC's head of the then Complaints Examining Unit (CEU) [which is now known as the Case Review Division (CRD)] (Barbara Wheeler), regarding the misconduct of OSC staff.

a. The Intervenor's spouse related that the Special Counsel alleged to have not seen evidence of certain misconduct, or that certain things did not happen, so the Intervenor directly disclosed proof to her.

i. The Intervenor provided documentary evidence against OSC's General Counsel, political appointees, and other staff therein.

31.    With the specter of both, a credible IG investigator, and an OSC employee attorney, having allegations and evidence against OSC and its Special Counsel, the Special Counsel began privately colluding with a former partisan Congressional staffer who served as the Special Counsel's (*i.e.* the governments **anti**-political

influence official's) personal private political strategist, and as she related their wanting him to lobby Congress on the Special Counsel's behalf, began scrambling to Hillary Clinton's presidential campaign, to ensure herself to be renominated (illegally, in direct violation of 5 U.S.C. § 1211(b)) to the <u>single term-limited position</u> of Special Counsel (so she could retain one of the only positions in government that effectively has no oversight or accountability, and continue to suppress such allegations), as scandalously demonstrated in emails revealed by Wikileaks via the media.[23]

32.    Early on February 24, 2015, since the Special Counsel had strangely been ignoring the Intervener's February 12, 2015, email (while the Special Counsel was scurrying to unethically protect herself), the Intervenor directly emailed her a **confidential** 11-page letter, to supplement his February 12, 2025 transmittal which, as proviso, he asked her to <u>confidentially read and handle it</u>.

33.    Just hours later (at 2:51 pm) that same day (February 24, 2015), plainly in an effort to keep herself in the apparently *all-powerful position of Special Counsel*, in order to protect herself and her cronies, and only after privately consulting with her personal political strategist – according to emails revealed by Wikileaks via the

---

[23]    a. The Special Counsel first attempted to secure such via the Obama White House, but they had apparently ignored her improper efforts.

b. So, by February 22, 2015, the Special Counsel followed up her private in-person lobbying, and in circumventing federal records, she now used her personal email account to confirm her lobbying of Mary Podesta, the wife of Hillary Clinton's Campaign Manager, John Podesta, to enlist Mr. Podesta's help to coerce the White House to (illegally) reappoint her as the U.S. Special Counsel, wherein she,

    i.    Privately assured the support of unions and nongovernmental organizations (NGOs).
    ii.   Noted that her personal political strategist wanted to further lobby Congress on her behalf.
    iii.  Offered to ply Podesta with alcohol, while he was lobbied by her and her personal political strategist.

https://wikileaks.org/podesta-emails/emailid/14846

media, the Special Counsel wrote to Hillary Clinton's campaign manager (John Podesta), wherein the Special Counsel noted she was following political guidance to:

  a. Remind her term of office was approaching, and expressing desire to continue to ensure her and her **"political"** employees that she would stay as Special Counsel so that they too could keep their **"political"** jobs.

  b. Privately relate how (in addition to the obvious Democrat support) that she also ensured the (likely unwittingly improper) support of Republicans, led by Senators Chuck Grassley and Mike Lee.

       i. Of note, the support of these Senators had apparent ties to a Republican staffer who was burrowed into OSC in 2017, and who helped cover up for OSC's misconduct since 2011.

34.    Also of note, at approximately the same time that he secretly served as the Special Counsel's (the U.S. preventor of partisan government influence's) private personal political strategist and secret lobbyist, records reflect that the assisting individual had either been working as a partisan Democrat political staffer, or during the same period, proximately engaged in formally lobbying against Republican interests[24] in Congress and even also for a reportedly "dark money" [25] partisan-Left Democrat political organization,[26] which the media (and **not** even a 'conservative' publication) later described as a "left-leaning, secret-money group", who "illustrates the extent to which the left embraced the use of 'dark money' to fight for its causes in

---

[24] https://lda.senate.gov/filings/public/filing/28e7ed48-0627-4fe3-ae77-41a60e337b02/print/
[25] https://en.wikipedia.org/wiki/Sixteen_Thirty_Fund
[26] https://www.opensecrets.org/federal-lobbying/firms/summary?cycle=2017&id=F220971

recent years," who "sent cash to groups that aided Democrats' efforts <u>to</u>

<u>unseat then-President Donald Trump and Republicans' Senate majority</u>." [27]

35.    That same evening, (February 24, 2015 at 8:15 pm), as matters were

still circumventing Federal records, Clinton's campaign manager emailed the

Special Counsel at her personal email account, and assured her that he had the

White House's new Presidential Personnel Office (PPO) Director, working on it.[28]

36.    On February 25, 2015, <u>just hours</u> **after** the Special Counsel received

assurances from Hillary Clinton's campaign that they were coordinating with the

White House to keep that term-limited Special Counsel and her implicated staff at

OSC, under the Special Counsel's untouchable control via an (illegal) reappointment,

the Special Counsel herself chillingly emailed the Intervenor.

a.   In doing so, while illegally preventing any proper processing of his

whistleblowing or other protected activity against OSC, let alone while

preventing any impartial investigation thereof, she summarily refuted

the Intervenor's allegations against OSC and her staff.

b.   In revealing and denigrating the Intervenor's whistleblowing and other

protected activity of OSC staff, the Special Counsel chillingly copied not

only the implicated supervisor, and his whistleblowing about their current

or former coworkers – staff whom Intervenor blew the whistle on, <u>but also</u>

---

[27] <u>Liberal 'dark-money' behemoth funneled more than $400M in 2020</u>, Politico, November 17, 2021.  Published on the Internet at: <u>https://www.politico.com/news/2021/11/17/dark-money-sixteen-thirty-fund-522781</u>
[28] <u>https://wikileaks.org/podesta-emails/emailid/40768</u>

those who at that time were specifically the <u>OSC staff currently in control</u>
<u>of the Intervenor's case and protections</u>.

    i. Not only did this open Intervenor up to retaliation by that staff, but it
is plainly biasing for OSC staff to have whistleblowing and other
protected of a complainant denigrated by the Special Counsel at the
same time OSC was supposed to be evaluating and investigation his
other whistleblowing and protected activity.

        1. In fact, such OSC attorney later admitted developing a bias
against the Intervener and his case, and even being told to not
even interview or respond to his filings, and to lie to him and
string him along for the next year (when OSC could attempt
to terminate investigation of his claims and dismiss him to
prosecute before the MSPB alone, after the point that the
Special Counsel expected to be reappointed, her staff
insulated, and her preferred candidate to be President).

c. The Special Counsel chillingly intimidated the Intervenor with having to
prosecute his PPP case by himself before the MSPB if he continued in such,
and thereby made clear to her staff that if he complained they could violate
his rights and neglect their duties, and commit malfeasance.

d. And, the Special Counsel of the United States – the individual and agency
head responsible to encourage and protect whistleblowing and other
protected activity – chillingly restricted the Intervenor's whistleblowing

and other protected against OSC staff to the Special Counsel or other OSC leadership by telling him that **ANYTHING** the Special Counsel or her immediate staff received from the Intervenor would be forwarded by them directly to her implicated subordinates.[29]

37.    Also in February 2015, another DoD IG whistleblower engaged the Special Counsel in protected activity and filed disclosures against some of the same DoD IG people, and some of the same or substantially similar DoD IG matters, which the Intervenor had filed with OSC since 2014, *et seq.*  § 1213

a.    In contrast to Intervenor's many more similar, proven, and arguably more important disclosures, the Special Counsel processed, in a vacuum, only those of this **other** whistleblower in accordance with § 1213, but disparately continued to illegally fail to process **any** from the Intervenor.[30]

i.    Dispositively – and in contrast to the Intervenor – not only was this other whistleblower not known by OSC to be engaging in whistleblowing or other protected activity against OSC, but he was formally represented by the immediate past employer and/or literally the family member of OSC's senior staff.

38.    As a result of the Intervenors whistleblowing and protected activity with Congress, the validating success by GAO, and the revelation that there was far more still wrong with the DoD IG, Congress again bipartisanly requested GAO to perform

---

[29] Email from Special Counsel Carolyn Lerner to the Intervenor, anomalously with no subject line, but with copy to Associate Special Counsel Louis Lopez, IPD Chief Darshan Sheth and attorney Greg Giaccio, February 25, 2015.
[30] See, *for example*, OSC File No. DI-15-2233

yet another review of DoD IG and the exact supervisors he blew the whistle on, which

enraged them, and further endangered him. Where GAO was previously asked to

focus on military reprisal investigations, now they were asked to focus on reprisal

against civilians and contractors too.[31]

     a. OSC ignored this too, and continued to willfully fail to perform.

39.     By *and before* May 2015, <u>GAO confirmed the actual **validity**</u> of much of

Intervenor's initial whistleblowing and other protected activity since by or before

2013, including revealing performance failures, misconduct, or crimes in DoD.[32]

     a. Ridiculously, the Special Counsel and other biased OSC staff ignored the

       enormous significance of this, its dispositive nature to the Intervenor's

       claims, and the ways in which it further underscored the needs to protect

       the Intervenor from those he blew the whistle on (let alone who the

       Intervenor had been and was still serving as a witness regarding the crimes

       of), in his patriotic service to our nation – and, let alone after peers in

---

[31] Senators McCaskill, Grassley, and Gillibrand Request GAO Review of DoD IG's WRI, March 26, 2015. https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2015-03-16%20McCaskill-Grassley-Gillibrand%20letter%20GAO%20Review%20of%20WRI.pdf

[32] GAO not only confirmed that DoD had been failing to perform or committing other misconduct which failed to protect or outright harmed the armed forces and national security, but confirmed that the Intervenors supervisors and other coworkers were utterly failing their performance standards, lazily rubber stamping whistleblower retaliation cases throughout DoD, and turning in blank work products which their supervisors or other coworkers would fraudulently sign off on as completed – and worst, confirmed findings that, as DoD's IG wanted, Intervenor's coworkers engaged **(in an apparent criminal conspiracy)** to retroactively perform work, create or alter records, stuff the files of whistleblower cases throughout DoD and all its armed forces, and falsely certified the casefiles and all work complete in cases they had certified as closed months or years prior (for **80% or more** of their cases), while they continued to willfully deceive Congress – and, all for the exact work and cases that DoD IG had learned that Congress was having GAO come in to review, scrutinize and report to Congress on. See, for example, *Whistleblower Protection: DOD Needs to Enhance Oversight of Military Whistleblower Reprisal*, Government Accountability Office, May 7, 2015. Publicly available at: http://www.gao.gov/assets/680/670067.pdf

another IG were criminally prosecuted for violations similar to that which

Intervenor was a witness of, and GAO corroborated indications of. [33]

40.　　In July 2015, as the Special Counsel and Principle Deputy Special Counsel

continued to abuse their authority to keep charges against themselves and their office

suppressed, as the Special Counsel now had a private political influence over the

White House PPO, President Obama nominated the Principle Deputy Special Counsel

to be burrowed-in to be a Member of the MSPB, the quasi-judicial forum which he

now served as prosecutor before (while never have actually prosecuted any violators),

let alone while he was actively implicated in wide-ranging performance failures and

misconduct, including violations of the Merit Systems Principles (MSP) in OSC.

　　　a.　Of note, the MSPB is likely the only other Federal agency subject to as

　　　　　little or less oversight as the OSC, and while the OSC at least **fakes** a

　　　　　limited avenue (for only some people) with some other agency's IG,

　　　　　the MSPB had previously abused their authority to eliminate their IG, and

　　　　　instead now <u>use their General Counsel – *i.e.,* their own defensive agent,</u>

　　　　　<u>to allegedly serve the function of their IG</u>, let alone while the MSPB claims

　　　　　even more protections from the President than OSC does.

41.　　In or about August 2015, as the Special Counsel still failed to sufficiently

protect the Intervenor or otherwise perform in, let alone properly understand or

regard, his case, multiple federal criminal investigators – including a Special Agent

---

[33] See, for example, "<u>Former Special Agent in Charge of the Department of Homeland Security's Office of Inspector General Sentenced to More Than Three Years in Prison</u>." Department of Justice, December 15, 2014. Publicly published on the Internet, *at that time (but later suspiciously removed)*, at: <u>http://www.justice.gov/opa/pr/former-special-agent-charge-department-homeland-securitys-office-inspectorgeneral-sentenced</u>

and a Supervisory Special Agent whom the Intervenor had been and was still further

assisting and serving as a witness for, went to OSC, spoke directly to the attorney

handling the Intervenor's case, about him, and demonstrated for the Special Counsel

the credibility and validity of the Intervenor's whistleblowing and other protected

activity, the importance of him and his testimony, and the needs for the Special

Counsel to protect him – in a manner that was likely unprecedented in OSC's history.

    a.   Yet still, the Special Counsel ignored this, and continued to employ and

         enable staff who not only failed to perform for the Intervenor as required,

         but who **literally** did nothing for the better part of a year, as the Intervenor

         continued to suffer, and misconduct – including fraud, waste, and abuse –

         let alone specific retaliation, continued in and by DoD.

42.    Also in 2015, as the Intervenor continued to supplement with OSC, he also

included further violations, but OSC's apathetic attorney acknowledged and then

suppressed and ignored them too.

    a.   And, as DoD IG continued to commit fraud, waste, abuse and other

         violations, and continued to commit PPPs including further retaliation

         against the Intervenor while OSC's assigned staff were strangely absent,

         the Intervenor also continued to supplement his §§ 1213, 1214 and 1216

         claims, but OSC's apathetic staff just suppressed it all too.

        i.   And, in violation of § 1213 and § 1214, OSC conducted no

             investigation of most PPPs, and **never** processed disclosures.

43.     Beginning or throughout this period, despite being exceptionally qualified, and one of OSC's best, most experienced, acclaimed and exceptionally reviewed employees, the Special Counsel began and repeatedly continued to pass over the Intervenor's spouse for promotional opportunities – while employees who were far less qualified, or whom she even helped train, were given the job instead of her.

    a.  Hiring decisions were even made **five (5) levels** above the positions in question, by the Special Counsel herself, all just to deprive the Intervener's spouse, OSC's employee whistleblower of promotions.

        i.  Shortly later, they even secretly modified a hiring and gave the promotional business that had been designed as a result of and for the Intervenor's spouse in previous years, to the less qualified OSC attorney who admitted bias and suppressed Intervenor's case.

44.     On January 6, 2016, the Intervenor sent to the Special Counsel, via the assigned attorneys, a formal Request for Stay and Other Actions. Wherein, over almost 60 pages – as OSC was still illegally failing to perform, he related additional complaints, disclosures and information dispositive for his case,

    a.  Therein, since OSC was ignoring it, the Intervenor further included allegations and evidence that the IG was criminally extorting him.

        i.  To wit, the Intervenor provided the Special Counsel evidence that not only had his current IG supervisors (and IG OGC) committed PPPs, but they had tried to extort him to waive his claims to those – while OSC was actively investigating, no less.  And, as written,

**IF** he would waive his rights in those claims against DoD IG, then they would immediately release him from his unfavorable assignment (let alone where they had moved his desk <u>into the **mail room**</u>), and let him assume the position that DoD's Presidentially-appointed, and Senate-confirmed IG had created for him – to be <u>The IG's CIGIE Liaison</u>.  But, <u>if he did not relent to such</u>, then he would be forced to stay in his assignment, where – while being a GS-14 investigator writing, amending, overseeing and enforcing IG policy, he would get rated by a logistics supervisor, from the mail room!

    1. It was ridiculous extortion by DoD IG that, as it later turned out, was actually encouraged by OSC's misdeeds.

45.    Concurrently, DoD's Presidentially-appointed, and Senate-confirmed IG, who had already essentially checked out months prior (reportedly forcibly) resigned from office, and his Principal Deputy (Glenn Fine) who was far worse and less whistleblower friendly (though he hid it), took over control of DoD IG.

46.    On January 11, 2016, the Intervenor also supplemented reports to multiple OSC officials, including as he complained prior and with the stay request, hereby proving that – while he was <u>a GS-14, let alone while assigned as the DoD IG's putative coordinator of all IG policy</u>, he was forced to move out of his private office in the DoD's main building, where 99% of the IG's offices resided, and instead moved to the furthest floor and corner of a completely different building, where he was stuffed into a cubicle next to inventory storage, adjacent to GS-5 mail clerks, at

the door to the IG's **mail room**, while even those less senior to him in that same room had better cubicles or private offices.

47.    That very same day, (January 11, 2016), implicated OSC staff, including with copy to an OSC official then-actively under investigation for alleged misconduct, including against the Intervenor's spouse, ridiculously refused to even informally request a stay from DoD, let alone through MSPB.

    a.    The Intervenor responded by not only noticing OSC that their failure would exponentially expand his case by the PPPs they would be further enabling, but the Intervenor engaged in whistleblowing and other protected activity alleging the performance failures and misconduct of the assigned OSC attorney, his supervisor, and the senior official on the email.

    b.    In the following days, the Intervenor continued to forward ongoing allegations and evidence against DoD, but nothing was done.

48.    Instead, just days later in February 2016, the Special Counsel's attorney, the same who was on the Special Counsel's February 2015 email which revealed the Intervenor's disclosures against this OSC staff, let alone the same who was just implicated in further misconduct, reached out for a date to speak with the Intervenor, while failing and refusing to say what it was about.

    a.    At the time, the Intervenor believed that the assigned OSC attorney, who had been the attorney assigned to handle the Intervenor's PPP case **since 2014**, was reaching out to interview the Intervenor regarding some of his claims, because - as Intervenor reminded in response, <u>they had yet **never**</u>

conducted a complaint clarification, let alone conducted any other interview of the Intervenor, **ever**.

    i. OSC's attorney curtly responded, "This call **won't** be a fact gathering interview," but he otherwise failed to respond to the Intervenor's queries, and he gave no other information.

49. On February 17, 2016, OSC's assigned attorney called the Intervenor and conducted a historically-bad phone call that has gone down in OSC/Congress infamy.

    a. On that call, OSC's assigned 'Investigation and Prosecution' attorney:

        i. Admitted that he had deceived the Intervenor about his and OSC's activities on the case for months, including lying that he and OSC were investigating when they were not;

        ii. Admitted that numerous people in DoD IG were conflicted and implicated in the case, including not only the IG's attorneys, but up to and including the acting IG himself – while at the same time refusing to relate such or communicate with the acting IG's boss, OSD, or DoD's OGC;

        iii. Admitted that for months he had been privately negotiating (without the complainant's knowledge, let alone involvement), not even with DoD's OGC, but the IG's most conflicted attorney (a person who was not only implicated in OSC's still active investigation, who OSC had documentary evidence proving he had been engaged in PPPs and other misconduct, and a criminal conspiracy therefor,

against the Intervenor – while the same IG attorney and other IG

staff continued PPPs to apply duress, and even attempted to extort

the Intervenor);

1.  Argued he was acting like the Intervenor's 'lawyer' when he

    did so, while concurrently arguing that the Intervenor had no

    choice in such, and that this OSC attorney could even perform

    as such even if the Intervenor did not want him to – and, he

    admitted that he willfully hid such from the Intervenor.

2.  Admitted that, OSC often improperly reveals things to those

    implicated, often based upon a preconceived or premature

    position on a case, even prior to discovery.

    a.  And, since OSC has no fear of accountability,

        or concern for causing harm, he exclaimed,

        "Oh, yeah, I mean, **that happens a lot**."

iv.  Not only conceded that OSC had never even properly interviewed

     the Intervenor, but admitted that he made all his decision in the case

     solely on document review – and admitted that other OSC

     headquarters staff (who were implicated by the Intervenor's

     whistleblowing) even told him not to even interview the Intervenor

     or not make appropriate follow-ups;

v.  Asserted that the Intervenor could not report crimes to OSC,

    let alone demonstrated that he had ignored such since 2014;

vi.    Presumed the authority and decision of the Special Counsel prior to the complainant's statutory right to respond, and prior to any actual decision by the Special Counsel, proclaimed,

> "Well, you'll have your opportunity before the Board or something, but you **won't** have it with us!"

vii.   Admitted that he had made summary conclusions against the Intervenor, since he first got the case in 2014, and was ready to instantly close the case as such since then.

viii.  <u>Admitted (in March 2016) that he had been **"biased"** against the Intervenor and his case since the first day he got it in 2014</u>.

ix.    Admitted that he based his opinions on documents from two or more years prior, without even talking to the Intervenor about what had happened since, let alone conducting any proper interview or work

x.     Brazenly proclaimed that even if the Intervenor could prove that OSC failed to comport with rules or law, it would **not** stop OSC from terminating all investigation now.

   1.   And, he brazenly mocked that nobody would care if even the MSPB found that OSC erred, because it would not be the first time that OSC "made a bad call on something."

xi.    Admitted that <u>OSC management essentially told him to be **dishonest** and string the Intervenor along for months or years.</u>

xii.   OSC's attorney literally scoffed to the Intervenor,

"If you want to pick apart every bit of this substandard, farce

of an investigation, that's how you see it."

xiii.   Admitted to the Intervenor that his case **"set the record"** for the

biggest in OSC history (while concurrently not even considering

most of it).

xiv.   Admitted that he had revealed – to those implicated in DoD IG

no less – his own bias and intention to close the case and leave the

Intervenor defenseless, without OSC protection from them.

xv.   And, uncompassionately spitted at the Intervenor this "biased" OSC

attorney's expectations that DoD would in fact continue to take more

severe actions against him.

b.   And, as evidence shows, OSC's admittedly "biased" attorney had already

pre-drafted his "pre-determination" proposal to close the case, before even

interviewing the complainant, let before talking now.

i.   And later, after the Intervenor revealed this fact to the Special

Counsel and Congress, the Special Counsel enabled this attorney to

teach other OSC attorneys how to not get caught in their prejudice,

bias and other misconduct, as the Intervenor had caught him!

c.   This OSC employee was paid more than six-figures at the time of his

shocking misfeasance, malfeasance, and nonfeasance – while he literally

admitted doing no proper work for more than year and disregarding law or

rules (but getting paid for it); and, since the Special Counsel only enables
and encourages such, he kept his job, continued to get paid progressively
more, <u>and has recently reportedly been paid over $170,000/year.</u>

      i. And proximately, the Special Counsel and conflicted others
          colluded, secretly modified hirings, and gave this unethically
          "biased" and dishonest attorney the Intervenor's spouse's promotion.

50. On February 19, 2016, as OSC staff leaked their planned putative theft of
the Intervenor's protections and other rights the Special Counsel had a duty to ensure,
DoD's acting IG (Glenn Fine) personally suddenly noticed the Intervenor that, as
opposed to letting the Intervenor transition to become DoD's CIGIE Liaison, as
DoD's only Presidentially-appointed, Senate-confirmed IG had ordered and literally
created the job specifically for the Intervenor, the acting IG (Glenn Fine) suspiciously
ordered that the Intervenor – a GS-14 Senior Investigator in charge of all IG policy,
and the expected IG-designated CIGIE Liaison, to be remanded under the IG's
logistics mail room manager, <u>but strangely, not to exceed just a few days.</u>

51. Just days later, on March 1, 2016, enabled by the prior implicated
acting IG's thinly-veiled remand (and OSC's neglect of duty and malfeasance),
the acting IG's logistics mail room manager ordered the Intervenor to meet him
(regarding private personnel matters) in the middle of the open cafeteria,
"to discuss your future assignment and a personnel action," at which he,

      a. Advised that, per DoD IG leadership, effective March 7, 2016,
          the Intervenor would be assigned back to his prior unit under his prior

supervisor (i.e., the exact same unit and supervisor that Congress, DoD's

actual IG, and the Special Counsel, had him assigned away from for his

protection – and the exact same whom (as a result of Intervenor's known

whistleblowing and other protected activity) GAO had publicly proclaimed

were failing in their performance, committing misconduct, and seemingly

committing crimes), the same who had even violently threatened the

Intervenor, let alone alleged that Intervenor could **NOT** do the job he was

being put back into.

b. But then, the IG's logistics mail room manager proposed to suspend the

Intervenor from duty for allegedly failing to perform for him many weeks

or months prior – which he conceded that the Intervenor had responded

**in January**, in pertinent part, "I believe it is unlawful, and also attempts

to coerce me to become enjoined in aiding and abetting unethical and

unlawful activities - even if what you request was reasonable and proper,

which it was also not," let that these related to duties and people for which

DoD's actual IG had instructed the Intervenor he did not have to do.

i. And most ridiculously, the acting IG's logistics mailroom manager's

proposal (which of course had been scripted by DoD IG's implicated

OGC attorneys) stated that he was not even proposing to suspend the

Intervenor from his job under that supervisor, but proposing to

suspend him, without pay, from his anticipated future role, in a

completely different job, under completely different supervisors, in a

completely separate unit that this supervisor had no control over.

52.     Unfortunately, as result of all this, it progressed, *inter alia*, a latent chronic

inflammatory disease which painfully crippled and incapacitated the Intervenor,

and which was to be a permanent chronic condition he would have and has for life.

    a.  Intervenor had to have crutches expressed to his house just so he could

       make it from the bed to the bathroom to relieve himself, while still being

       in excruciatingly incapacitating pain.

    b.  And though it was contributed to by work, he was not even offered any

       consideration for potential workers compensation, and was instead made to

       take his own leave, while being harassed.

53.     On March 8, 2016, the Intervenor filed a 176-page response to the

OSC attorney's attempts to terminate investigation of his PPP case, and otherwise

in regards to extensive misconduct by OSC and its Special Counsel.

    a.  In doing so, the Intervenor openly copied 20 different Members of

       Congress, Republicans and Democrats, in both the House and Senate.

54.     Promptly concurrent for such, on March 8, 2016, a renowned Federal

watchdog wrote a letter to DoD's acting IG, with copies to the Secretary of Defense,

12 different Members of the Senate and House, and all the members of the Senate and

House Armed Services Committees, wherein,[34]

---

[34] Letter to acting IG Glenn Fine, POGO, March 8, 2016.
https://docs.pogo.org/letter/2016/pogo_ig_fine_letter_20160308.pdf

a.  They highlighted their own findings, along with GAO's 2015 findings that DoD (and OSC) knew resulted from the Intervenor's whistleblowing and other protected activity.

b.  They proclaimed that the exact chain of command that the Intervenor was now being forced back under in DoD IG may have purposely altered records to mislead GAO investigators about the depth of the actual problems in their office and agency.

c.  They related evidence how the exact manager who the Intervenor was being forced back under had instructed his unit to "stand down" on all other work in 2013, and even offered them overtime pay to go back and "back-fill" the files before GAO got there.

d.  They reminded that DoD IG staff (and specifically, the unit the Intervenor was being forced back under) had engaged in activities which that DOJ had actually **criminally prosecuted** another IG's similarly-situated employees for the same types of misconduct.

e.  They related that not only was the IG demonstrably retaliatory to its own employees, but also that they (the exact unit the Intervener was being forced back into now) also dismissed approximately 85% of all reprisal cases, doing so at even twice the rate of the military services.

f.  They reminded that prior reviews, including that led by former Senior Military and DoD Civilian officials found "the culture of the OIG DoD has been, and continues to be, hostile to internal whistleblowers. All too often,

OIG employees who have endeavored to identify mismanagement or

violations of law have been punished by their chain of command."

g. They related that DoD's investigations of senior officials (the Intervenor's

former unit that he also blew the whistle on), only investigated **7%** of

cases, and only substantiated investigations against senior officials in **1%**

of cases, while in comparison, DoD's Component and Military Service IGs

investigated **100%** of cases, and substantiated **36%** of them.

h. They reminded that OPM surveys found that at least 1 in 4 DoD IG

employees "did not feel they could disclose suspected violation of any law,

rule, or regulation <u>without fear of reprisal</u>."

i. And, they concluded that the leadership of the responsible DoD IG unit (the

exact who the Intervenor was the known whistleblower against, and was

now being forced back under) <u>should be **removed and replaced**</u>.

55.    On March 9, 2016, the Intervenor formally filed an urgent request for stay

as (while OSC was required to still be investigating, let alone protecting him, but after

OSC's attorney had leaked to those implicated his intentions to not investigate them

and instead to deprive the Intervenor of OSC's protections) DoD IG continued to take

dangerously harmful actions against him, let alone forced him back under the exact

persons he had served as witness against, the exact same persons GAO determined

were engaging in failures and other misconduct, including putative crimes – and,

<u>the exact same persons who both **the Special Counsel** and DoD's Presentially-</u>

<u>appointed, Senate-confirmed IG had agreed it was necessary to protect him from, and</u>

<u>whom he had been kept protected from beginning in 2014 through 2016</u>.

     a.  The Stay Request not only detailed how the DoD IG's actions were illegal, but reported the extremely dangerous medical harm that resulted, and the severe disability that the Intervenor was suffering, and even simply asked the Special Counsel to ensure that OSC was working with the agency head (*e.g.,* the Secretary of Defense or his OGC) instead of those directly implicated in the case.

         i.  Aiding and abetting witness tampering, and covering up for the IG community's corruption, the Special Counsel ignored all.

56.    On March 10, 2016, matters which the Special Counsel, DoD and Congress knew arose from the Intervenor's whistleblowing and other protected activity even made international news.[35]

57.    On March 11, 2016, despite law **requiring** OSC to **protect** the Intervenor, let alone act in his interests, and national and international news demonstrating urgent needs to protect him, the Special Counsel rushed to <u>inexplicably **refuse**</u> any stay of any personnel actions, including refusing to informally perform even simply any temporary protections, while not only did they have a duty to protect the Intervenor – let alone during still open and active case – but while they knew that their illegal

---

[35] *See, for example,* <u>Pentagon maintains 'toxic' environment for whistleblowers, watchdog says</u>, The Guardian, March 10, 2016. International news article publicly available on the internet at: <u>https://www.theguardian.com/us-news/2016/mar/10/pentagon-whistleblowers-toxic-project-on-government-oversight-report</u>

failure to do so, had literally caused the Intervenor to be crippled, and that he was

otherwise in imminent danger.

58.    In retaliation by DoD IG, as OSC still illegally sat on the sideline, the

Intervenor was ordered to physically return to the office (and now under those

implicated), against medical restrictions, while he was painfully disabled at home,

on prescription narcotics – medicines so severe the label threatened up to death.

    a.    He was forced to dangerously commute and physically ambulate such that,

        even with the use of assistive devices, he had to stop, sit and rest numerous

        times just to make it through DoD IG's lobby.

    b.    He even developed a seeming blood-clot that potentially <u>threatened his life</u>,

        as those implicated showed no remorse, and OSC unlawfully stood by.

59.    On April 25 2016, <u>as a result of the whistleblowing and other protected

activity of the Intervenor and his spouse</u>, Congress asked the Comptroller General to

direct GAO to review the work of OSC, including: [36]

    a.    Matters which the Special Counsel knew that the Intervenor and his spouse

        engaged in whistleblowing and other protected activity about;

    b.    Including specifically about the Intervenor's spouse's work unit; and,

    c.    The ability for OSC's employees to blow the whistle on OSC, make

        complaints against OSC, or engage in other protected activity (as the

        Special Counsel knew that the Intervenor's spouse had disclosed OSC's

---

[36] <u>Chairman Johnson Requests GAO Review OSC</u>, Homeland Security and Government Affairs Committee, U.S. Senate, April 25, 2016.  Publicly posted to the Internet at: <u>https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2016-04-25%20RHJ%20to%20Dodaro%20re%20OSC%20request1.pdf</u>

improper obstructions of – including to the Special Counsel herself since in
or before 2014; and, OSC's safeguards therefore.

60.    In May 2016, the Intervenor gave permission for The Special Counsel
herself to speak with a government watchdog who was advocating and raising
concerns about OSC's mishandling of his case, and the misconduct in DoD.  The
Special Counsel excluded the Intervenor from such meeting, but instead specifically
involved her conflicted partisan "political" congressional liaison (Adam Miles, who
the Intervenor had been blowing the whistle on, and who had been discrediting and
refuting to Congress the Intervenor and his complaints about OSC (including the
subordinate-level staff that this liaison was secretly sleeping with) – let alone that the
Special Counsel had secretly executed an agreement which guaranteed Intervenor's
spouse that all IOSC would be forever be recused from the Intervenor's case.

a.    And, at that meeting, the Special Counsel let her "political" advisor, Adam
Miles, falsely and unfairly attempt to discredit the Intervener and undercut
his claims and case, despite that he had no foundation to do so, let alone
that OSC had failed to yet properly investigate.

61.    Proximately, however, as a result of Congress, watchdogs, *et al*, apoplectic
at OSC's mishandling, the Special Counsel delegated her handling of the Intervenor's
case out of OSC headquarters, and all the way up to the SES-level Associate Special
Counsel of Investigation and Prosecution for around the entire country (Bruce Fong),
and tasked him to work directly with the Intervenor from that point forward.

62.    On or by June 15, 2016, after review of the years of evidence and activities, the Special Counsel, via her SES designee, not only <u>confirmed that the Petitioner was a whistleblower who also engaged in protected activity</u> with, *inter alia*, Congress and its GAO, but <u>the Special Counsel also determined there were reasonable grounds to believe that the Petitioner had been retaliated against for his whistleblowing and protected activity</u>, and that his whistleblowing and protected activity <u>was a contributing factor</u> in every personnel action taken against him, years of (still uncorrected) personnel actions (let alone proving that prior OSC staff erred and failed to perform as required).

63.    On June 30, 2016, as the Special Counsel failed to perform to protect the Intervenor, and while the Intervenor was unfairly compelled to physically work in the office while painfully disabled, he was dropped several feet onto the concrete basement floor of DoD's building, traumatically injuring his spine and body, and which DoD admitted was because of its own negligence.

    a.    Yet still, DoD IG illegally failed to inform the Intervenor about his rights to workers compensation and illegally failed to inform the Secretary of Labor, while the Special Counsel also failed to perform; and while the Intervenor was deprived needed medical care and leave.

64. From that point on, the Special Counsel's designee began  to regularly email, interview or otherwise speak with the Intervnor, to both work on and overturn prior mishandling of the case heretofore, but to also supplement the Intervnor's complaints and protected activity, as the Special Counsel's direct designee.

65.    On July 6, 2016, the Special Counsel's designee assured the Intervener that he was and would be compiling a list of DoD's PPPs (including the so-called '(b)(12)s', *i.e.*, violations of 5 U.S.C. § 2302(b)(12), and that OSC would later put together **a list** which compared, "when you do something and then later on they do something," **to produce multiple lists** which showed PPPs against Petitioner, even also in a "graphic way" and with a "comparison chart" showing the DoD's PPPs, including retaliation against him, which even included PPPs and other misconduct by the IG's attorneys, which OSC would work with him on – let alone he had rights to.

   a.    This was critical information that OSC needed as a blueprint for its investigation, and any settlement negotiations or prosecutions, let alone to inform the Intervenor in the event that OSC terminated his investigation with any corrective actions still outstanding for which he had an IRA.

      i.    But, in failing to perform OSC's duties, let alone failing to ever provide such for the Intervenor as promised, OSC compromised their entire investigation, and hobbled the Intervenor from any proper ability to invoke IRA or get any remedies from the MSPB or the Courts **– ongoing to date**.

66.    On August 5, 2016, OSC reported that DoD's acting IG's (implicated) attorney contacted OSC to discern if the Intervenor was still and continually engaging in protected activity with OSC against them. OSC confirmed it to.

67.    On August 11, 2016, the Special Counsel's designee promised the Intervenor that they would not advocate that he relinquishes any of his rights, and also

assured him of OSC's most immediate effort at that time, namely, to extricate the

Petitioner from his chain of command, and move him to a, "better safer place."

68.     On August 26, 2016, the Special Counsel's designee advised that he had

"invited" DoD (though improperly via those IG attorneys conflicted in the case) to

explore providing the Intervenor with relief, but yet again pledged they would

**never** ask him to compromise his legal rights.

69.     By or before September 2016, the Special Counsel's designee told DoD's

acting IG that the Special Counsel determined that there were reasonable grounds to

believe that numerous PPPs had occurred, existed and would continue to be taken by

DoD against the Petitioner, for years, and ongoing – which required numerous and

even "comprehensive" corrective actions with compensatory damages.  And, OSC

privately encouraged 'remedies' from the acting IG on Intervenor's behalf <u>while

excluding Petitioner and the Secretary</u>.

70.     On September 7, 2016, Congress held a hearing on their findings which

resulted from the Intervenor's whistleblowing and other protected activity, where

DoD's acting IG, GAO, and a government watchdog were the required witnesses.

a.  During which a Congressional Committee leader proclaimed, *inter alia*,

"We do have really an **abominable** case, though, with the Department

of Defense Office of the Inspector General. We are in total agreement on

that. We have got cases where there appears to be **<u>deliberate</u>** mishandling

of documentation. You are right, Mr. Chairman, they have **<u>failed</u>** miserably

in meeting the 180-day statutory requirement for informing

servicemembers of their rights and of the status of their case. Instead of

180 days, the average day over there for review is 526 days, and in that

case, you know, justice delayed is justice denied for a lot of these soldiers

who come forward and report misconduct and engage in whistleblowing.

So, there is a lot here. There are — <u>there is the case of personnel at the</u>

<u>DoD Inspector General's office backfilling evidence in files **after** the case</u>

<u>is closed, which, you know, sounds like some of the things that we have</u>

<u>prosecuted people for and people are doing **jail time** for</u>."

    b.   Accordingly, not only had watchdogs, but now <u>Congress officially</u>

        <u>proclaimed that DoD IG staff (who Intervenor was a known whistleblower</u>

        <u>regarding) not only failed to perform, but also appeared to have committed</u>

        <u>**crimes** which they should go to **jail** for</u>!

71.    But now, DoD's implicated acting IG and his implicated attorneys falsely

placated the Special Counsel, and continued to deprive the Intervenor of necessary,

and even promised protections, while the Special Counsel's designee delayed

requesting a stay from the MSPB because he allegedly believed that he could get the

acting IG to provide protections for the Intervenor even quicker.

    a.   But as the acting IG unlawfully failed to protect the Intervenor who had

        blown the whistle on him, the Special Counsel sat idly by.

72.    In September 2016, when the Special Counsel herself was interviewed as a

subject of investigation (though she later lied about and suppressed such) the Special

Counsel – who had regularly directly worked with the Intervenor's spouse, sought her

out, intentionally went to speak to her in the private office, or even ordered her to a private meeting to suppress allegations against OSC by – and numerous other encounters different than any other OSC employee, the Special Counsel lied to the investigator that she had never worked directly with the Intervenor's spouse, and was not aware of her race or color, presenting as if she never even recognizably seen her.

    a.  The Special Counsel plainly lied, and made false statements in official proceedings in order to cover up for herself as she was seeking reappointment, let alone used fraud in service of deprivation of rights.

    b.  For years, the Special Counsel(s) and other OSC staff abused their authority to compromise, truncate and suppress this, and other investigations of OSC, as they and their staff sought to keep their jobs, burrow into other positions or branches of government, <u>and prevent the President of the United States, *et al*, from learning the truth</u>.

73.    On October 6, 2016, while DoD's conflicted IG – including the acting IG who was just vilified before Congress – slow-rolled necessary protections, and OSC's mishandling allowed the IG to hide their misconduct from the agency head (i.e., from both the Secretary and his legal counsel), *et al*, the Special Counsel's designee again assured that they would get the Intervenor to a "safe place" out of his chain of command - **within two weeks**. Such false placations were used by OSC to justify their self-serving presentations that the only reason OSC had not asked MSPB for stays or other protective orders was because OSC's informal efforts would be faster and better for the Intervenor (which they were not, but OSC **never** corrected course).

74.     On October 11, 2016, OSC conceded that even in the recent days, it had still tried, unsuccessfully, to simply get the Intervenor protectively moved temporarily, even before 'a permanent position outside his chain of command' was secured for him.

75.     On October 28, 2016, while protections for the Intervenor were still unfairly and harassingly slow-rolled by DoD IG, and OSC failed to ministerially perform, the Special Counsel's designee claimed that the acting IG agreed to move the Intervenor out of his chain of command and into a better situation for a "fresh start," even, "independent of any settlement agreement."

   a.  Yet still, nothing actually happened, DoD IG lied, and OSC allowed it.

76.     On November 2, 2016, as the Special Counsel still failed to take decisive, let alone necessary or statutory, actions to protect the Intervenor, and continued to improperly go 'hat-in-hand' to the implicated IG, instead of to the Secretary, MSPB, and OPM, OSC yet again assured the Intervenor that, "Finding you a new job remains priority one," whereafter, OSC was to more fully and aggressively proceed against DoD and its IG.

77.     On November 3, 2016, OSC claimed that the acting IG had met with his staff the prior day, and instructed them to provide an appropriate Position Description (PD) out of his chain of command by November 8, 2016, with the move to that allegedly appropriate new job scheduled to occur on November 14, 2016, but even despite his also anticipated detail outside the entire agency as well, which would

therefore protectively remove the Intervenor to a safer situation, not just when he was still working in the IG, but even for basic matters whenever he was detailed out of it.

    a. Yet still, nothing actually happened, DoD IG lied, and OSC allowed it.

78. On November 8, 2016, as matters continued to be slow-rolled by those implicated, the Special Counsel's designee again placated that their prior promises, e.g., for further full investigation of all the Intervenor's claims, and the assignment of top OSC field staff therefore, **would** be tackled **after** securing the Intervenor beneficial work outside the DoD.

79. On November 16, 2016, as the Special Counsel's and the acting IG's alleged action date also passed, the Special Counsel's designee repeatedly told the Petitioner to focus on getting completely out of DoD, as OSC assured it would do.

    a. This went on for **months** more, while the Special Counsel let the IG continue to deprive protections, failed to take decisive actions, and did not tell the Secretary of Defense or MSPB. OSC did not even tell the Secretary of Labor that, as it knew, DoD IG was committing PPPs and even violating statute, rule and regulation regarding his workers compensation, and both illegally obstructing that and withholding a medically suitable position for the disabled Intervenor.

80. In or about January 2017, after the Intervenor had been competitively selected to become a key official in the U.S. Department of Homeland Security (DHS) IG, where he was to be able to help shape the entire DHS whistleblower protection program, after he made a whistleblower disclosure, and after DoD IG's

most conflicted attorney engaged with DHS IG's OGC, DHS IG rescinded their offer,

and did so solely based upon their assertion that the Intervenor made a whistleblower

disclosure to DHS from his personal email account instead of his DoD email account.

    a. OSC failed to investigate DoD IG in its investigation

    b. Even taking a job with DHS would have been problematic for the

       Intervenor, however, because despite that OSC made positive findings, and

       knew that the personnel actions and other records in the Intervenors file or

       otherwise with DoD were negatively fraudulent or otherwise illegal, they

       had still not ensured corrective actions for matters outstanding for years.

81.    It wasn't until February 2017, that the Intervenor was nebulously assigned

to a different, and allegedly safer, chain of command, in a vague teleworking position.

82.    Proximately, however, the Intervenor was finally enrolled in a Fellowship

training program via Georgetown University which DoD IG had been depriving him

of for years. And the Special Counsel's designee confirmed and noted the acting IG's

concurrent recognition that it was separate from any potential settlement.

83. The Intervenor was then assigned full-time out of the Executive Branch via

    Georgetown, and through them, also into Congress, from February 2017 **through**

    **March 2, 2018**, whereafter he would to return to the new protective position out

    of his prior implicated chain of command, if he go elsewhere.

       a. Throughout this period, and with his DoD supervisor's consideration and

         approval of such as workers compensation time, the Intervenor continued to

         take time off for physical therapy and other treatments for his prior work-

related injuries, and he developed more having to commute to DC and

ambulate the concrete of Georgetown and the concrete/marble of Congress.

  i.  DoD suppressed all of this, and never even let him be compensated

   for it (and later lied about it), all of which the Special Counsel

   willfully ignored and served as accessory to.

84.  During this time, and as DoD IG continued to take PPPs against him, the

Intervenor complained to the Special Counsel's designee they had been (unlawfully)

failing to communicate and perform. The Special Counsel's designee conceded that

they had been doing **nothing** in the Intervenor's case, and not acting in his interests,

and instead just working on other people's cases only.  5 U.S.C. § 1214 (a)(1)(C)(ii)

  a.  But the Special Counsel's designee told the Intervenor they were trying to

   find him a different job, and presented that any corrective actions which

   kept the Petitioner in DoD **must not** even be considered.

  b.  The Special Counsel's designee and foremost OSC expert on the case,

   insisted that after the Intervenor completed his fellowship with Georgetown

   University and Congress, he should get a job **elsewhere** from DoD and IG.

   The Special Counsel's designee not only told the Intervenor that this was

   what they wanted for him, but they also insisted it was the "only solution",

   even going so far as to proclaim that Intervenor going back to the DoD after

   this is all over would be **"the worst"** and he "might as well just fold up".

85.  On May 26, 2017, President Trump publicly revealed his intent to nominate

a new Special Counsel, and therefore his decision not to renominate the existing

Special Counsel despite her bragging how she had Republicans like Senators Grassley and Lee essentially in her pocket.

     a.  The Special Counsel had reasons to believe that the Intervenor's and his spouse's whistleblowing and other protected activity caused or contributed to her losing her bid to keep her and her "political" cronies in place in OSC.

86.    Suddenly, the Special Counsel's designee began **secretly** negotiating with DoD, and not even via the Secretary of Defense or his OGC, but via acting IG and his attorneys – all of whom the same OSC official had conceded were conflicted and implicated in the case, and none of whom were a presumed neutral.

87.    In June 2017, because of the Special Counsel's failure to refer allegations or ensure accountability, and years of willful activities to suppress anyone from learning the truth about their own staff, the Special Counsel's highly-partisan "political" congressional policy advisor (Adam Miles), who reportedly had never worked as an attorney, including in OSC, apparently tricked President Trump, or got those in PPO who were against Trump, to appoint him as acting Special Counsel.[37]

88.    Also in June 2017, as Mr. Miles, the OSC "political" liaison who the Intervenor and his spouse had blown the whistle on and engaged in protected activity against, was to rule as the acting Special Counsel, and without OSC having ever performed as required by law, let alone as they promised they would, <u>they attempted to **extort** the Intervenor to relent to a settlement with DoD IG</u> that was vague, did **not** constitute full corrective actions, did **not** provide any compensatory damages (despite

---

[37] Even the government's own records apparently show that Mr. Miles that even in OSC, Mr. Miles was employed as a series 0301 (administrative management and program analysis), and **not** <u>as a series 0905 (attorney)</u>.

that the Special Counsel's designee had dissuaded the Intervenor from filling an

EEOC claim because the Special Counsel's designee bewailed it would limit them to

'**only $300,000**' in compensatory damages) – but worst of all, it permanently

reassigned the Intervenor to a vague and unspecified position **within DoD**, and even

**within DoD IG**, <u>and within a unit who the Intervenor had not only blown the whistle

on and engaged in protected activity against, but who had committed PPPs against

him</u> – i.e., the exact situation the Special Counsel's designee for months insisted the

Intervenor **must not** consider – the same which the Special Counsel's designee said

would be **"the worst"** and essentially be the end of the Intervenor's life.

   a.   And in service of the extortion, and despite law and all prior promises, the

         Special Counsel's designee applied duress by relating that *if the Intervenor

         did not relent to this insufficient and dangerous settlement*, (just to

         corrective actions the Special Counsel's designee agreed that the Intervenor

         had **rights** to <u>because they were PPPs committed against him in retaliation

         for his whistleblowing and other protected activity</u>), then the Special

         Counsel would terminate investigation of his PPP case, and force the

         Intervenor to attempt to **prosecute** (the biggest case in OSC's history)

         by himself before the MSPB.

89.    In August 2017, under then acting Special Counsel Adam Miles,

OSC formally documented all this, with their "Preliminary Determination" proposing

to terminate investigation in the Intervenor's PPP case.

a. And, not only was OSC's preliminary determination otherwise in violation of law, e.g., 5 U.S.C. § 1214(a)(1)(D) – let alone prior to actually fully investigating outstanding PPPs § 1214(a)(1)(A); but, also, in abusing his authority to prevent further reveal of OSC's performance failures and misconduct, the Special Counsel's designee made an *ultra vires* restriction on the amount of pages which the Intervenor's written comments could be (while knowing that the last time the Intervenor made such comments to the Special Counsel, with copy to Congress, it resulted in a complete overturn of OSC's improprieties), followed with the White House choosing a new Special Counsel, let alone that this was the 'biggest case in history'.

90.    In September 2017, [after burrowing in a fellow (establishment Republican) congressional staffer who had apparently been suppressing the misconduct of both DoD IG and OSC for years – or otherwise even deceiving his own Congressional bosses – and concurrent with OSC referring matters against the DoD IG to IG Michael Horowitz and Deputy IG Rob Storch at DOJ, and as they were planning to work on highly political matters related to Hillary Clinton and Donald Trump, they circumvented standard hiring and security practices, and burrowed Adam Miles in as Counsel to the IG (Horowitz), where both implicated staff from DoD IG who OSC had prevented holding accountable, and the subordinate who OSC's political leader had been sleeping with while she was mishandling the Intervenor's case had already similarly been prepositioned on IG Horowitz and DIG Storch – while DIG Storch was being prepared to replace the Republican NSA IG under DoD they had forced out, all

while they (including Horowitz and Storch)] suppressed the Intervenor's allegations and evidence against DoD IG and OSC, and burrow in their proven friend and protector to take over as acting Special Counsel.

91.    The Intervenor attempted to respond to OSC's preliminary determination in accordance with the unfair restrictions placed upon him, and in doing so, engaged in further whistleblowing and other protected activity.

    a.  The acting Special Counsel (Tristan Leavitt) not only ignored this for months, but did so while he and OSC illegally did no further work for the Intervenor, and illegally failed to protect the Intervenor – even while his case was still open and no actual decision had even been made to terminate investigation, let alone while PPPs continued by DoD against him, in complete violation of the documented intent of Congress and letter of law.

        i.  By or about November 2017, the new Special Counsel (Henry Kerner) assumed office, and continued the same misconduct for months, as he covered for his predecessors, and demonstrated that he had lied to Congress and the President to get the job.

92.    On  December 20, 2017, OSC attempted to discipline the Intervenor's wife (who heretofore had a spotless disciplinary and performance record), and not only did those she had blown the whistle on, engaged in protected activity against, filed charges against and had pending as subjects of investigation (i.e., her supervisor, and their manager, OSC's Chief of CEU),  did so in collusion with the Special Counsel's prior-implicated OGC, but they disciplined her **without** any investigation of the

charges and **without** any due process, via a letter backdated as if it was given to her more than a week prior.  And, as if all that wasn't ridiculous enough, OSC disciplined the Intervenor's spouse – their employee whistleblower – and, for ridiculous things, specifically,

      a.   *(Allegedly* exercising her <u>First Amendment Rights to Freedom of Speech</u> by) *allegedly* making disparaging remarks [blowing the whistle] about current or former OSC leaders, <u>while the employee was out of the office, during her lunch, while celebrating her own birthday;</u>

      b.   *Allegedly* posting a sign (which turned out to be a **newspaper article**) in the communal posting area of the office's break room (and amongst other employee-posted signs), which informed that it is poor office etiquette to microwave fish in the communal office microwave – something which exacerbated the employee's medical conditions and disabled her ill, and would even make her have to medically flee; and,

      c.   *Allegedly,* offering advice to a coworker about employment opportunities, alleging that she told a coworker that OSC had a "bad reputation", which her manager alleged, "caused at least one employee to question whether he/she made the right decision to accept OSC's offer of employment," – an agency whose former Special Counsels were investigated by the FBI or prosecuted by DOJ; an OSC who had the worst OPM survey results.

93.    In January 2018, only after the Intervenor's spouse had related that she intended to file allegations that now implicated the new Special Counsel and his

Principal Deputy, Special Counsel Henry Kerner took personal control of the
Intervenor's case, and summarily, fraudulently and otherwise illegally terminated
the investigation.

    a. And in doing so, and in continuation of OSC's illegal acts since 2016,
the Special Counsel illegally failed to inform the MSPB, the Secretary of
Defense, and the OPM of the Special Counsel's prior determination of
PPPs committed by DoD which required corrective actions, or other
violations of law, 5 U.S.C. § 1214(b)(2)(B) and § 1214(e);

    b. And, the Special Counsel illegally failed to provide the Intervenor the
information Congress ministerially mandated that the Special Counsel
provide ever since they took action to prevent this exact misconduct by the
Special Counsel, let alone that such was predominantly a failsafe for those
who OSC did not find in favor of, because Congress could never have
imagined an OSC that has gotten so lazy and corrupt that it would even fail
to perform when it had evidence of PPPs.  5 U.S.C. § 1214(a)(2)(A).

94.    In January 2018, as a result of OSC's putative leaking to the DoD IG,
DoD IG ordered him to their offices in Virginia – while he was assigned to
Georgetown and Congress – and made him personally physically pack and load boxes
and crates in direct violation of his medical restrictions while he was still painfully
disabled, hobbled on a cane, and actively receiving physical therapy.

    a. The Special Counsel ignored claims and refused to protect the Intervenor.

95.    And, OSC recanted and truncated Intervenor's spouse's reasonable accommodations for a neurological medical disability, causing her an enhancement of her disabilities which progressed through her employment with OSC, and beyond.

96.    In February 2018, after acting IG Glenn Fine refused respond to the Intervenor, and even Congress's requests and needs that the Intervenor be allowed to continue in his fellowship or otherwise continue to directly support Congress, the Intervenor again contacted the Special Counsel and requested a stay and other protections with related more claims, including simply for OSC to protectively stay the Intervenor's return to DoD IG, and instead maintain in his Fellowship/detail, status quo, as even Congress wanted, let alone was a needed protection.

   a.    The Special Counsel Kerner himself refused for OSC to consider such and willfully allowed monetary and medical harm to come to the Intervener.

97.    In March 2018, on the Intervenors first day back from his year-plus long fellowship where he even assisted Congress against the DoD, he found that (as a result of the Special Counsel's misconduct and his refusal to settle and hide matters from President Trump), DoD IG had secretly seized all his equipment, files and property; took control of them; wedged his chair and telephone and computer equipment, unconnected and unwired, behind towers of boxes – and not even in a private office like he had – but in a cubicle in the middle of the room in the unit he had served as whistleblower and witness of crimes by, where he was forced back under the same criminally-implicated supervisor, and where he was told he had to physically perform, unpack boxes, and even crawl and setup his computer, phone and

other equipment – and that he otherwise had to remain hobbled on his cane in the middle of the office, and was not allowed to even sit down in any chair until he did so.

98.     The Intervenor had to stop active duty under doctor's orders, but DoD IG again obstructed him from workers compensation, and committed crimes to defraud the Secretary of Labor – while the Special Counsel still failed to inform the Secretary of OSC's dispositive knowledge and evidence of misconduct, acting as accessory.[38]

99.     On or by March 7, 2018, both the Intervenor and a watchdog requested to speak to the Special Counsel's designee (Bruce Fong), who was the knowledgeable official on his case, and was a Congressionally-guaranteed right the Intervenor had.

    a.  Principle Deputy Special Counsel Leavitt  interceded this, but asserted that he would only engage with the watchdog/press "one-on-one" about the Intervenor's case, and not with the Intervenor – if the Intervenor grant him a Privacy Act waiver to do so.

        i.  The Intervenor contested that Mr. Leavitt was acting unlawfully, let also acting in contravention to the Privacy Act, essentially extorting the Intervenor to provide a Privacy Act waiver so OSC could privately argue information about the Intervenor's case without the Intervenor being privy.

            1.  Foiled, Tristan Leavitt refused to entertain any advocacy, or otherwise allow the Intervenor his rights to information and communications with OSC in and about his own case.

---

[38] *Inter alia*, <u>False or withheld report concerning Federal employees' compensation</u>, 18 U.S.C. § 1922

100.    And, when the Intervenor attempted to get stays or other protective orders

from the MSPB, further performance by OSC, or even any discovery as a prerequisite

to unfairly having to prosecute DoD by himself – the IG's own implicated attorneys –

literally named in the case and who the Special Counsel knew were conflicted,

harassed the Intervenor and blocked such that, in the absence of the Special Counsel

performing as ministerially required, as DoD IG even moved to illegally and even

criminally remove him from his position, the MSPB did not even regard the

Intervenor as a whistleblower, and unlawfully refused him any stays, any other

protective orders, any discovery, and any merit hearings.

101.    In June 2018, (and well after they privately informed Congress and the

Special Counsel in advance regarding their findings), GAO publicly released their

review of OSC, which had resulted from the Intervenor's and his spouse's

whistleblowing and protected activity with Congress and its GAO.  And though the

Special Counsel muddled it, GAO found, in pertinent parts,

      a.  Approximately **1 in 3 cases** which OSC claimed 'favorable actions', lacked

            any documentation to prove that either the agency actually performed the

            favorable corrective action, or that any such favorable action was actually

            the result of OSC's work, *e.g.*, <u>OSC **falsely** claimed positive work by OSC</u>

            <u>in approximately 1 in every 3 cases.</u>

      b.  OSC admitted "informally" referring whistleblower disclosures down to

            agency IGs (who are themselves often implicated in misconduct), let alone

            instead of to the President's agency head (exactly as the Intervenor had

disclosed and complained that OSC had been illegally doing in his case(s), against his interest, and causing him harm.

c. After GAO began its review in 2017, of cases that closed in 2016 or earlier, OSC either conveniently could not find (*e.g.,* lost or destroyed), or was strangely 'still retrieving' (and likely altering and scrubbing) about 15% of the cases that GAO requested to review.

    i. And even thereafter, GAO determined that OSC still could not find (and conveniently lost) at least 10% of the casefiles for cases it had alleged to have prior closed.

d. OSC could not provide any documents to justify its claims of how, or even if, it trained the staff in OSC's Disclosure Unit (the unit which receives, directs agency investigations of, and conducts oversight therefore, whistleblowing from and about any agency or program in government), which, as the data shows, almost never ever actually performs as needed.

e. OSC CEU (now, Case Review Division) claimed having performed training, including multi-week-long training courses, where OSC could not actually provide any documentation to prove who was trained or that the training actually even existed – neither a syllabus of what was allegedly taught in the training, nor any list of employees who allegedly attended the training, let alone completed the training.

f.  OSC staff from outside CEU were assigned to perform CEU work to decide if complainants brought any valid claim to OSC (like the Intervenor,

or a prior intervenor in this case), despite that these staff were provided no training in CEU work.

g. Of the cases made by internal OSC employee whistleblowers against OSC and their coworkers, OSC conveniently could not locate for GAO review **80%** of the cases that GAO requested to review, and all the cases that OSC allegedly 'lost' were <u>cases where an OSC employee blew the whistle on **misconduct** by other OSC employees</u>.

h. For years now, OSC still does not have an IG to oversee it, let alone which any outside Federal employee customer or citizen could report on OSC to, unlike virtually every other Federal agency in the entire government.

102.    Proximately, Principal Deputy Special Counsel Tristan Leavitt pursued a golden parachute from OSC to be burrowed in as the General Counsel (and fake IG) of the MSPB (which itself is likely professional misconduct), not only after having been implicated in violations of these exact things, and while still actively a subject of investigation from charges by OSC's own employee(s) (including Intervenor's spouse), but in matters implicating him and OSC before the MSPB and that exact office and role in MSPB (from the Intervenor), but even while legal briefs under his signature against the MSPB were pending in Federal Court which the MSPB's General Counsel was defending against, and while reportedly being the least qualified person to ever hold that SES position of General Counsel.

103.    By or about October 2018, the first-line supervisors in the OSC unit which GAO found had been profusely deceitful or failing to perform received **promotions**.

104.    On or about October 2018, and while responsible supervisors received promotions, Special Counsel Kerner, Principle Deputy Special Counsel Leavitt, and Associate Special Counsel Louis Lopez, *et al*, who were implicated in active outstanding investigations by the Intervenor's spouse's charges, laterally reassigned the Intervenor's spouse to be under a new supervisor – and, despite having options otherwise, they specifically reassigned her under an OSC employee whom the Intervenor's spouse had charges and Federal investigation pending against since 2016 and while such were active.  <u>OSC literally took a victim and made her be supervised by the implicated perpetrators</u> – much like OSC allowed done to the Intervenor.

105.    On October 15, 2018, <u>within **hours** of</u> Principle Deputy Special Counsel Tristan Leavitt burrowing in to be the MSPB's General Counsel and (fake) IG, the MSPB's IG (*i.e.,* Tristan Leavitt) summarily dismissed all of the Intervenor's complaints against MSPB in matters revealing misconduct by OSC during Mr. Leavitt's tenure (which had been outstanding with the MSPB's General Counsel and alleged (fake) IG <u>for more than a month</u>).  MSPB IG did so <u>without investigation</u> or any referral whatsoever, and instead made false statements to prevent all such.  It is likely that Mr. Leavitt was even specifically burrowed in to perform such cover up.

      a.    And after further abusing his authority to continue to keep all matters that implicated him under wraps, Mr. Leavitt next was prepositioned to **illegally** steal control of the entire MSPB for **years**, without ever being appointed by the President nor confirmed by the Senate for such. Whereafter, he became a Member of the Board, all while keeping Intervenor's claims suppressed,

rights deprived and protections refused, while Mr. Leavitt even teleworked or got moved to West Virginia, on tax-payer funds, as a Board Member of a Washington, D.C.-based Federal Board, all while he and the Special Counsel illegally failed to refer *any* allegations – from Intervenor, or OSC's own employees, for any investigation, against himself/OSC whatsoever.[39]

106.    In December 2018, the Intervenor complained to the Special Counsel's SES-level designee of more serious and plainly illegal PPPs pursued against him by those in DoD IG who OSC had already found against, and he requested stay therefore.

    a.    Upon review, the Special Counsel's SES-level designee (Bruce Fong), knowing that the Intervenor had warrant for a stay, coordinated OSC's CEU/CRD to expedite the processing of it, and it was even referred out of CEU/CRD for Investigation and Prosecution (IPD) under Louis Lopez.

        i.    But then, Anne Wagner, the CEU/CRD chief's supervisor (who had been implicated misconduct against Intervenor's spouse or even DoD IG whistleblowers, and had a horrific documented history of reported misconduct against whistleblowers), seized or was given control of the Intervenor's filing and stay request back from IPD, and summarily refused, based upon illegal, let alone completely ludicrous reasoning.

            1.    The Intervenor blew the whistle on Ms. Wagner and engaged in protected activity to do so, directly with Special Counsel

---

[39] Any allegations against the Special Counsel and Principal Deputy Special Counsel are supposed to be investigated by CIGIE, and the Special Counsel and Principal Deputy Special Counsel are required to refer ay such allegations.

Kerner and Principal Deputy Special Counsel Epstein, and

detailed how Ms. Wagner's actions were wrong and illegal.

2. Both the Special Counsel and his Deputy ignored it all.

3. Days later, Ms. Wagner, in collusion with Mr. Lopez, literally

rewrote and changed her proven-wrong reasoning to deny

the stay request, and engaged in further misconduct.

4. Both the Special Counsel and his Deputy ignored it all.

a. Later, after Principal Deputy Special Counsel Epstein

failed to perform in matters against IGs and IG

counsels (and committed crimes or other misconduct

against OSC staff), she was burrowed in to become a

Senior Counsel to an IG.

107.    Beginning on **January 7**, 2019, as OSC and its Special Counsel willfully

continued to fail to do its job, properly perform for the Intervenor in his complaints,

or process even a single one of his disclosures – let alone tell the Secretary of Defense

and his General Counsel anything, DoD IG's – (including Glenn Fine's) fraud, waste,

abuse, or shocking mistreatment of whistleblowers not only continued, the Intervenor

went himself <u>directly to President Trump's acting Secretary of Defense (Patrick</u>

<u>Shanahan), and his General Counsel (Paul Ney)</u>, and blew the whistle on such.

108.    The very next day, **January 8**, 2019, [immediately after the Intervenor's

former immediate peer coworker and fellow DoD IG whistleblower revealed to DoD

PDIG Glenn Fine that he was going to provide testimony to Republicans in Congress,

which DoD IG knew would corroborate the Intervenor's whistleblowing and other

protected activity against him and DoD IG, and cause then-President Trump, *et al*,

to take notice – and immediately, literally the day after the Intervenor put the

Secretary of Defense on notice of the DoD IG's (including Glenn Fine's) misconduct]

– The Intervenor's patriotic coworker, who told acting IG Glenn Fine that he was

going to testify as a witness before Congress on such, <u>was found **dead**, stuffed in</u>

<u>a car trunk, in DoD IG's secured, monitored, gated, restricted-access parking lot.</u>[40]

    a. This other DoD IG whistleblower had apparently been internally blowing

        the whistle (and suffering retaliation therefore) – against and by the same

        people as Intervenor, in DoD and IC, right before he lost his life as a result.

    b. DoD IG did not bring in the FBI to investigate, Congress was made to shut

        down their inquiry, and the case was shuffled off to local police who had

        no knowledge to dig into the bigger issues, no capability to discern the

        truth, and no reason to not quietly buy the story that it was suicide.

    c. **If not for** the Special Counsel's performance failures and other

        <u>misconduct, including that of numerous OSC employees</u> who covered up

        charges against the DoD IG and received pay and promotions for doing so,

        the implicated DoD IG officials would have already been removed,

        DoD IG's whistleblowers would have been protected, and this other

        whistleblower (an honorably retired Lieutenant Colonel, former

        Intelligence Officer, GS-14 DoD IG investigator, husband, and

---

[40] <u>Death of a Whistleblower</u>. Foreign Policy, March 20, 2020. Publicly available on the internet at:
https://foreignpolicy.com/2020/03/20/death-of-a-whistleblower-suicide-pentagon-office-inspector-general/

father of four – a truly and genuinely good person, and patriotic

whistleblower) would never have either been killed or driven to death.

d.   As OSC turned a blind eye, and even suppressed dispositive knowledge and

information, DoD's IG shamelessly worked to discredit the deceased, and

portray him as mentally defective – as is a decades long, and still

ongoing, known tactic in and by DoD known  by Congress and current and

former DoD officials (but strangely ignored and disregarded by OSC's

biased staff who too often look for any way possible to discount

whistleblowers and avoid OSC's work).

e.   DoD's implicated IG even privately mobbed the deceased's wife,

and coordinated the media's interview of her through them, and seemingly

applied other pressures or coercive tactics, while the Special Counsel and

his OSC staff apathetically sat silently by.

109.   In late January 2019, after the Intervenor learned the shocking news of what

happened to his fellow DoD IG whistleblower, he again directly communicated with

acting Secretary of Defense Shanahan, and General Counsel Ney, and continued in

further protected activity with them for months.

110.   As a result of the Intervenor's whistleblowing and other protected activity,

and the Secretary of Defense and his General Counsel's clear alarm at what the

Special Counsel had been withholding and suppressing from them, the Secretary of

Defense referred matters to CIGIE's Integrity Committee, thereby asking CIGIE to

conduct an independent investigation of, *inter alia*, DoD IG.

111.    While the Special Counsel continued to illegally suppress such and fail to perform, the Intervenor continued protected activity with and for the Secretary of Defense (who was pushing CIGIE), and further implicated other officials who had improperly acted to cover up for DoD IG, including OSC, MSPB, CIGIE Chairman and DOJ IG Michael Horowitz, CIGIE Whistleblower Ombudsman Chairman and DOJ PDIG Rob Storch (who was burrowed in as NSA IG), and CIGIE Integrity Committee Chairman, DOL IG Scott Dahl, *et al*.

112.    An NGO, apparently led by a former partisan staffer who reportedly had connections to the former Special Counsel's personal political strategist, coordinated with those conflicted in DoD IG – including acting IG Fine, and the deceased whistleblower's and the Intervenor's former unit that they were blowing the whistle on – and began applying investigative pressures against President's Trump's acting Secretary of Defense, and even opened investigations on him.

113.    Promptly thereafter, CIGIE's "Integrity Committee", via Chairman Scott Dahl (who had actually been Glenn Fine's former attorney no less), confirmed to the Intervenor that the Secretary of Defense had referred matters to CIGIE investigation, but then – without any complaint clarification or ever even talking to the Intervenor, let alone following up for further development, Dahl refused to investigate anything, specifically including anything against acting DoD IG Glenn Fine, and summarily dismissed the Secretary of Defense's own referral, without **any** further action.

   a.   Only then, DoD IG intermediately relented against Secretary Shanahan.

114.    Unfortunately, as NGOs coordinated with those conflicted in DoD IG –

including the suspiciously-deceased whistleblowers and the Intervenor's former unit

that they were blowing the whistle on – and as enhanced efforts began to harass and

harm Secretary Shanahan's family – and most specifically his child, and threated

worse, Mr.  Shanahan fled DoD, "to devote more time with his family".

       i.  President Trump later replaced him with Mark Esper, who failed to

          hold DoD IG accountable. President Trump fired Mr. Esper and

          revoked his security clearance.

115.    Since OSC began taking shockingly illegal actions against her in 2017

through 2020, *et seq*, the Intervenor's spouse had and progressively continued to

suffer enhanced and new disabilities due to work-related injuries and conditions

caused by OSC, specifically including the misconduct of multiple OSC officials, up to

and including Special Counsel Henry Kerner and Principal Deputy Tristan Leavitt, let

alone other OSC management staff and their insidiously illegal OGC.

116.    In 2019, OSC itself determined that the Intervenor's wife had enhanced

disabilities and was suffering *bona fide* medical emergency, for which, *inter alia*,

leave donations were warranted, and extended leave was approved as accommodation.

    a.  Despite this, while on leave, while suffering medical emergency, and while

       even certified to be incapacitated, her implicated supervisor (Kim Baxter)

       in collusion with the Special Counsel's unlawful OGC, *et al,* would harass

       both Intervenor and his spouse, illegally harassing both him and her,

       illegally preventing her from the Family and Medical Leave Act (FMLA),

and unlawfully retroactively declaring her AWOL while incapacitated during a Special Counsel-designated medical emergency.

117.    In January 2020, (and since OSC had illegally suppressed such matters since 2017, and performing within OSC's statutory duty requirement window), the Intervenor again broached the PPPs committed by DHS IG in and since 2017, whereby evidence proved that DHS IG, via its 2017 OGC, had rescinded their job offer to bring in the Intervenor to help shape and build the entire DHS whistleblower protection program, solely because he exercised his Constitutional Right to Free Speech, and communicated – in his capacity as a private U.S. citizen – with the office of DHS IG – while he was not an employee of DHS, to blow the whistle on crimes or other misconduct by others against DHS, via his personal email address, instead of his DoD email address, which DHS IG OGC wanted him to, despite that his disclosures implicated DoD IG staff who committed crimes and other misconduct before DHS, whom the Intervenor knew monitored DoD emails and IG staff's whistleblowing.

a.    The Special Counsel assigned an attorney who was concurrently pursuing employment, as a defensive agent no less, with an agency implicated in the Intervenors claims, and then that attorney committed fraud and refuse to investigate, despite the availability evidence which plainly provided PPPs, and OSC failed to lawfully perform in the matters, ever, ongoing to date.

b.    Special Counsel Henry Kerner, *et al*, thereby illegally suppressed information that was critical to President Trump's new DHS IG, who was unfairly being criticized or investigated for bypassing CIGIE to have a

third-party investigate misconduct in his office, and, while Special Counsel

Kerner, *et al,* knew that the Intervenor's records not only proved the new

DHS IG was warranted in doing so, but that the Special Counsel's files

contained information and evidence implicating DHS IG employees who

were subjects of the new DHS's IG investigation, or who were working to

harm the DHS IG, for which the information was dispositive and would

have corrected the some of the false aspects in the public narrative.

      i.  Even while related matters were put before the Courts by

           the DHS IG, OSC kept dispositive information suppressed.

118.    In February 2020, against medical restrictions, <u>but under duress by OSC</u>,

the Intervenor's spouse, most recently a full-time teleworker due to medical needs,

attempted to return from FMLA leave (which was only partially permitted after HR

had to overturn Ms. Baxter's illegally obstructions), via telework, but found herself

locked out of OSC's systems, and even locked out of conferencing and contacts.

      a.  In response, the Intervenor's spouse followed OSC's guidance, including

           the guidance of her most recent confirmed supervisor, to remedy matters

           through OSC's IT labeled-helpdesk, whereby she was then left waiting for

           days in duty status, per IT, while OSC internally conspired against her.

119.    On February 11, 2020, after approximately two days of such, the

Intervenor's spouse directly contacted the only two supervisors (Special Counsel

Henry Kerner and Principal Deputy Special Counsel Ellen Chubin Epstein) she was

sure of at that point (based upon conflicted information in OSC's third-party payroll

system, which seemed to reflect a new supervisor that nobody told her about).

In doing so, the Intervenor's spouse, *inter alia,* and with assistance due to disability,

    a.  Engaged in whistleblowing and other protected activity to OSC.

    b.  Related the occurrences under OSC's guidance for the past two days.

    c.  Further exposed her past supervisor (Kim Baxter) as a criminal.

    d.  Reminded OSC that her medical restrictions required her to telework, and provided an updated medical report from a Board-Certified Neurologist who confirmed that not only had she not yet been cleared to return to duty, and reminded that she had medical restrictions which required accommodations, but related that she was permitted to return, his patient could only do so via telework, could not commute, and alerted that otherwise her patient could suffer harm <u>and even be **paralyzed**</u>.

120.    On February 12, 2020, the (criminally-implicated) Kim Baxter asserted that she was now the Intervenor's spouse's supervisor, and in criminal witness tampering and other retaliation, with the ongoing implication of being fired, Ms. Baxter ordered her to commute from Virginia to OSC's headquarters in DC, to physically appear in person the next day to speak with Ms. Baxter, in contravention to all medical restrictions, let alone at the impetus of the COVID-19 pandemic, and with no need.

121.    On February 13, 2020, under duress to lose the Intervenor's family's – including infant baby's medical insurance and possible salary to survive, the Intervenor, a teleworker, was compelled to attempt to commute into DC, against medical restrictions, dragging medical equipment, office equipment, and casefiles.

a.  She apparently fell and was injured *en route*, attempted to pull herself from the parking lot to and through the train station, collapsed on the platform – blessedly missing falling onto the tracks and getting hit by a train, had to be carried by staff, attended to by paramedics, and rush to the nearest emergency room.

122.   Promptly that evening, the Intervenor notified Special Counsel Henry Kerner, Principle Deputy Special Counsel Ellen Chubin Espstein, Chief Administrative Officer Bruce Gipe (to whom all administrative functions reported), OSC Chief Human Capital Officer Kathy McDuffie, Associate Special Counsel Louis Lopez (to whom Ms. Baxter directly reported), and Chief Kim Baxter, in most pertinent part, that his spouse had suffered, "traumatic injuries and related medical conditions" as in the foregoing, specifically <u>as a result of OSC's unlawful activities</u>, *inter alia*, their willful actions in violation of his spouse's known medical restrictions, and reported that their employee needed, *inter alia*, emergency medical care. And, so there was no doubt, he titled the email,

"Notice of Traumatic Injuries; <u>OSC Criminal Negligence</u>."

123.   In violation of law, let alone likely crimes, **all** of those involved officials (and other HR and OGC they related such to) illegally failed to ensure matters were immediately reported to the Secretary of Labor, nor even informed their employee regarding her potential rights to workers compensation, let alone offered the required medical care, which she had rights to.

a. These were all illegal personnel acts by OSC, in service of their criminal retaliation, witness tampering, and deprivation of rights.

124.    As a result of the misconduct of the Special Counsel, *et al*, in OSC, within days, the Intervenor's spouse had to be medically directed to a "Trauma 1" Emergency Room due to potentially life-threatening consequences, and upon evaluation, it was determined that she had to be admitted to the "Stroke Unit".

125.    Days of evaluation, surgeries and other procedures later, the hospital determined that that the Intervenor's spouse could be released, but only to 'home health care', 'home supervision', with a walker, physical therapy, and further specialist neurological evaluation for further treatment.

126.    Only at this point (despite being irrefutably told for a year by medical doctors, and legally required to have acted since that time that the Intervenor's spouse required both, her prior approved and new accommodations for her disabilities and new accommodations), did OSC first broach the concept of accommodations, as OSC attempted to illegally cover up and criminally obstruct the Federal Employee's Compensation Act (FECA) and obfuscate matters from the Secretary of Labor.

127.    As the Special Counsel, *et al*, continued to illegally fail to perform, and obstructed worker's compensation, the Intervenor filed further complaints, process for workers compensation for his spouse, and provided medical certification of the work-related disability, along with notice of the doctor anticipating further medical and duty status report in about 90 days.

128.    In response, on March 27, 2020, the criminally-implicated supervisor (Kim Baxter), on behalf of the Special Counsel, illegally subsumed the authority of the Secretary of Labor, and committed crimes to obstruct and deny the Intervenor's spouse's (OSC employee whistleblower's) workers compensation – including by lying (amongst Ms. Baxter's other fraud) that there was no evidence of *any* disability.

129.    Then, on April 16, 2020, this same OSC supervisor (Kim Baxter) proposed to remove the Intervenor's spouse for:

   a.    Medical inability to perform, based upon the same workers compensation medical evidence (that Ms. Baxter just putatively made criminally false statements, false official writings, and allegedly told (lied to) the Secretary of Labor contained **no** evidence of *any* disability, in order to criminally obstruct her whistleblowing employee's workers compensation);

   b.    And also, for the whistleblower's alleged misconduct of not only allegedly failing to communicate with Ms. Baxter <u>while she was medically incapacitated and on leave suffering a Special Counsel-declared medical emergency</u>, but also explicitly <u>for whistleblowing or other protected activity</u> – and even then, not just that of the Intervenor's spouse, but that of Intervenor himself – a non-employee U.S. Citizen exercising Constitutional Rights to petition government regarding governmental misconduct while his spouse was medically incapacitated.

130.    In May 2020, before the Intervenor's incapacitated spouse could even attempt to respond, Ms. Baxter's conflicted supervisor, Louis Lopez (whom the

Special Counsel unconscionably designated as the deciding official well after the Intervenor and his spouse had for years blown the whistle on Mr. Lopez – and while he was actively a subject of related investigations for committing discrimination or retaliation in OSC before the EEOC) and for which he was not impartial, decided to summarily remove OSC's employee whistleblower for medical inability to perform, while depriving workers compensation, and preempting medical report and treatment.

    a.   Though he is a purported expert, Mr. Lopez simply ignored and then suppressed all of Ms. Baxter's crimes and other misconduct, thereby aiding, abetting and serving as accessory after the fact, let alone being equally liable for the PPPs, and allowing a proposal OSC would have overturned from literally any other agency, for any employee that they did not hate.

131.    In June 2020, as the Intervenor took steps which acting DoD IG Glenn Fine, and CIGIE Integrity Committee Chairman and DOL IG Scott Dahl would have been able to foresee could give President Trump justifications to investigate and fire them, and thereby pull back the curtain to the truth of who many of the compromised oversight officials really are, and relieve the unfair misdirection that they had instead cast upon President Trump, both IG Fine and IG Dahl abruptly resigned, thereby preventing the true reveal which the Special Counsel and his OSC had been abusing their authority and discretion to prevent occuring for years.

132.    And though OSC, including the Special Counsel or Deputy Special Counsel thereof, knew of misconduct, not only was Ms. Baxter not disciplined, fired and

prosecuted, but she was chillingly promoted, and made OSC's Deputy Chief
Administrative Officer, under Bruce Gipe, and over programs they corrupted.

    a. [And later, as he aided, abetted or served as accessory to such retaliation or even apparent criminal misconduct, since OSC illegally suppressed it all, and despite not appearing to have the proper experience for it, but having proven he was willing to allow or assist whistleblower retaliation], Mr. Gipe was made President Biden's acting Assistant Secretary of Veteran's Affairs, over the Office of Accountability and Whistleblower Protection, after running a tiny whistleblower agency's corrupt budget, IT, and HR.

    b. Whereafter, after Special Counsel Kerner rewarded Ms. Baxter's misconduct to destroy the employee who dared blow the whistle on them by padding her resume with executive management experience and while OSC prevented any investigation of her misconduct, Bruce Gipe burrowed Ms. Baxter in to serve as Executive Director of Investigation over VA's Office of Accountability and Whistleblower Protection, whereafter, after securing herself SES-level pay, Ms. Baxter (who chillingly refused telework to her disabled employee) burrowed herself into a permanent **remote** position under herself, and where she now works from home.

    c. And, after Principal Deputy Special Counsel Chubin Epstein similarly demonstrated that she was willing to engage in misconduct to suppress the Intervenor and cover up for the IG community, she too became yet another OSC official to burrow into the IG community as a Counsel to an IG.

        i.  So, while OSC and its Special Counsel had for years covered for IGs, and even illegally covered up the misconduct of IG counsels, several OSC officials who directly did such, were thereafter burrowed in as Counsel to IGs, furthering corruption.

    d.  And, the former Special Counsel, who took such lengths to retaliate against OSC's employees and prevent anyone from learning of her own misconduct, as lying to investigators, preventing investigations, controlling hirings five-levels below her, refusing to protect whistleblowers or make fair judgements in cases, refusing to hold government violators accountable, and even ordering her own whistleblower to her office – with supervisor in tow – while she compelled the employee to recant charges of retaliation under duress, or secretly colluding with a political campaign (while the sitting Special Counsel) to exert pressure on the President of the United States, to ensure further illegal political appointment for her and her cronies, <u>was appointed for a fifteen year term as a</u> **Federal Judge**.

133.    In or by November 2021, yet another of the Intervenor's former similarly-situated peer DoD IG, coworkers, who was also a whistleblower in and against DoD IG or to OSC, publicly revealed that, as a result of or to further discern his lawfully protected whistleblowing, DoD IG had not only been monitoring his work communications and activities, but DoD IG also infiltrated his home network, stole information from computers – apparently even non-work computers, or his security system, and not only monitored him, but his wife too.

a. This was another credible individual who was not only a GS-14 senior IG investigator, but who was an honorably retired U.S. Army Colonel (O-6), and had even been a Republican candidate for the United States Senate.[41]

b. Despite years of implication of PPPs by DoD against him, OSC also illegally failed to protect him or otherwise perform as necessary, thus causing him to flee DoD, and reportedly even lose his pension;

    i. And whether he was even correct about this or not (though he apparently publicly revealed computer network proof), OSC still had a responsibility to inform the Secretary of Defense, the MSPB and OPM about DoD misconduct, which it causally never did.

134.    And, after OSC and its Special Counsel believed they kept Mr. Lopez, *et al's* deprivation of their employee's and her spouse's civil rights, from being able to hold them accountable, Mr. Lopez was burrowed in to be the Chief of Policy and Strategy for DOJ's **Civil Rights** division.

135.    The Principal Deputy Special Counsel who illegally failed to protect whistleblowers and covered up for OSC/IGs, was made a Member of the MSPB.

136.    And then, when it was time to pass the corrupt baton, the Special Counsel himself took over his former deputy's seat on the MSPB, while both he and his former deputy continue to deceive President Trump and Congress about themselves and the true extent of their misconduct, including misconduct that

---

[41] Republican John Vernon announces candidacy for Pennsylvania's U.S. Senate seat, PennLive, Patriot-News, Sept. 13, 2011.  https://www.pennlive.com/midstate/2011/09/republican_john_vernon_announc.html

prevented President Trump for holding violators accountable or even from defending himself from false attacks.

**Plaintiff Misled Congress/Court, and Proclaimed He Still Intends to Misperform**

137.     In his 2023 testimony to secure confirmation from the U.S. Senate, in order to become the Special Counsel of OSC, the Plaintiff swore that,

   a.  "Simply put: the branch of government that executes and enforces the law **must** also -- and ***always*** -- follow the law including whistleblower protection laws;" and,

   b.  "At OSC, independence to me would mean **ensuring** that all federal workers -- no matter what they disclose nor who they challenge – **receive** the legal rights and protections they are guaranteed. <u>If confirmed,</u> I **will** work with my OSC colleagues to vindicate these rights and protections.  We will do so independently, even-handedly, without regard to politics, and <u>100% consistent with the mission and mandate Congress has given the agency</u>."

      i.  Plainly, Plaintiff not only misled this Court, but Congress as well.

138.      As the evidence shows, let alone as he certified in his recent Court filing, not only has the Plaintiff turned a blind eye to the violations of Federal agencies and employees – including OSC's own, and allowed such to continue to be suppressed under his authority; and has he failed to protect whistleblowers and

ensure their rights; but, he has done so himself, and shown via his complaint to

this Court, that he intends to continue to do so, and encouraged his staff to as well.

139.    Thereafter, though the Intervenor, his spouse or others continued to suffer

or contest performance failures and misconduct by OSC which Special Counsel

had both the authority and duty to correct, he never did.  He failed to ensure their

rights and protect them, or correct matters for them.

140.    Plaintiff's misconduct, his intent to continue such, is not only inviolate in

and of itself, but it encourages misconduct by OSC staff, and reverberates harm to

every whistleblower or other complainant.

    a.    As former, current and future Special Counsels and OSC staff are misled

        about what their actual duties are, and what employees' actual rights are –

        and in the demonstrably thin-skinned elitist culture of most of OSC's staff,

        they take mortally-wounded exception when anyone, internal or external,

        dares to blow the whistle, or when any putative customer/client of OSC

        complains that the Special Counsel or his staff are not doing their job,

        or simply asks them to perform in accordance with law.

    b.    OSC will generally retaliate against any whistleblower or other who dares

        to complain.  OSC will leak information against them, refuse to perform, or

        even – literally refuse to even let them exercise their rights as a complainant

        --- let alone commit PPPs against their own staff and cover it up.

141.    According to the February 13, 2025, filing in this case by a different

intervenor, Mitchell Wine, (hereafter, Mr. Wine), on August 31, 2021, after allegedly

illegally mishandling his claims, and apparently in retaliation for his protected activity, OSC advised Mr. Wine,

> "[O]ur staff will **not** process, acknowledge or respond to **any** future complaints, calls, emails, or **any** other type of correspondence submitted **by you**."

a. Intervenor notes that though Mr. Wine recognized this as unfair, and only even mentioned it to this Court in the context of his PPP complaints, he failed to recognize the extent of the illegality of OSC's restrictions, which include OSC refusing to perform their **ministerial duties** under multiple Federal Statutes, as well as other laws, and rules, **ever**.[42]

   i. Intervenor suggests that this would be like the public staff of a police department, who did not like a complainant's actions or discontent with police failures to perform in prior complaints, to respond by telling a member of the public that, whether he is ever robbed, beaten, raped, or even if he sees a child being abducted – do **not** contact police, <u>because they will not listen to **anything** he reports</u>.

      1. This travesty is a tragic dereliction of ministerial duties, but Intervenor knows <u>it is par for the course for OSC</u>, and OSC repeatedly demonstrates (illegal) animus for complainants, and an abusive propensity to deprive Federal employees (including former employees and applicants for employment)

---

[42] Intervenor takes no position otherwise regarding Mr. Wine nor his PPP claims or cases, absent this comment.

of the OSC services they have rights to, or are even required

by statute to use,[43] and OSC does so constructively, or even

explicitly, as they did to both the Intervenor (as both a

complainant, caregiving representative of an incapacitated

OSC employee, and member of the public) and Mr. Wine.

142.   On February 21, 2025, the Plaintiff, as Special Counsel, hypocritically and

self-servingly filed stays on behalf of six (6) different former *probationary* Federal

employees removed from the Federal Service by President Trump.

a.  Prior to the Special Counsel being under threat from the president and

<u>throughout the entire **five-year** period</u> covered in OSC's most recent annual

report, the Special Counsel obtained **only four (4)** or less stays for anyone,

but in the days following the President's firing of the Special Counsel, or

attempts thereto, and as the Special Counsel misleads the Court about his

and his agencies Prosecutions, the Special Counsel rushed to look as if

they actually do their job, and exceeded history by orders magnitude.

b.  Throughout active investigations by OSC, and following OSC's illegal

termination of his PPP cases, from 2014  to date, in every instance (of

multiple) that the Intervenor requested OSC to file for a stay – including for

matters which OSC had already made positive findings, let alone simply in

any instance where OSC had any  reasonable grounds to believe that any

personnel action was taken, or is to be taken, as a result of a PPP (which is

---

[43] Most whistleblowers, as Mr. Wine has found, in order to get an IRA to take their own whistleblower case to the MSPB, let alone any court, they **must** first submit to and suffer <u>OSC – an agency who **almost never** performs</u>.

all OSC needs to request a stay), OSC never once asked the MSPB for a

stay for the Intervenor, and instead repeatedly refused to perform – even

when they knew the Intervenor was literally at risk (even of physical harm),

and even after the Special Counsel's SES designee had advised the Special

Counsel's position that 'everything that happened to his whistleblowing

and other protected activity was a contributing factor to everything that

happened to him thereafter.'

    i.   To summarize, the Special Counsel did not obtain a stay from the

          MSPB for the Intervenor even once in almost 11 years, and <u>obtained</u>

          <u>a stay for only 4 or less others over the entire 5-year period in OSC's</u>

          <u>latest annual report</u>, but now – the Special Counsel moved to secure

          six **(6)** different stays **in one day** <u>against actions by the new</u>

          <u>President who dared to attempt to remove and replace him</u>.

143.   Despite that all this and far more is all documented, provable, and well

known to OSC, not only did the Plaintiff fail to correct or perform to help those OSC

was required to protect, but he has instead lavished praise on those (both current and

former OSC officers and other employees) who committed misconduct, continued to

employ violators in OSC, turned a blind eye to violators who have burrowed in

throughout government – and now, the Plaintiff has apparently even tried to mislead

the Court about his own duties or violations, while continuing OSC's practice of

obstructing any real oversight of itself, and instead allowing fraud, waste and abuse to

be the accepted norm in government, and professing no accountability therefor.

144.    It's not even that the Plaintiff is the only Special Counsel to commit inefficiency, neglect of duty, or malfeasance in office – far from it.  But, the Plaintiff may be the first to actually admit that he does that which constitutes violations, whereas other Special Counsels just made believe they did not, while still leading thoroughly underperforming or misconduct filled iterations of OSC.

145.    With the right Special Counsel and staff, OSC has the ability, like no other agency in government, and at far less cost than any other agency in government, to help rid the government of fraud, waste and abuse; and facilitate the removal of the nonperforming or misconduct committing employees responsible therefor. But, in the wrong hands, OSC can – and has instead caused, aided, enabled, and served as accessory after the fact to all such misconduct, and to the detriment of many.


We, the people, can only pray that if the Plaintiff is to continue as Special Counsel (despite how it looks), hopefully than – everything he wrongfully or insufficiently said, he does not actually mean or embrace; and, he has instead been misled by his staff in his knowledge, thinking, and work; and, that he will correct matters for the many wronged complainants; and, that he will clean up and clean out an enduringly misbehaving and nonperforming OSC and government – or, in the alternative, that President Trump will replace the Plaintiff and his staff with people who lawfully and vigorously will.


The role of OSC and its Special Counsel is far too essential to continue to compromised.

But the President cannot ensure such accountability if he is prevented from the authority to do it, and this Court (or any other Court) cannot properly consider the matter without the accurate, correct and full picture – which Plaintiff deprived these proceedings of, but which the Intervenor, like no other party, or any other thus far, can bring to the fore.

Very Respectfully, *44*

**Damian R. Nastri**, *Pro Se*
6419 Julian Street
Springfield, VA 22150
Telephone: 703-569-0414
DRNastri@gmail.com

## CERTIFICATE OF SERVICE[45]

Like the other Intervenor, this filing was transmitted to the court via email on February 25, 2025, at: dcdml_intake@dcd.uscourts.gov. It is to be automatically transmitted to appropriate attorneys of record when uploaded to the court's electronic filing system, or otherwise as needed.

---

[44] The Intervenor, disabled and *Pro Se*, produced this with great difficulty, doing the best he could, and apologizes for any errors, omissions or defects, and and requests all possible leave and accommodations.
[45] *Ibid*